# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

| | | |
|---|---|---|
| STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, and STATE FARM FIRE AND CASUALTY COMPANY, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:19-cv-22487-RS |
| | ) | |
| MARK CERECEDA, D.C., | ) | |
| MARIA CRISTINA CRESPO-SMITH, M.D., | ) | Hon. Rodney Smith |
| NESTOR JAVECH, M.D., | ) | |
| ROBERTO MOYA, M.D., | ) | Magistrate Lauren Fleischer Louis |
| ROY CANIZARES, D.C., | ) | |
| EDGAR FACUSEH, D.C., | ) | **JURY DEMAND** |
| PATRICK FENELUS, D.C., | ) | |
| THOMAS HABAN, D.C., | ) | |
| KARIM HABAYEB, D.C., | ) | |
| JOHN ROSS, D.C., | ) | |
| MICHAEL SCHULMAN, D.C., | ) | |
| RICHARD YOHAM, D.C., | ) | |
| CEDA ORTHOPEDIC GROUP, LLC, | ) | |
| CEDA ORTHOPEDICS & INTERVENTIONAL MEDICINE OF CUTLER BAY, LLC, | ) ) | |
| CEDA ORTHOPEDICS & INTERVENTIONAL MEDICINE OF DOWNTOWN/LITTLE HAVANA, L.L.C., | ) ) ) | |
| CEDA ORTHOPEDICS & INTERVENTIONAL MEDICINE OF F.I.U/KENDALL, L.L.C., | ) ) | |
| CEDA ORTHOPEDICS & INTERVENTIONAL MEDICINE OF HIALEAH, L.L.C., | ) ) | |
| CEDA ORTHOPEDICS & INTERVENTIONAL MEDICINE OF SOUTH MIAMI, L.L.C., | ) ) | |
| PHYSICIANS CENTRAL BUSINESS OFFICE, L.L.C., and | ) ) | |
| SPRINGS CROSSING IMAGING, L.L.C., | ) | |
| | ) | |
| Defendants. | ) | |

## FIRST AMENDED COMPLAINT

State Farm Mutual Automobile Insurance Company ("State Farm Mutual") and State Farm Fire and Casualty Company ("State Farm Fire"), for their First Amended Complaint against Mark Cereceda, D.C. ("Cereceda"), Maria Cristina Crespo-Smith, M.D. ("Crespo-Smith"), Nestor Javech, M.D. ("Javech"), Roberto Moya, M.D. ("Moya"), Roy Canizares, D.C. ("Canizares"), Edgar Facuseh, D.C. ("Facuseh"), Patrick Fenelus, D.C. ("Fenelus"), Thomas Haban, D.C. ("Haban"), Karim Habayeb, D.C. ("Habayeb"), John Ross, D.C. ("Ross"), Michael Schulman, D.C. ("Schulman"), Richard Yoham, D.C. ("Yoham"), Ceda Orthopedic Group, LLC ("Ceda Ortho Group"), Ceda Orthopedics & Interventional Medicine of Cutler Bay, LLC ("Ceda Ortho Cutler Bay"), Ceda Orthopedics & Interventional Medicine of Downtown/Little Havana, L.L.C. ("Ceda Ortho Downtown"), Ceda Orthopedics & Interventional Medicine of F.I.U/Kendall, L.L.C. ("Ceda Ortho FIU"), Ceda Orthopedics & Interventional Medicine of Hialeah, L.L.C. ("Ceda Ortho Hialeah"), Ceda Orthopedics & Interventional Medicine of South Miami, L.L.C. ("Ceda Ortho South Miami"), Physicians Central Business Office, L.L.C. ("Physicians CBO"), and Springs Crossing Imaging, L.L.C. ("Springs Crossing MRI") (collectively, "Defendants"), allege as follows:

## I.    NATURE OF THE CASE

1.    This case involves a widespread fraudulent scheme in which Defendants act in concert to collect benefits under Personal Injury Protection Coverage ("PIP Benefits") and Medical Payments Coverage ("MPC Benefits") (collectively, "No-Fault Benefits") from State Farm Mutual and State Farm Fire.  Defendants' scheme involves the submission of thousands of bills and supporting documentation for services that were not medically necessary and lawfully rendered,

but were purportedly provided to patients involved in auto accidents and eligible for No-Fault Benefits under State Farm Mutual and State Farm Fire insurance policies.

2.      Defendants are:

(a)      Cereceda, who wholly owns and controls Ceda Ortho Group, Ceda Ortho Cutler Bay, Ceda Ortho Downtown, Ceda Ortho FIU, Ceda Ortho Hialeah, Ceda Ortho South Miami,[1] and Ceda Ortho Group, as well as Physicians CBO and Springs Crossing MRI;

(b)      Crespo-Smith, Javech, and Moya (collectively, the "Physician Defendants"), physicians who purport to examine patients of Ceda Ortho Group and the Cereceda Clinics and facilitate billing for medically unnecessary and unlawful services by falsely documenting that nearly all patients they examine had sustained an emergency medical condition ("EMC") as a result of their auto accident and required a predetermined course of treatment designed to exploit patients' available No-Fault Benefits rather than to address their unique needs;

(c)      Canizares, Facuseh, Fenelus, Haban, Habayeb, Ross, Schulman, and Yoham (collectively, the "Chiropractor Defendants"), chiropractors who purport to examine patients of the Cereceda Clinics and facilitate billing for medically unnecessary and unlawful services by falsely documenting that, among other things, virtually all patients are injured as a result of their auto accident and require a predetermined course of treatment;

---

[1] Ceda Ortho Cutler Bay, Ceda Ortho Downtown, Ceda Ortho FIU, Ceda Ortho Hialeah, and Ceda Ortho South Miami are collectively referred to herein as the "Cereceda Clinics."

(d)     Ceda Ortho Group, a medical clinic owned and controlled by Cereceda, that purports to provide examination and pain management (*e.g.*, injections) services, which are not medically necessary and not lawfully rendered;

(e)     the Cereceda Clinics, which operate under the name 388-CEDA, are Miami-area medical clinics that Cereceda owns and controls, and are used to knowingly submit bills and supporting documentation that are fraudulent to State Farm Mutual and State Farm Fire for chiropractic, physical therapy, and diagnostic imaging services, that are not medically necessary or lawfully rendered;

(f)     Physicians CBO, which Cereceda owns and controls and that he formed to submit bills and supporting documentation that is fraudulent and unlawful to State Farm Mutual and State Farm Fire and other insurers on behalf of Ceda Ortho Group, the Cereceda Clinics, and Springs Crossing MRI; and

(g)     Springs Crossing MRI, an entity that Cereceda owns and controls and to which he directs the Physician and Chiropractor Defendants to refer patients of Ceda Ortho Group and the Cereceda Clinics to receive magnetic resonance imaging services ("MRIs") that are billed to State Farm Mutual and State Farm Fire and other insurers, but are not medically necessary and not lawfully rendered.  Indeed, since Cereceda formed Springs Crossing MRI in 2015, the vast majority of the patients who received an MRI pursuant to a referral from the Cereceda Providers, received their MRIs at Springs Crossing MRI.

3.     Defendants act in concert to exploit patients' No-Fault Benefits by submitting, or causing to be submitted, to State Farm Mutual and State Farm Fire bills and supporting documentation that are fraudulent because they were for services that were not medically necessary and not lawfully rendered.

4.       First, pursuant to their fraudulent scheme, Defendants subject patients to services that are performed pursuant to a predetermined protocol ("Predetermined Protocol"), which is designed and carried out to enrich Defendants by exploiting their patients' No-Fault Benefits, not because such services are medically necessary.  The Predetermined Protocol includes: (a) failing to legitimately examine patients to determine the true nature and extent of their injuries; (b) documenting a litany of diagnoses for each patient, most often exceeding ten or more diagnoses per patient, including predetermined findings of sprains and strains and nerve root lesions for nearly every patient; (c) falsely documenting that nearly all patients had sustained an EMC as a result of their auto accident to maximize Defendants' collection of No-Fault Benefits; (d) providing medically unnecessary goods (*e.g.*, cold packs, creams) to nearly all patients; (e) implementing the same treatment plan for patients, and purporting to provide six or more modalities on nearly all visits; (f) ordering medically unnecessary x-rays, MRIs, and/or computerized tomography ("CT") scans to (i) support the purported need for the Predetermined Protocol and the existence of conditions that could support the patients' bodily injury claims ("BI Claims") and uninsured motorist claims ("UM Claims") and (ii) allow Defendants to submit additional charges when those x-rays, MRIs, and CT scans were purportedly performed at the Cereceda Clinics and/or Springs Crossing MRI; (g) continuing to purportedly treat patients until the patients unilaterally stop the treatment, or their No-Fault Benefits are exhausted or substantially reduced; (h) submitting documents to State Farm Mutual and State Farm Fire falsely representing the services and goods provided to the patients were medically necessary when, in fact, they were not medically necessary (or, as detailed below lawfully rendered); and (i) performing final examinations in which nearly every patient reportedly suffers from permanent impairments, despite purportedly receiving the extensive battery of services in the Predetermined Protocol.

5.      As a result of the Predetermined Protocol: (a) patients are not legitimately examined, diagnosed, or treated for conditions they may have; (b) patients are subjected to medically unnecessary and unlawfully rendered services, regardless of their unique needs; (c) patients' limited No-Fault Benefits are exhausted or substantially reduced and therefore not available for medically necessary treatment they may need; and (d) personal injury attorneys ("PI Attorneys") use Defendants' bills and supporting documentation, which are fraudulent, to present inflated BI Claims against at-fault drivers and UM Claims against State Farm Mutual and State Farm Fire.

6.      Second, all of the bills Defendants submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire were unlawful and not compensable because Ceda Ortho Group, the Cereceda Clinics, and Springs Crossing MRI are not licensed pursuant Florida's Health Care Clinic Act, Fla. Stat. § 400.9905 *et seq*. ("HCCA"), and do not qualify for an exemption from the licensure requirements of the HCCA.  *See* Fla. Stat. §§ 400.9905(4)(g), 400.9935(3), 627.732(11), 627.736(5)(b)(1)(b)-(c), and 627.736(5)(h)(3).   Specifically, Ceda Ortho Group, the Cereceda Clinics, and Springs Crossing MRI did not apply for and obtain a license to establish and operate a clinic pursuant to the HCCA.[2]  Instead, Ceda Ortho Group, the Cereceda Clinics, and Springs Crossing MRI obtained an exemption from licensure from Florida's Agency for Health Care Administration ("AHCA") by attesting that, pursuant to Fla. Stat. § 400.9905(4)(g), Cereceda wholly owns Ceda Ortho Group, the Cereceda Clinics, and Springs Crossing MRI, and supervises their business activities; and was legally responsible for their compliance with all federal and state

---

[2] "A facility becomes a 'clinic' as defined in Section 400.9905(4), F.S., when it does not qualify for an exemption, provides health care services to individuals and bills third party pay[o]rs for those services."  Fla. Admin. Code R. 59A-33.006(4).

laws.[3]  Ceda Ortho Group, the Cereceda Clinics, and Springs Crossing MRI do not qualify for the HCCA license exemption because, since at least June 2015, Cereceda has not fulfilled his statutory duties under Fla. Stat. § 400.9905(4)(g) to supervise the business activities of Ceda Ortho Group, the Cereceda Clinics, and Springs Crossing MRI and ensure that they comply with all federal and state laws, including Fla. Stat. § 627.736 *et seq.* (the "PIP Law") and the Patient Self-Referral Act. Thus, Ceda Ortho Group, the Cereceda Clinics, and Springs Crossing MRI submitted, or caused to be submitted, bills to State Farm Mutual and State Farm Fire that falsely represented such bills were for services lawfully rendered, and eligible to collect No-Fault Benefits when in fact they were not.

7.     Third, the MRIs and CT scans purportedly performed on patients at Springs Crossing MRI and Ceda Ortho South Miami, respectively, pursuant to referrals from Ceda Ortho Group and the Cereceda Clinics were not lawfully rendered because they were performed pursuant to unlawful self-referrals in violation of the Patient Self-Referral Act.  *See* Fla. Stat. § 456.053(5). Specifically, Cereceda violated the Patient Self-Referral Act by: (1) directing the Cereceda Providers and/or staff who work for or on behalf of Ceda Ortho Group and the Cereceda Clinics to refer patients for MRIs at Springs Crossing MRI, an entity Cereceda owns and controls; and (2) directing the Cereceda Providers and/or staff who work for or on behalf of Ceda Ortho Group and the Cereceda Clinics to refer patients for CT scans at Ceda Ortho South Miami, an entity Cereceda owns and controls.  *See* Exs. 4A-B, reflecting the patients at issue who received unlawful MRIs at Springs Crossing MRI and/or CT scans at Ceda Ortho South Miami.  All of these services were

---

[3] "A facility is not required to have, but may voluntarily apply for a certificate of exemption."  Fla. Admin. Code R. 59A-33.006(1).  "Facilities that claim an exemption, either by filing an application for a certificate of exemption with [AHCA] and receiving a certificate of exemption, or self-determining, must maintain an exempt status at all times the facility is in operation."  Fla. Admin. Code R. 59A-33.006(2).

the product of unlawful self-referrals in violation of the Patient Self-Referral Act.  As such, these MRIs and CT scans were not lawfully rendered and were not compensable.  *See* Fla. Stat. §§ 456.053(5)(c) and (d), 627.732(11), 627.736(1)(a)(1), (5)(a), and (5)(b)(1)(b) and (c).

8.     Defendants' fraudulent scheme began at least as early as June 2015, and has continued uninterrupted since that time.  Defendants have made material misrepresentations and have taken other affirmative acts to conceal their fraud from State Farm Mutual and State Farm Fire.  Each bill and its supporting documentation, when viewed in isolation, does not reveal its fraudulent and unlawful nature.  Only when the bills and supporting documentation across the patients at issue in this Complaint are viewed together as a whole do the patterns emerge revealing the fraudulent and unlawful nature of all the bills and supporting documentation.  (*See, e.g.*, Exs. 1-4A-B, 25-26, 28-29, 32A-B, and 33-35.)  As a direct and proximate result of the scheme, State Farm Mutual and State Farm Fire have incurred actual damages of at least $4 million in No-Fault Benefits paid to Defendants.

9.     This action asserts common law claims for fraud, unjust enrichment, civil conspiracy, and aiding and abetting fraud, and a statutory claim under Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq*. ("FDUTPA"), to recover actual damages of at least $4 million paid to Defendants, as well as reasonable attorneys' fees for violations of FDUTPA, and any other relief that is just and proper.

10.    Pursuant to 28 U.S.C. § 2201, this action also seeks a declaratory judgment that State Farm Mutual and State Farm Fire are not liable for any unpaid or allegedly underpaid charges Ceda Ortho Group, the Cereceda Clinics, and Springs Crossing MRI have submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire through the date of this Complaint and the trial of this case, based upon the conduct described above and throughout this Complaint.

## II.     JURISDICTION AND VENUE

11.     Pursuant to 28 U.S.C. § 1332(a)(1), this Court has jurisdiction over all claims because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

12.     Pursuant to 28 U.S.C. § 1391(b)(1), venue is proper in this district because all Defendants reside in Florida.  Venue is also proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## III.    PARTIES

### A.     Plaintiffs

13.     State Farm Mutual is a citizen of the state of Illinois.  It is incorporated under the laws of the state of Illinois, with its principal place of business in Bloomington, Illinois. At all relevant times, it has been licensed in Florida to engage in the business of insurance.

14.     State Farm Fire is a citizen of the state of Illinois.  It is incorporated under the laws of the state of Illinois, with its principal place of business in Bloomington, Illinois.  At all relevant times, it has been licensed in Florida to engage in the business of insurance.

### B.     Defendants

15.     Defendant Cereceda resides in and is a citizen of Florida.  Cereceda has been licensed to practice chiropractic medicine in Florida since 1995.  Since at least June 2015, Cereceda has owned and controlled Ceda Ortho Group, the Cereceda Clinics, Springs Crossing MRI, and Physicians CBO.  In addition, Cereceda obtained an exemption from licensure from AHCA for Ceda Ortho Downtown, Ceda Ortho FIU, Ceda Ortho Hialeah, Ceda Ortho South Miami, and Springs Crossing MRI and, additionally, self-determined Ceda Ortho Cutler Bay and

Ceda Ortho Group were exempt from the HCCA's clinic licensure requirements. Moreover, Cereceda directed the Cereceda Providers and/or staff to (1) refer patients of Ceda Ortho Group and the Cereceda Clinics to Springs Crossing MRI for MRIs, in violation of the Patient Self-Referral Act; and (2) refer patients of Ceda Ortho Group and the Cereceda Clinics to Ceda Ortho South Miami for CT scans, in violation of the Patient Self-Referral Act. At all relevant times, Cereceda has knowingly directed and profited from the activities of those who have been employed by or associated with Ceda Ortho Group, the Cereceda Clinics, Springs Crossing MRI, and Physicians CBO to provide medically unnecessary and unlawful services.[4]

16.     Defendant Crespo-Smith resides in and is a citizen of Florida. Crespo-Smith has been licensed to practice medicine in Florida since 2004. Since at least June 2015 through at least June 2018, Crespo-Smith has knowingly provided fraudulent and unlawful services pursuant to the Predetermined Protocol to patients of at least Ceda Ortho Downtown, Ceda Ortho FIU, Ceda Ortho Hialeah, and Ceda Ortho South Miami. (*See* Ex. 3, Provider Column (listing physician who purportedly examined each patient in the claims at issue).)

17.     Defendant Javech resides in and is a citizen of Florida. Javech has been licensed to practice medicine in Florida since 1983. Since at least September 2017 through the present,

---

[4] Exhibit 1 identifies the claims at issue in this action, which reflect dates of loss of June 14, 2015 through the present. For these claims, Exhibit 1 identifies: (a) the claim number; (b) patient's initials; (c) the patient's age on the date of the accident; (d) the date of the accident; (e) the first and last dates of service at Ceda Ortho Group, the Cereceda Clinics, and Springs Crossing MRI; (f) the number of total visits to Ceda Ortho Group, the Cereceda Clinics, and Springs Crossing MRI; (g) the Ceda Ortho Group and/or Cereceda Clinic location(s) where the patient allegedly received services; (h) the medically unnecessary and unlawful chiropractic, physical therapy, and diagnostic imaging services rendered to each patient at Ceda Ortho Group, the Cereceda Clinics, and/or Springs Crossing MRI; (i) noncredible patterns regarding the EMC findings and final examinations for patients who were discharged from Ceda Ortho Group and the Cereceda Clinics; and (j) the total amount Ceda Ortho Group, the Cereceda Clinics, and Springs Crossing MRI billed to State Farm Mutual and State Farm for the services purportedly provided to each patient in the claims at issue.

Javech has knowingly provided fraudulent and unlawful services pursuant to the Predetermined Protocol to patients of at least Ceda Ortho Hialeah, Ceda Ortho South Miami, and Ceda Ortho Group.  (*See* Ex. 3, Provider Column.)

18.     Defendant Moya resides in and is a citizen of Florida.  Moya has been licensed to practice medicine in Florida since 1977.  Since at least June 2015 through the present, Moya has knowingly provided fraudulent and unlawful services pursuant to the Predetermined Protocol to patients of at least Ceda Ortho Group, Ceda Ortho FIU, Ceda Ortho Hialeah, and Ceda Ortho South Miami.  (*See* Ex. 3, Provider Column.)

19.     Defendant Canizares resides in and is a citizen of Florida.  Canizares has been licensed to practice chiropractic medicine in Florida since 1999.  Since at least June 2015 through the present, Canizares has knowingly provided fraudulent and unlawful services pursuant to the Predetermined Protocol to patients of at least Ceda Ortho Downtown and Ceda Ortho FIU.  (*See* Ex. 2, Chiropractor Column (listing chiropractor who purportedly examined each patient in the claims at issue).)

20.     Defendant Facuseh resides in and is a citizen of Florida.  Facuseh has been licensed to practice chiropractic medicine in Florida since 2008.  Since at least June 2015 through at least August 2017, Facuseh has knowingly provided fraudulent and unlawful services pursuant to the Predetermined Protocol to patients of at least Ceda Ortho Downtown, Ceda Ortho FIU, Ceda Ortho Hialeah, and Ceda Ortho South Miami.  (*See* Ex. 2, Chiropractor Column.)

21.     Defendant Fenelus resides in and is a citizen of Florida.  Fenelus has been licensed to practice chiropractic medicine in Florida since 2001.  Since at least June 2015 through at least July 2017, Fenelus has knowingly provided fraudulent and unlawful services pursuant to the

Predetermined Protocol to patients of at least Ceda Ortho Hialeah.  (*See* Ex. 2, Chiropractor Column.)

22.     Defendant Haban resides in and is a citizen of Florida.  Haban has been licensed to practice chiropractic medicine in Florida since 2003.  Since at least January 2016 through at least October 2018, Haban has knowingly provided fraudulent and unlawful services pursuant to the Predetermined Protocol to patients of at least Ceda Ortho Cutler Bay and Ceda Ortho South Miami. (*See* Ex. 2, Chiropractor Column.)

23.     Defendant Habayeb resides in and is a citizen of Florida.  Habayeb has been licensed to practice chiropractic medicine in Florida since 2008.  Since at least June 2015 through September 2019, Habayeb has knowingly provided fraudulent and unlawful services pursuant to the Predetermined Protocol to patients at each of the Cereceda Clinic locations.  (*See* Ex. 2, Chiropractor Column.)

24.     Defendant Ross resides in and is a citizen of Florida.  Ross has been licensed to practice chiropractic medicine in Florida since 2017.  Since at least July 2017 through the present, Ross has knowingly provided fraudulent and unlawful services pursuant to the Predetermined Protocol to patients of at least Ceda Ortho Hialeah and Ceda Ortho South Miami.  (*See* Ex. 2, Chiropractor Column.)

25.     Defendant Schulman resides in and is a citizen of Florida.  Schulman has been licensed to practice chiropractic medicine in Florida since 1997.  Since at least June 2015 through April 2016, Schulman has knowingly provided fraudulent and unlawful services pursuant to the Predetermined Protocol to patients of at least Ceda Ortho South Miami.  (*See* Ex. 2, Chiropractor Column.)

26.     Defendant Yoham resides in and is a citizen of Florida, and is Cereceda's former brother-in-law.  Yoham has been licensed to practice chiropractic medicine in Florida since 2000. Since at least June 2015 through the present, Yoham has knowingly provided fraudulent and unlawful services pursuant to the Predetermined Protocol to patients of at least Ceda Ortho Cutler Bay, Ceda Ortho FIU, and Ceda Ortho Hialeah.  (*See* Ex. 2, Chiropractor Column.)

27.     Defendant Ceda Ortho Group is an active Florida limited liability company, formed in 2018, with its principal place of business at 815 Northwest 57th Avenue, Suite 202, Miami, Florida 33126.  Cereceda is the owner and sole member of Ceda Ortho Group.  At all relevant times, Ceda Ortho Group has operated as a "clinic"[5] as that term is defined in Fla. Stat. § 400.9905(4).  Cereceda self-determined Ceda Ortho Group was exempt from the HCCA's licensure requirements based upon the HCCA's wholly owned exemption, Fla. Stat. § 400.9905(4)(g), which requires Cereceda to supervise Ceda Ortho Group's business activities and be legally responsible for its compliance with all federal and state laws.  Since at least 2018 through the present, Ceda Ortho Group has knowingly submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire bills and supporting documentation that are fraudulent because they represent the services were medically necessary and lawfully rendered when, in fact, they were not medically necessary and were not lawfully rendered.  The chart attached hereto as Exhibit 1 summarizes the medically unnecessary and unlawful services provided to Ceda Ortho Group's patients pursuant to the Predetermined Protocol.  Since 2018, it has employed several Cereceda Providers and/or staff, who, at Cereceda's direction, have referred patients to Springs Crossing

---

[5] Pursuant to Fla. Stat. § 400.9905(4), a "clinic" is defined as "an entity where health care services are provided to individuals and which tenders changes for reimbursement for such services[.]"

MRI for MRIs and to Ceda Ortho South Miami for CT scans, in violation of the Patient Self-Referral Act.  *See* Ex. 1.

28.     Defendant Ceda Ortho Cutler Bay is an active Florida limited liability company, formed in 2015, with its principal place of business at 815 Northwest 57th Avenue, Suite 405, Miami, Florida 33126.  Cereceda is the owner and sole member of Ceda Ortho Cutler Bay.  At all relevant times, Ceda Ortho Cutler Bay has operated as a "clinic" as that term is defined in Fla. Stat. § 400.9905(4).  Cereceda self-determined Ceda Ortho Cutler Bay was exempt from the HCCA's licensure requirements based upon the HCCA's wholly owned exemption, Fla. Stat. § 400.9905(4)(g), which requires Cereceda to supervise Ceda Ortho Cutler Bay's business activities and be legally responsible for its compliance with all federal and state laws.  Since at least June 2015 through the present, Ceda Ortho Cutler Bay has knowingly submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire bills and supporting documentation that are fraudulent because they represent the services were medically necessary and lawfully rendered when, in fact, they were not medically necessary and were not lawfully rendered.  The chart attached hereto as Exhibit 1 summarizes the medically unnecessary and unlawful services provided to Ceda Ortho Cutler Bay's patients pursuant to the Predetermined Protocol.  Since 2015, it has employed several Cereceda Providers and/or staff, who, at Cereceda's direction, have referred patients to Springs Crossing MRI for MRIs and to Ceda Ortho South Miami for CT scans, in violation of the Patient Self-Referral Act.  *See* Ex. 1.

29.     Defendant Ceda Ortho Downtown is an active Florida limited liability company, formed in 2009, with its principal place of business at 2750 Coral Way, Suites 201, 202, 204,

Miami, Florida 33184.  Cereceda is the owner and sole member of Ceda Ortho Downtown.[6]  At all relevant times, Ceda Ortho Downtown has operated as a "clinic" as that term is defined in Fla. Stat. § 400.9905(4).  Ceda Ortho Downtown is an unlicensed clinic that obtained a certificate of exemption from licensure based on Cereceda's false representation that he "supervises the business activities and is legally responsible for the applicant's compliance with all federal and state laws," including the PIP Law and Patient Self-Referral Act.  Since at least June 2015 through the present, Ceda Ortho Downtown has knowingly submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire bills and supporting documentation that are fraudulent because they represent the services were medically necessary and lawfully rendered when, in fact, they were not medically necessary and were not lawfully rendered.  The chart attached hereto as Exhibit 1 summarizes the medically unnecessary and unlawful services provided to Ceda Ortho Downtown's patients pursuant to the Predetermined Protocol.  Since 2015, it has employed several Cereceda Providers and/or staff, who, at Cereceda's direction, have referred patients to Springs Crossing MRI for MRIs and to Ceda Ortho South Miami for CT scans, in violation of the Patient Self-Referral Act. *See* Ex. 1.

30.     Defendant Ceda Ortho FIU is an active Florida limited liability company, formed in 2009, with its principal place of business at 815 Northwest 57th Avenue, Suite 405, Miami, Florida 33126.  Cereceda is the owner and sole member of Ceda Ortho FIU.[7]  At all relevant times, Ceda Ortho FIU has operated as a "clinic" as that term is defined in Fla. Stat. § 400.9905(4).  Ceda

---

[6] From November 2009 to around September 2011, Ceda Ortho Downtown operated as Florida Wellness & Rehabilitation Center of Little Havana, L.L.C.  From around September 2011 to around January 2013, Ceda Ortho Downtown operated as Ceda Health of Downtown/Little Havana, L.L.C.

[7] From November 2009 to around September 2011, Ceda Ortho FIU operated as Florida Wellness & Rehabilitation Center of F.I.U./Kendall, L.L.C.  From around September 2011 to around January 2013, Ceda Ortho FIU operated as Ceda Health of F.I.U./Kendall, L.L.C.

Ortho FIU is an unlicensed clinic that obtained a certificate of exemption from licensure based on Cereceda's false representation that he "supervises the business activities and is legally responsible for the applicant's compliance with all federal and state laws," including the PIP Law and Patient Self-Referral Act.  Since at least June 2015 through the present, Ceda Ortho FIU has knowingly submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire bills and supporting documentation that are fraudulent because they represent the services were medically necessary and lawfully rendered when, in fact, they were not medically necessary and were not lawfully rendered.  The chart attached hereto as Exhibit 1 summarizes the medically unnecessary and unlawful services provided to Ceda Ortho FIU's patients pursuant to the Predetermined Protocol.  Since 2015, it has employed several Cereceda Providers and/or staff, who, at Cereceda's direction, have referred patients to Springs Crossing MRI for MRIs and to Ceda Ortho South Miami for CT scans, in violation of the Patient Self-Referral Act.  *See* Ex. 1.

31.    Defendant Ceda Ortho Hialeah is an active Florida limited liability company, formed in 2009, with its principal place of business at 235 West 49th Street, Hialeah, Florida 33012.  Cereceda is the owner and sole member of Ceda Ortho Hialeah.[8]  At all relevant times, Ceda Ortho Hialeah has operated as a "clinic" as that term is defined in Fla. Stat. § 400.9905(4). Ceda Ortho Hialeah is an unlicensed clinic that obtained a certificate of exemption from licensure based on Cereceda's false representation that he "supervises the business activities and is legally responsible for the applicant's compliance with all federal and state laws," including the PIP Law and Patient Self-Referral Act.  Since at least June 2015 through the present, Ceda Ortho Hialeah has knowingly submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire

---

[8] From November 2009 to around September 2011, Ceda Ortho Hialeah operated as Florida Wellness & Rehabilitation Center of Hialeah, L.L.C.  From around September 2011 to around January 2013, Ceda Ortho Hialeah operated as Ceda Health of Hialeah, L.L.C.

bills and supporting documentation that are fraudulent because they represent the services were medically necessary and lawfully rendered when, in fact, they were not medically necessary and were not lawfully rendered.  The chart attached hereto as Exhibit 1 summarizes the medically unnecessary and unlawful services provided to Ceda Ortho Hialeah's patients pursuant to the Predetermined Protocol.  Since 2015, it has employed several Cereceda Providers and/or staff, who, at Cereceda's direction, have referred patients to Springs Crossing MRI for MRIs and to Ceda Ortho South Miami for CT scans, in violation of the Patient Self-Referral Act.  *See* Ex. 1.

32.     Defendant Ceda Ortho South Miami is an active Florida limited liability company, formed in 2009, with its principal place of business at 6075 Sunset Drive, 4th Floor, Miami, Florida 33143.  Cereceda is the owner and sole member of Ceda Ortho South Miami.[9]  At all relevant times, Ceda Ortho South Miami has operated as a "clinic" as that term is defined in Fla. Stat. § 400.9905(4).  Ceda Ortho South Miami is an unlicensed clinic that obtained a certificate of exemption from licensure based on Cereceda's false representation that he "supervises the business activities and is legally responsible for the applicant's compliance with all federal and state laws," including the PIP Law and Patient Self-Referral Act.  Since at least June 2015 through the present, Ceda Ortho South Miami has knowingly submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire bills and supporting documentation that are fraudulent because they represent the services were medically necessary and lawfully rendered when, in fact, they were not medically necessary and were not lawfully rendered.  The chart attached hereto as Exhibit 1 summarizes the medically unnecessary and unlawful services provided to Ceda Ortho South Miami's patients pursuant to the Predetermined Protocol. Since 2015, it has employed several

---

[9] From November 2009 to around September 2011, Ceda Ortho South Miami operated as Florida Wellness & Rehabilitation Center of South Miami, L.L.C.  From around September 2011 to around January 2013, Ceda Ortho South Miami operated as Ceda Health of South Miami, L.L.C.

Cereceda Providers and/or staff, who, at Cereceda's direction, have referred patients to Springs Crossing MRI for MRIs and to Ceda Ortho South Miami for CT scans, in violation of the Patient Self-Referral Act.  *See* Ex. 1.

33.   Defendant Physicians CBO is an active Florida limited liability company, formed in 2011, with its principal place of business at 815 Northwest 57th Avenue, Suite 405, Miami, Florida 33126.  Cereceda is the owner and sole member of Physicians CBO.  Since at least June 2015 through the present, Physicians CBO has knowingly submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire bills and supporting documentation on behalf of Ceda Ortho Group, the Cereceda Clinics, and Springs Crossing MRI that are fraudulent because they represent the services were medically necessary and lawfully rendered when, in fact, they were not medically necessary and were not lawfully rendered.  The charts attached hereto as Exhibits 1 and 4A-B summarize the medically unnecessary and unlawful services provided pursuant to the Predetermined Protocol, for which Physicians CBO coordinated the submission of bills and supporting documentation to State Farm Mutual and State Farm Fire.

34.   Defendant Springs Crossing MRI is an active Florida limited liability company, formed in 2014, with its principal place of business at 51 East 1st Avenue, Hialeah, Florida 33010. Cereceda is the owner and sole member of Springs Crossing MRI.  At all relevant times, Springs Crossing MRI has operated as a "clinic" as that term is defined in Fla. Stat. § 400.9905(4).  Springs Crossing MRI is an unlicensed clinic that obtained a certificate of exemption from licensure based on Cereceda's false representation that he "supervises the business activities and is legally responsible for the applicant's compliance with all federal and state laws," including the PIP Law

and Patient Self-Referral Act.[10]  Since at least June 2015 through the present, Springs Crossing MRI has knowingly submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire bills and supporting documentation that are fraudulent because they represent the MRIs were medically necessary and lawfully rendered when, in fact, they were not medically necessary and were not lawfully rendered.  The chart attached hereto as Exhibit 4A summarizes the medically unnecessary and unlawful MRIs performed at Springs Crossing MRI pursuant to the Predetermined Protocol.  Since 2015, it has knowingly submitted bills and supporting documents for MRIs that were not lawfully rendered because patients were referred to Springs Crossing MRI in violation of the Patient Self-Referral Act.  *See* Ex. 1.

35.     Defendants have acted in concert and have symbiotic relationships with each other in that each one needed and depended upon the participation of the others to accomplish their common purpose of defrauding State Farm Mutual and State Farm Fire through the fraudulent claims described above and throughout this Complaint.  Specifically: (a) Cereceda designed, oversaw, and is responsible for the Predetermined Protocol to exploit the No-Fault Benefits of patients who treat at Ceda Ortho Group, the Cereceda Clinics, and Springs Crossing MRI, as well as enabled Ceda Ortho Group, the Cereceda Clinics, and Springs Crossing MRI to circumvent the HCCA's health care clinic licensure requirements, and directed the Cereceda Providers to refer patients to Springs Crossing MRI and Ceda Ortho South Miami for unlawful MRIs and CT scans, respectively; (b) Ceda Ortho Group, the Cereceda Clinics, Springs Crossing MRI, Physician

---

[10] In September 2018, Springs Crossing MRI applied for and obtained an exemption from licensure from AHCA pursuant to Fla. Stat. § 400.9905(4)(g).  In its application for exemption, Springs Crossing MRI sought a "Facility Name Change," with an effective date of January 23, 2014, based upon an exemption Cereceda obtained for Florida Wellness & Rehabilitation Center, Inc.  In his application for exemption for Florida Wellness & Rehabilitation Center, Inc., Cereceda represented he supervised the business activities of and was legally responsible for Florida Wellness & Rehabilitation Center, Inc.'s compliance with all federal and state laws.

Defendants, and Chiropractor Defendants submitted, or caused to be submitted, bills and supporting documentation to State Farm Mutual and State Farm Fire that were fraudulent because they were for treatment and diagnostic imaging services that were not medically necessary and not lawfully rendered; and (c) Physicians CBO provided billing services for Ceda Ortho Group, the Cereceda Clinics, and Springs Crossing MRI and coordinated the submission of bills and other documentation to State Farm Mutual and State Farm Fire that were fraudulent.

## IV.   ALLEGATIONS COMMON TO ALL CLAIMS

### A.   Insurance Benefits Under Florida Law

36.     Pursuant to the PIP Law, auto insurers are required to provide PIP Benefits of at least $10,000 to certain designated individuals ("Insureds"), for losses resulting from injuries arising out of the ownership, maintenance, or use of a motor vehicle.  Insureds may also carry additional coverage in the form of MPC Benefits, which may cover additional amounts after their PIP Benefits are exhausted.

37.     For purposes of PIP Benefits, insurers are required to pay 80% of all reasonable expenses for medically necessary medical, surgical, x-ray, dental, and rehabilitative services related to such injuries.  Fla. Stat. § 627.736(1)(a).

38.     Pursuant to Fla. Stat. § 627.732(2)(a)-(c), "'medically necessary' refers to a medical service or supply that a prudent physician would provide for the purpose of preventing, diagnosing, or treating an illness, injury, disease or symptom in a manner that is: (a) [i]n accordance with generally accepted standards of medical practice; (b) [c]linically appropriate in terms of type, frequency, extent, site, and duration; and (c) [n]ot primarily for the convenience of the patient, physician, or other health care provider."

39.     Before January 1, 2013, injured parties who were eligible for PIP Benefits were entitled to up to $10,000 of PIP Benefits for medically necessary goods and services.  However,

after an amendment to the PIP Law that became effective on January 1, 2013, PIP Benefits are now limited to $2,500 unless a physician or other professional licensed under other specific provisions of Florida law determines the injured person sustained an EMC, in which case the injured person would be eligible for PIP Benefits of up to $10,000.  Fla. Stat. § 627.736(1)(a)(3)-(4).  Florida law defines an EMC as "a medical condition manifesting itself by acute symptoms of sufficient severity, which may include severe pain, such that the absence of immediate medical attention could reasonably be expected to result in any of the following: (a) [s]erious jeopardy to patient health[;] (b) [s]erious impairment of bodily functions[; or] (c) [s]erious dysfunction of any bodily organ or part."  Fla. Stat. § 627.732(16).

40.     State Farm Mutual and State Farm Fire are required to pay or deny claims for PIP Benefits within 30 days, and may be ordered to pay interest and attorneys' fees if they fail to pay the full amount owed within that time period.  Fla. Stat. § 627.736(4)(b) and (d).

41.     Neither an insurer nor an insured is required to pay a claim or charge: (a) "[f]or any service or treatment that was not lawful at the time rendered; or (b) "[t]o any person who knowingly submits a false or misleading statement relating to the claim or charges."  Fla. Stat. § 627.736(5)(b)(1)(b)-(c).  Pursuant to Fla. Stat. § 627.732(11), "'[l]awful' or 'lawfully' means in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment."  "'Knowingly' means that a person, with respect to information, has actual knowledge of the information; acts in deliberate ignorance of the truth or falsity of the information; or acts in reckless disregard of the information, and proof of specific intent to defraud is not required."  Fla. Stat. § 627.732(10).

42.     Pursuant to the HCCA, to lawfully operate, a "clinic" must either obtain a license from AHCA or qualify for an exemption from licensure, such as being "wholly owned by one or

more licensed health care practitioners." Fla. Stat. § 400.9905(g) (the "Wholly-Owned Exemption"). Under the Wholly-Owned Exemption, the licensed health care practitioner must own and supervise the business activities of the clinic and remain legally responsible for the clinic's compliance with all federal and state laws. Fla. Stat. § 400.9905(g). If the health care practitioner fails to supervise the business activities of the clinic or does not remain legally responsible for the clinic's compliance with all federal and state laws, then the clinic does not lawfully qualify for the Wholly-Owned Exemption and is not entitled to collect No-Fault Benefits. *See, e.g.*, *State Farm Fire & Cas. Co. v. Silver Star Health & Rehab*, 739 F.3d 579, 585 (11th Cir. 2013); *State Farm Mut. Auto. Ins. Co. v. Performance Orthopaedics & Neurosurgery, LLC*, 2018 WL 2186496, at *9 (S.D. Fla. Feb. 16, 2018); *State Farm Mut. Auto. Ins. Co. v. Med. Serv. Ctr. of Florida, Inc.*, 103 F. Supp. 3d 1343, 1351 (S.D. Fla. 2015).

### B. Tort Claims For Non-Economic Loss

43. Individuals who are not at fault for an auto accident can also potentially recover damages: (a) from at-fault drivers or their insurers through a BI Claim; and/or (b) through a UM Claim from the individuals' own insurer(s) if recovery under the BI Claim is insufficient. The benefits potentially available to patients through BI and UM Claims include pain and suffering and other forms of non-economic damages, as well as necessary medical expenses and lost wages.

44. To bring BI Claims or UM Claims, individuals must establish they meet one of several statutory requirements including that they have: (a) a significant and permanent loss of an important bodily function, or (b) a permanent injury (other than scarring or disfigurement) within a reasonable degree of medical probability. Fla. Stat. § 627.737(2).

45. Defendants' Predetermined Protocol, along with the corresponding bills and supporting documentation that are fraudulent, are designed to facilitate fraudulent claims for No-Fault Benefits, and to develop and maintain apparent *quid pro quo* cross-referral relationships with

PI Attorneys by supporting the PI Attorneys' ability to profit from inflated BI Claims against at-fault drivers and inflated UM Claims against their clients' own insurers if recovery under the BI Claims is insufficient to satisfy the clients' purported damages.

### C. The Legitimate Treatment Of Patients With Strains And Sprains

46.    Ceda Ortho Group, the Cereceda Clinics, and their providers, including the Physician Defendants and Chiropractor Defendants, purport to examine, diagnose, and treat patients who have been in auto accidents and complain of neck and/or back pain, among other ailments.

47.    For patients who have been in auto accidents and have legitimate complaints of neck and/or back pain, or other ailments, a provider must perform a detailed history and legitimate examination to arrive at a legitimate diagnosis.

48.    Based upon a legitimate diagnosis, a licensed professional must engage in medical decision-making to design a legitimate treatment plan tailored to the unique circumstances of the patient.  During the course of treatment, treatment plans should be modified based upon the unique circumstances of each patient and their response (or lack thereof) to treatment.

49.    Legitimate treatment plans for patients with soft tissue injuries such as strains and sprains may involve no treatment at all because many of these kinds of injuries heal without any intervention, or a variety of interventions, including medications to reduce inflammation and relieve pain, passive modalities, and active modalities.

50.    Passive modalities do not require any affirmative effort or movement by patients. There are many kinds of passive modalities, including: (a) hot/cold packs, (b) ultrasound, (c) electrical stimulation ("e-stim"), (d) manual therapy, (e) massage, and (f) traction.  Active modalities require affirmative movement by patients and include a wide variety of exercises, strengthening, and stretching tailored to the unique circumstances of each patient, including the

nature and location of the injuries, the patients' physical abilities, and the patients' response (or lack thereof) to any particular active modality on any day or over time.

51.     In legitimate treatment plans, passive modalities should generally be used only to the extent necessary to reduce pain and facilitate active modalities, while active modalities should generally be introduced as soon as practicable to promote the actual healing of strains and sprains.

52.     The decision of which, if any, types of treatment are appropriate for each patient, as well as the level, frequency, and duration of the various services, should vary depending on the unique circumstances of each patient, including: (a) the patient's age, social, family, and medical history; (b) the patient's physical condition, limitations, and abilities; (c) the location, nature, and severity of the patient's injury and symptoms; and (d) the patient's response to treatment.

53.     Therefore, while one or more passive modalities may be medically necessary on any particular visit to reduce pain and facilitate the patient's ability to perform active modalities, the combination of five or more passive modalities together with an active modality on nearly every visit would rarely, if ever, be appropriate for any patient.

54.     Treatment plans should be periodically reassessed and modified based upon the progress of the patient, or lack thereof.  To the extent diagnostic tests such as x-rays, MRIs, and CT scans are medically necessary and are performed, treatment plans should integrate their results.

55.     Patients should be discharged from treatment when they have reached maximum medical improvement ("MMI"), such that no further treatment is likely to benefit the patient, or when patients fail to respond to the treatment program.

56.     The above-described process of examination, diagnosis, and treatment must be appropriately documented for the benefit of: (a) the licensed professionals involved in the patient's care; (b) other licensed professionals who may treat the patient contemporaneously or

subsequently; (c) the patient, whose care and condition necessarily depends on the documentation of this information; and (d) payors such as State Farm Mutual and State Farm Fire, so that they can pay for reasonable and necessary treatment.

57.     As described below, Defendants' patients are not legitimately examined, diagnosed, or treated for their unique needs.  Instead, they are subjected to the Predetermined Protocol in which they receive virtually the same laundry list of services on every visit to exploit their No-Fault Benefits.  Furthermore, the pervasive patterns in the documentation of services Ceda Ortho Group and the Cereceda Clinics have submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire are not credible and reflect services that were performed pursuant to the Predetermined Protocol, rather than because they were medically necessary to address the unique needs of each patient.

## V.     DEFENDANTS' RELATIONSHIPS WITH REFERRAL SERVICES AND PI ATTORNEYS

### A.     Defendants' Relationship With Referral Services

58.     The success of Defendants' scheme depends heavily upon the ability to gain quick access to individuals involved in auto accidents who can be steered to Ceda Ortho Group and/or the Cereceda Clinics for services designed to exploit their No-Fault Benefits.  From at least June 2015 through at least December 2018, Ceda Ortho Group and/or the Cereceda Clinics appear to have gained quick access to patients involved in auto accidents in part due to their relationship with 1-800-411-PAIN Referral Service, LLC ("411-PAIN Referral Service"), which is owned by a Florida chiropractor and business associate of Cereceda.[11]

---

[11] According to a December 4, 2018 letter to The Florida Bar, 411-PAIN Referral Service closed its operations on December 31, 2018.  (Ex. 5.)  In its place, beginning on January 1, 2019, a new qualifying provider ("Path Referral Service") operating under the fictitious name Path, began operating and using the "1-800-411-PAIN phone number and branding."  (*Id.*)  The 1-800-411-PAIN number, branding, and associated trademarks ("411-PAIN") are owned by 1-800-411-I.P.

59.     While the full scope of the referral relationship between 411-PAIN Referral Service, Path Referral Service, Ceda Ortho Group, and the Cereceda Clinics is presently not known by State Farm Mutual and State Farm Fire, Cereceda testified the Cereceda Clinics received patient referrals from 411-PAIN Referral Service, and that the Cereceda Clinics paid an "advertising fee" to be a part of the 411-PAIN Referral Service network.  Cereceda further testified he keeps a written log reflecting the patients that 411-PAIN Referral Service referred to the Cereceda Clinics. In addition, 411-PAIN Referral Service's marketing material reflected that at least Ceda Ortho Downtown, Ceda Ortho FIU, Ceda Ortho Hialeah, and Ceda Ortho South Miami participated in the 411-PAIN Referral Service.  (Ex. 6.)  Further, as described below, patients in the claims at issue in this case have testified the 411-PAIN Referral Service referred them directly to the Cereceda Clinics, or referred them to a PI Attorney who participates in the 411-PAIN Referral Service and referred them to the Cereceda Clinics.

60.     411-PAIN Referral Service's marketing materials urged individuals who were in auto accidents to call 411-PAIN for legal and medical referrals through an aggressive multi-million dollar marketing campaign, which implores accident victims to "call from home, hospital or accident scene." (Ex. 7.)  411-PAIN Referral Service used various catchphrases to target auto accident victims, including "after 911, call 411."  (Ex. 8.)  411-PAIN Referral Service's website stated that "[once] you call 411-PAIN at 1-800-411-PAIN, you will be asked a few simple questions to determine exactly what type of assistance you will need and immediately after-wards [sic] be scheduled to see a doctor.  Same day appointments are available."  (Ex. 9.)  411-PAIN Referral Service also claims that callers should use the doctors from 1-800-411-PAIN because the

---

Holdings, LLC ("411-PAIN Holdings").  Cereceda's business associate is the owner and manager of 411-PAIN Holdings.

network "has almost 20 years of experience . . . [and] [t]hey will assist you in recovering from your injuries as quickly as possible." (*Id.*)

61.     The 411-PAIN Referral Service did not refer callers to a panel of medical providers randomly or based upon the callers' best interests.  Instead, 411-PAIN Referral Service referred callers to specific clinics in defined geographic areas, like the Cereceda Clinics, who paid a fee to receive referrals within those defined geographic areas.  Indeed, in at least certain geographic areas of Florida, 411-PAIN Referral Service appears to have steered all callers to a single health care provider pursuant to advertising agreements.  (*See generally* Ex. 10.)  Specifically, chiropractors appear to have purchased territorial exclusivity for patient referrals, as reflected in the testimony of a chiropractor in Jacksonville who testified his clinic licensed the exclusive rights over all calls made to 1-800-411-PAIN in the Jacksonville market.   (Ex. 11 at pp. 123-124, 134-136.) Specifically, the chiropractor testified that when individuals called from the 904 area code, they were connected directly to the chiropractor's office:

> Q.     The – When I asked you if I, meaning me the attorney and I was in an accident and I called the 1-800-411-PAIN number and I had a 904 area code number that goes directly to you, that's what you told me, right?
>
> A.     Yes.  The reason I asked you what your phone number was –
>
> Q.     Right.
>
> A.     – because if it's not 904 it would probably ring to somebody else. I don't know who. We don't – we only have 904.

(*Id.* at pp. 138-39.)  In addition, the chiropractor testified that if a caller asks for a lawyer, the chiropractor, with the patient's permission, "will try and contact an attorney that will call [the patient] back . . . ." (*Id.* at p. 144.)

62.     411-PAIN Referral Service's advertising materials have also marketed similar types of exclusive referral arrangements that allow chiropractors to purchase "vanity numbers" exclusive to specific broadcast markets.  (Ex. 12.)  Unbeknownst to callers, there is no panel or

network of chiropractors or clinics to whom callers in those markets will be referred.  Instead, the

vanity number provides territorial exclusivity to participating clinics so that when a "potential

patient dials 1-800-411-PAIN the number is 'pointed' by [the particular clinic's] direction to any

number [it] wish[es]," including the clinics themselves.  (*Id.* at p. 1.)  411-PAIN Referral Service

explained the arrangement as follows:

> Fast, simple and easy to remember.  This is a 24-hour, 7 day-a-week service.
> Potential patients or referral sources dial this number and are automatically
> transferred directly to YOU . . . not a confusing referral network.  When a call
> comes from your designated marketing area, it automatically connects directly to
> you.

(*Id.*)  411-PAIN Referral Service touted its patient-referral arrangements allow for the participating

clinic to be "1-800-411-PAIN" in that particular market: "There is no such thing as a closed door.

You are now 1-800-411-PAIN [and] the attorneys NOW need you more than you need them."

(*Id.*)  Moreover, the participating clinic's use of the vanity number is exclusive "in the precise

market area that [its] business covers" – calls originating in that market are redirected to the

participating chiropractor:

> You own the right to use the vanity number in the precise market area your business
> covers.  It doesn't matter if all your customers are in multiple area codes or zip
> codes, one hundred percent of all calls originating from your territory ring directly
> to YOU.  1-800-411-PAIN is pointed to your current phone line, cell phone or call
> center according to your directions.

(Ex. 12 at p. 6.)  411-PAIN Referral Service's marketing materials made clear that not all territories

are available, and that interested chiropractors should "call or email [to] reserve [their] territory . .

. on a first-come-first-serve-basis . . . ."  (*Id.* at p. 3.)

63.     The exclusive nature of 411-PAIN Referral Service's referral obligations is

illustrated by an unsigned advertising agreement between 411-PAIN Referral Service and a

chiropractic clinic.  The agreement obligates 411-PAIN Referral Service to "redirect all phone

calls placed by potential clients to the Toll Free Numbers [which are defined in the agreement as,

"1-800-411-PAIN and any other related phrases and toll free numbers"] to the phone number(s) designated by Participating Clinic . . . ."  (Ex. 10 at p. 1 and § 2(b).)  Participating chiropractors, in turn, are obligated to "attend to phone calls placed by Potential Clients to the Toll Free Numbers and redirected by Referral Service to the phone number(s) designated by Participating Clinic" and pay a monthly "fee."  (*Id.* at §§ 3(a), 4(a).)

> **B.** **The Cereceda Clinics' Apparent *Quid Pro Quo* Relationships With PI Attorneys**

64.    In addition to the relationship between 411-PAIN Referral Service and/or Path Referral Service and Ceda Ortho Group and the Cereceda Clinics, Defendants also appear to have *quid pro quo* relationships with PI Attorneys, many of whom also participate in the 411-PAIN Referral Service and/or Path Referral Service.   Numerous patients have confirmed that PI Attorneys referred them to the Cereceda Clinics, and that the Cereceda Clinics referred patients to PI Attorneys.  (*See, e.g.*, Ex. 13 at pp. 5-8 (patient called 411-PAIN and was referred to a PI Attorney who, in turn, referred the patient to a Cereceda Clinic); Ex. 14 at p. 18 (PI Attorney referred client to a Cereceda Clinic); Ex. 15 at pp. 21-22 (PI Attorney referred client to a Cereceda Clinic); Ex. 16 at pp. 15-16 (patient called 411-PAIN and was referred to a PI Attorney who, in turn, referred the patient to a Cereceda Clinic); Ex. 17 at pp. 19-20 (PI Attorney referred client to a Cereceda Clinic); Ex. 18 at pp. 24-26 (PI Attorney referred client to a Cereceda Clinic); Ex. 19 at pp. 32-34 (a Cereceda Clinic referred the patient to a PI Attorney).)  Indeed, according to an April 2018 quarterly disclosure filed by the 411-PAIN Referral Service with The Florida Bar, at least 272 PI Attorneys participated in the 411-PAIN Referral Service.  (Ex. 20.)  Many of these same PI Attorneys now participate in the Path Referral Service.  In fact, of the 677 patients reflected on Exhibit 1 who were represented by a PI Attorney, at least 368 were represented by PI

Attorneys who participate in the 411-PAIN Referral Service, and at least 320 were represented by PI Attorneys who participate in the Path Referral Service.

65.     Individuals in auto accidents report calling 411-PAIN, which steered them to Ceda Ortho Group and/or the Cereceda Clinics, or to PI Attorneys who refer the patients back to Ceda Ortho Group and/or the Cereceda Clinics.  For example, an 18-year-old female patient ("patient A.D.") testified on November 28, 2016 that she called 411-PAIN after her auto accident.  (Ex. 16 at pp. 15-16.)  411-PAIN Referral Service referred patient A.D. to a participating PI Attorney who, in turn, referred her to a Cereceda Clinic where she received medically unnecessary and unlawful services.  (*Id.*)  In fact, patient A.D. purportedly received treatment on 31 occasions from Ceda Ortho Downtown, Ceda Ortho Hialeah, and Ceda Ortho South Miami pursuant to the Predetermined Protocol, which included at least five passive modalities and one or more active modalities on virtually every visit, as well as a MRI from Springs Crossing MRI.  (Ex. 1, Patient No. 382, Treatment and MRI Columns.)  Once at the Cereceda Clinic, Crespo-Smith purportedly determined patient A.D. had suffered from an EMC and was eventually discharged with a purported permanent impairment.  (Ex. 1, Patient No. 382, EMC, MMI, and Impairment Columns.)

66.     Likewise, a 34-year-old male patient ("patient C.M.") of the Cereceda Clinics testified on October 21, 2016 that he called 411-PAIN after his auto accident and was referred by 411-PAIN Referral Service to a Cereceda Clinic and a participating PI Attorney.  (Ex. 21 at pp. 40-42.)  At the Cereceda Clinic, the patient received medically unnecessary and unlawful services. In fact, patient C.M. purportedly received treatment on 34 visits from Ceda Ortho Downtown and Ceda Ortho South Miami, which included at least five passive modalities and one active modality on virtually every visit, as well as a MRI from Springs Crossing MRI.  (Ex. 1, Patient No. 373, Treatment and MRI Columns.)  In addition, Crespo-Smith purportedly determined patient C.M.

had suffered from an EMC and was eventually discharged with a purported permanent impairment. (Ex. 1, Patient No. 373, EMC, MMI, and Impairment Columns.)

67.     Similarly, a 24-year-old female patient ("patient K.B.") testified on May 11, 2017 that she called 411-PAIN after she was involved in an auto accident.  (Ex. 13 at pp. 5-6.)  411-PAIN Referral Service referred patient K.B. to a PI Attorney.  (*Id.* at pp. 7-8.)  The PI Attorney subsequently referred patient K.B. to Ceda Ortho FIU where she was purportedly examined and prescribed services pursuant to the Predetermined Protocol.  (*Id.* at p. 5; Ex. 22, Initial Exam Report.)  After the initial examination, patient K.B. never returned to Ceda Ortho FIU.  (Ex. 13 at pp. 11-12.)

68.     Defendants also appear to operate their own referral network in which patients are solicited through a hotline to treat at Ceda Ortho Group and/or the Cereceda Clinics and then referred to PI Attorneys with whom Defendants maintain apparent *quid pro quo* relationships. Specifically, Defendants solicit potential patients through Cereceda's hotline, 388-CEDA, which advertises to auto accident victims that "388CEDA's M.D. & D.C. physicians document and treat individuals that have suffered injuries," and encourages individuals to call 388-CEDA to "strengthen" their insurance claims.  (*See generally* Ex. 23.)  388-CEDA, a Florida fictitious name registered to Ceda Ortho Cutler Bay, Ceda Ortho Downtown, Ceda Ortho FIU, Ceda Ortho Hialeah, and Ceda Ortho South Miami, is not registered with The Florida Bar as a lawyer referral service (*i.e.*, "qualifying provider") and claims that it is "not a law firm or an attorney referral service."  (*Id.*)  Under Florida law, qualifying providers are required to register with The Florida Bar and disclose on an annual basis the names of all attorneys who participate in the service.  *See generally* Fla. Bar. R. 4-7.22.  Although 388-CEDA is not registered as a qualifying provider, it

nonetheless informs prospective patients that it "work[s] with [t]rial lawyers and [a]ttorneys" and "can recommend one or more attorneys in South Florida." (*Id.*)

69.     The PI Attorneys benefit by referring patients to Ceda Ortho Group and/or the Cereceda Clinics because the PI Attorneys: (a) receive referrals from Ceda Ortho Group and/or the Cereceda Clinics; and (b) can rely upon the Predetermined Protocol to satisfy the statutory threshold for BI and UM Claims and to inflate the value of such claims, which in turn increases the amounts of contingency fees for the PI Attorneys.

## VI.     THE FRAUDULENT PREDETERMINED PROTOCOL

70.     When patients present to Ceda Ortho Group and the Cereceda Clinics, they are not legitimately examined, diagnosed, or treated for their unique needs.  They are instead subjected to the Predetermined Protocol in which chiropractors and/or physicians employed by or associated with Ceda Ortho Group and the Cereceda Clinics (collectively, the "Cereceda Providers"), including the Physician Defendants and Chiropractor Defendants, purport to examine the patients, document they suffered from emergency medical conditions (EMC), and diagnose them with a litany of diagnoses, most often exceeding ten or more, to support a predetermined course of care, which they receive until they unilaterally stop treatment, or their No-Fault Benefits are exhausted, or substantially reduced, at which time the Cereceda Providers discharge the patients with a permanent impairment.

71.     The bills and supporting documentation associated with the purported initial, follow-up, and final examinations, the EMC findings, the treatment, diagnostic imaging, and other services purportedly rendered by the Cereceda Providers to patients, which Defendants submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire are fraudulent because they falsely represent that services were medically necessary and lawfully rendered, when they were

not.  *See* Fla. Stat. § 627.736(5)(b)(1)(b)-(c).  Each step in Defendants' fraudulent Predetermined Protocol is discussed next.

### A.    The Fraudulent Initial Examinations

72.    The first step in the Predetermined Protocol is for the Cereceda Providers to purportedly perform initial examinations of patients and document they suffer from a litany of diagnoses, most often exceeding ten or more diagnoses per patient, and that they suffered from an EMC to maximize Defendants' collection of No-Fault Benefits.  Based on the purported examinations, reports are created summarizing the patients' subjective complaints, as well as the Cereceda Providers' purported findings, results of any diagnostic imaging, diagnoses, and plan of care ("Initial Exam Reports").  Defendants submit, or cause to be submitted, the Initial Exam Reports to State Farm Mutual and State Farm Fire to support separate office visit charges and to justify the predetermined treatment and diagnostic imaging services purportedly provided to patients pursuant to the Predetermined Protocol.  Indeed, regardless of the examination findings, results of any diagnostic imaging or numerous diagnoses listed in the Initial Exam Reports, patients are prescribed the same boilerplate treatment plan and the Cereceda Clinics purport to provide virtually all patients with five or more passive modalities, in addition to one or more active modalities, on every visit.  (Ex. 1, Treatment Columns; Ex. 2, Boilerplate Treatment Plan Column.)

73.    At the Cereceda Clinics, a chiropractor ("Cereceda Chiropractor") purports to examine each patient at their initial visit and then a physician ("Cereceda Physician") purports to perform a second, separate examination of the patient.[12]  Both the Cereceda Chiropractor, on the

---

[12] When a patient presents to Ceda Ortho Group he or she is examined only by a Cereceda Physician, typically Moya or Javech.  Unlike the Cereceda Clinics, Ceda Ortho Group does not purport to provide chiropractic and physical therapy services.  Rather, Ceda Ortho Group provides examination and pain management services (*e.g.*, injections) to the patients of the Cereceda Clinics, among others.

one hand, and the physician, on the other hand, prepare separate Initial Exam Reports, which Defendants submit, or cause to be submitted, to State Farm Mutual and State Fare Fire in support of separate office charges.  The Initial Exam Reports from the Cereceda Chiropractors contain no documented basis or rationale for another provider in a different discipline to perform a second examination of patients, most of whom purportedly suffer from commonplace, soft tissue injuries such as sprains and strains.  In fact, Yoham testified that irrespective of a patient's injury or diagnosis, patients at the Cereceda Clinics are required to be examined by both a Cereceda Chiropractor and Cereceda Physician in "every single case."  (Ex. 24 at pp. 38-39.)  Indeed, while the examinations purportedly performed by the Cereceda Physicians are not medically necessary, they nonetheless play an important role in Defendants' scheme to exploit the full profit potential of their patients because they purport to justify the predetermined treatment and related services prescribed by the Cereceda Chiropractors and document the existence of an EMC.

74.     The Initial Exam Reports prepared by the Cereceda Chiropractors and Physicians submitted to State Farm Mutual and State Farm Fire are largely boilerplate and not credible.  As discussed next, the descriptions of physical examinations reflected in their Initial Exam Reports reflect noncredible patterns and document patients are injured, suffered from EMCs, and require extensive treatment pursuant to the Predetermined Protocol.

### 1.     The Fraudulent Initial Exam Reports Prepared By The Cereceda Chiropractors And Cereceda Physicians

75.     The Initial Exam Reports, which are prepared by the Cereceda Chiropractors (including Canizares, Facuseh, Fenelus, Haban, Habayeb, Ross, Schulman, and Yoham) and submitted to State Farm Mutual and State Farm Fire, reflect many of the same complaints, findings, and diagnoses across nearly all patients.  Specifically, the overwhelming majority of Initial Exam Reports prepared by the Cereceda Chiropractors reflect: (a) patient complaints of pain in at least

two, and most often three, regions of the spine; (b) pain, tenderness, and myospasms in at least two, and most often three, regions of the spine; (c) patients suffer from a litany of diagnoses, most often exceeding ten or more diagnoses per patient, including predetermined findings of sprains and strains and nerve root lesions; and (d) prescriptions for goods (*e.g.*, cold packs, creams).  (Ex. 2, Spine-Related Complaints, Diagnosis, and Supplies/Goods Columns; *see also* Ex. 25, Representative Examples of Chiropractic Initial Exam Reports and Bills.)

76.     In addition, the Initial Exam Reports include: (a) recommendations for "home exercise," without detailing the specific home exercises that might be appropriate for any given patient; (b) referrals for patients to undergo (i) x-rays, which are virtually always performed on two or more regions of the spine, and (ii) diagnostic imaging studies such as MRIs and CT scans, the majority of which are performed on two or more regions of the spine or parts of the body; and (c) boilerplate treatment plans that are not tailored to the unique needs of patients.  (Ex. 2, Home Exercise, MRI/CT Ordered, and Boilerplate Treatment Plan Columns; *see also* Ex. 25, Representative Examples of Chiropractic Initial Exam Reports and Bills.)

77.     The Cereceda Physicians, including Crespo-Smith, Javech, and Moya, also prepare Initial Exam Reports.  The overwhelming majority of Initial Exam Reports prepared by the Cereceda Physicians reflect: (a) patient complaints of pain in at least two, and most often three, regions of the spine; (b) patients suffer from a litany of diagnoses, most often exceeding ten or more diagnoses per patient, including strains and sprains in at least two regions of the spine; (c) findings that the auto accident caused the patients' purported injuries; and (d) noncredible determinations that patients sustained an EMC, which is done solely to maximize Defendants' collection of No-Fault Benefits.  (Ex. 3, Spine-Related Complaints, Diagnosis, Discussion, and

EMC Columns; *see also* Ex. 26, Representative Examples of Physician Initial Exam Reports and Bills.)

78.     The complaints and findings documented in the Cereceda Chiropractors and Physicians' Initial Exam Reports are a pretext to support the purported diagnoses and recommendation for and performance of predetermined treatment that is not individually tailored to each patient's unique circumstances.  Even when the Cereceda Providers receive additional information concerning patients' conditions (*e.g.*, imaging studies), they rarely, if ever, attempt to correlate that additional information with their clinical findings or modify the predetermined treatment plan.  In short, the Initial Exam Reports prepared by the Cereceda Providers are fraudulent and are not credible.

79.     In fact, patients have expressly refuted the veracity of the information reflected in the Initial Exam Reports, underscoring the Cereceda Providers did not perform legitimate examinations.  For example, patient K.B. called 411-PAIN after she was involved in an auto accident on March 1, 2017.  (Ex. 13 at pp. 5-8.)  411-PAIN Referral Service referred patient K.B. to a PI Attorney who told her "to go to Ceda [Ortho FIU]."  *Id.*  In the Initial Exam Report submitted to State Farm Mutual in support of a bill for the purported examination, Facuseh reported a laundry list of purported tests he supposedly performed and findings he purportedly made. (Ex. 22 at pp. 2-3.)  Based upon these purported tests and examination findings, Facuseh diagnosed patient K.B. with several injuries, including but not limited to, cervical and thoracic sprains and strains, and made treatment recommendations.  (*Id.* at pp. 4-5.)

80.     In sharp contrast to the Initial Exam Report, patient K.B. provided sworn testimony that Facuseh did not actually physically examine her, or perform any orthopedic or other testing.  (Ex. 13 at pp. 25-35.)  In fact, patient K.B. testified that Facuseh "didn't touch me – he stayed on

his side [of the desk] and that was it," which would have rendered it impossible for him to perform the examination documented in the Initial Exam Report for patient K.B.  (*Id.* at p. 27.)  K.B. also testified that Facuseh did not inform her of ***any*** of the treatment recommendations.  (*Id.* at pp. 34-35.)

81.     Similarly, patient L.C., a 45-year-old female patient, provided sworn testimony that directly contradicts the initial examination findings reflected in Crespo-Smith's Initial Exam Report.  Specifically, on February 27, 2017, Crespo-Smith purportedly examined patient L.C. at Ceda Ortho South Miami.  (Ex. 27, Initial Exam Report.)  In the Initial Exam Report submitted to State Farm Mutual in support of a bill for the purported examination, Crespo-Smith documented that she examined patient L.C.'s cervical, thoracic, and lumbar spine, as well as her left and right knees.  (*Id.* at p. 2.)   Crespo-Smith also documented musculoskeletal examination findings reflecting that, among other things, patient L.C. experienced: (a) pain in all planes upon cervical, thoracic, and lumbar ROM testing; (b) tenderness and myospasms in her cervical, thoracic, and lumbar spine; (c) positive, bilateral straight leg raise tests; (d) full ROM in both knees; and (e) negative orthopedic tests in both knees. (*Id.*)  Crespo-Smith documented patient L.C. had suffered from an EMC, ordered a lumbar MRI to "rule out herniated nucleus," and diagnosed her with, among other things, cervical, thoracic, and lumbar sprains and root disorders, as well as bilateral knee pain and sprains.  (*Id.* at p. 3.)  Ceda Ortho South Miami billed State Farm Mutual more than $350 for this initial examination.  (*Id.* at p. 4.)

82.     In sharp contrast to her Initial Exam Report, patient L.C. testified that Crespo-Smith did not physically examine her neck, back, or knees, which would have rendered it impossible for her to perform the examination documented in the Initial Exam Report for patient L.C.  (Ex. 19 at p. 62.)  Specifically, patient L.C. testified:

Q.      Okay.   Did the female doctor do anything to physically examine your neck?

A.      No.

Q.      Did the female doctor do anything to physically examine your back?

A.      No.

Q.      Same question: Did the female doctor do anything to physically examine your knees?

A.      No.

(*Id.*)  Although Crespo-Smith did not conduct a legitimate examination of patient L.C. to determine her true needs, patient L.C. received extensive medically unnecessary services over the course of 20 visits for which Defendants billed State Farm Mutual nearly $12,000.  (Ex. 1, Patient No. 526, Treatment, MRI/CT, X-Ray, and Supplies/Goods Columns.)

83.      The Initial Exam Reports do not reflect legitimate examinations, but instead reflect predetermined findings Defendants use to justify the decision to subject patients to a predetermined treatment plan designed to exploit patients' No-Fault Benefits and is not tailored to address any patient's unique medical needs.

## 2.      The Cereceda Physicians' Fraudulent EMC Determinations

84.      As noted above, before January 1, 2013, injured parties who were eligible for PIP Benefits were entitled to up to $10,000 of PIP Benefits for medically necessary goods and services. Then, in 2012, the Florida Legislature amended the PIP Law in an attempt "to reduce fraud in order to lower the cost of insurance premiums." *Progressive Am. Ins. Co. v. Eduardo J. Garrido D.C. P.A.*, 211 So. 3d 1086, 1089 (Fla. Dist. Ct. App. 2017), *review denied sub nom. Eduardo J. Garrido D.C. P.A. v. Progressive Am. Ins. Co.*, No. SC17-383, 2017 WL 2874837 (Fla. July 6, 2017).  The amendment, which became effective on January 1, 2013, sought to further its objective by limiting PIP Benefits to $2,500 unless there was a determination by a physician or other professional licensed under other specific provisions of Florida law that the injured person

sustained an EMC, in which case the injured person was eligible for PIP Benefits of up to $10,000 for such goods and services. *See* Fla. Stat. § 627.736(1)(a)(3)-(4). Accordingly, because chiropractors are not allowed under the PIP Law to assign patients with an emergency medical condition, Defendants could lawfully be limited to $2,500 in PIP Benefits in the absence of the Cereceda Physicians' examinations. Thus, Defendants' scheme involves shuffling their patients to the second, medically unnecessary examination performed by a Cereceda Physician, which routinely results in findings of an emergency medical condition, to ensure the full $10,000 in PIP Benefits is available for Defendants to exploit.

85.     Indeed, since at least June 2015, the Cereceda Physicians, including Crespo-Smith, Javech, and Moya, have falsely represented nearly all patients they examined at Ceda Ortho Group and/or the Cereceda Clinics suffered from an EMC – that is, a condition that "manifest[s] itself by acute symptoms of sufficient severity, which may include severe pain, such that the absence of immediate medical attention could reasonably be expected to result in . . . [s]erious jeopardy to patient health, . . . [s]erious impairment to bodily functions, [or] . . . [s]erious dysfunction of any bodily organ or part." Fla. Stat. § 627.732(16); *see also* Ex. 1, EMC Column. These fraudulent EMC determinations are documented in Initial Exam Reports and "Notice Of Emergency Medical Condition" forms, which Defendants submit to State Farm Mutual and State Farm Fire. (Ex. 3, EMC Column; Ex. 26, Representative Examples of Physician Initial Exam Reports and Bills; Ex. 28, Representative Examples of EMC Notices.) Defendants' records fail, however, to meaningfully detail any emergency medical conditions in their patients, most of whom purportedly suffer from commonplace, soft tissue injuries such as sprains and strains (*see, e.g.*, Exs. 2 and 3, sprain/strain diagnosis columns), that would rarely, if ever, result in serious jeopardy to patient health, serious impairment of bodily functions, or serious dysfunction of any bodily organ or part.

In brief, it simply is not credible that nearly all patients of Ceda Ortho Group and the Cereceda Clinics sustained an EMC.

86.     By virtue of the fraudulent EMC findings contained in Defendants' documentation, Defendants knowingly submitted to State Farm Mutual and State Farm Fire a false statement relating to a claim or charge.  *See* Fla. Stat. § 627.736(5)(b)(1)(c).  Accordingly, neither State Farm Mutual and State Farm Fire nor their insureds were required to pay any claims or charges for any goods or services from Ceda Ortho Group, the Cereceda Clinics, and Springs Crossing MRI that contained a fraudulent EMC determination.  *See* Fla. Stat. §§ 627.732(11) and 627.736(5)(b)(1)(b)-(c); *see also* Ex. 1, EMC Column.

**B.      The Cereceda Clinics' Fraudulent Treatment Plan**

87.     Regardless of the examination findings and diagnoses reflected in the Initial Exam Reports, the results of any diagnostic imaging, or other unique circumstances of their patients, the Cereceda Chiropractors invariably document patients are injured and require a predetermined plan of care.  (Ex. 2, Diagnosis and Boilerplate Treatment Plan Columns; Ex. 25.)  The Cereceda Clinics' patients are subjected to this predetermined treatment because it allows the Cereceda Clinics to submit separate charges for each modality on each date of service, not because it is medically necessary.

88.     The "Treatment Plan" section of the Initial Exam Reports prepared by the Cereceda Chiropractors (including Canizares, Facuseh, Fenelus, Haban, Habayeb, Ross, Schulman, and Yoham) virtually always reflects the same boilerplate plan of care for all patients:

> I have recommended that [the patient] should begin an initial program of care consisting of 3-5 visits per week for two weeks followed by continued active care with the goal of returning her to pre-injury status or maximum functional capacity status.  The need for ongoing care will be determined via outcomes assessment procedures and visit by visit clinical evaluations.  Outcomes assessment procedures are performed during re-examinations to determine if the patient is getting better, worse or unchanged.  The types of outcomes assessment procedures utilized in our

office include but are not limited to: neurological and orthopedic testing, comparative muscle testing, balance and proprioception testing, leg length discrepancy resolution, etc.  The recommended treatment modalities include but are not limited to: Cryotherapy (Cryo), hydrocollator therapy (Hydroc), electric muscle stimulation (EMS), therapeutic ultrasound (U/S), therapeutic exercises (Exer) passive and active, intersegmental mechanical traction (IST), spinal decompression traction (Decomp), chiropractic manipulative treatment (CMT), neuromuscular re-education (NMR), trigger point therapy (TP), massage (Mass), myofascial release (Myofasc), paraffin (Par), joint mobilization procedures (JMP), etc.

(Ex. 2, Boilerplate Treatment Plan Column; *see also* Ex. 25.)  Among other issues, Defendants' boilerplate treatment plan fails to detail which of these specific modalities should be used, the frequency with which each should be used (*e.g.*, as needed, every visit), the targeted muscles, joints, or other structures for each modality, or any specific types of neuromuscular reeducation or therapeutic exercise to be performed.

89.     The Initial Exam Reports prepared by the Cereceda Physicians (including Crespo-Smith, Javech, and Moya) fare no better, reflecting treatment recommendations that fail to demonstrate any consideration of the various symptoms reported by the patients to create a coherent, individualized, diagnostic picture and individually tailored treatment plan.  (Ex. 26.) Instead, the Cereceda Physicians' Initial Exam Reports reflect treatment plans that, if documented at all, simply prescribe medication, recommend the patient continue treating, and/or undergo an injection.  (*Id.*)

90.     In short, the treatment plans reflected in the Initial Exam Reports are not credible, and are designed to allow Defendants to justify a course of treatment that will exhaust, or substantially reduce, patients' No-Fault Benefits by submitting separate charges for each service on each visit, not because such treatment is medically necessary to address the unique needs of each patient.

### C.     The Cereceda Clinics' Fraudulent Treatment

91.     Following their initial examinations, the Cereceda Clinics subject virtually all patients to the Predetermined Protocol consisting of five or more passive modalities at nearly every visit, in addition to active modalities patients also allegedly receive on virtually all visits.  (Ex. 1, Treatment Columns.)  The treatment patients purportedly receive at the Cereceda Clinics is not individualized or adjusted over the course of treatment to address patients' unique response to treatment, progress, or lack thereof.

92.     The Cereceda Clinics ensure virtually all patients receive six or more modalities on nearly every visit because it enables Defendants to submit six or more charges for each date of service to State Farm Mutual and State Farm Fire, thereby quickly reducing patients' available No-Fault Benefits for Defendants' gain.

93.     In addition to the course of medically unnecessary passive and active modalities, the Cereceda Clinics also bill $30 for medically unnecessary goods (*e.g.*, cold packs, creams) under Current Procedural Terminology ("CPT") Code A9273, which are purportedly provided to every patient on the first date of service.  (Ex. 1, Supplies/Goods Column; Ex. 25.)  Patients have testified that staff at the Cereceda Clinics simply provide a "goody bag" or "welcome package" when patients first arrive at the Cereceda Clinics, not because such goods were medically necessary and prescribed by licensed providers to address their unique needs.  (Ex. 13 at pp. 34-35; Ex. 16 at pp. 28-29; Ex. 18 at pp. 62-63.)

94.     In most instances, as reflected in Exhibit 1, the modalities purportedly provided to the Cereceda Clinics' patients are virtually identical and consist of five or more passive modalities (*i.e.*, hot/cold packs, e-stim, massage/manual therapy, ultrasound, chiropractic manipulation, mechanical traction) at nearly every visit, in addition to active modalities (*i.e.*, neuromuscular reeducation, group physical therapy, and therapeutic exercise) that patients also allegedly receive

on virtually all visits, which is not credible given the wide range of unique circumstances presented by each patient, including the patient's age, physical characteristics, symptoms, history, ability to participate in treatment, and his or her response to treatment. Moreover, this combination of treatments results in patients allegedly receiving six or more modalities on nearly every visit, which would rarely, if ever, be medically necessary for any patient, let alone for nearly all patients.

95.     The testimony of patient O.M. underscores the predetermined nature of the treatment protocol. On October 31, 2017, patient O.M. testified that on her first visit to Ceda Ortho South Miami, Habayeb stated she needed "42 therapy sessions," regardless of her actual need or response to treatment. (Ex. 18 at p. 51.) Similarly, the Cereceda Chiropractors have recommended the predetermined treatment plan for patients they never even examined. For example, patient K.B., who testified she was neither physically examined by Facuseh nor informed of any treatment recommendations, nevertheless was prescribed the predetermined treatment plan in the Initial Exam Report. (Ex. 13 at p. 27; Ex. 22, Initial Exam Report.)

96.     To support fraudulent charges for the medically unnecessary services provided at the Cereceda Clinics, Defendants submit, or cause to be submitted, to State Farm Mutual and State Farm Fire daily progress notes ("Progress Notes") for each visit. The Progress Notes purport to reflect the patients' subjective complaints, although such complaints are described in a cursory fashion. For example, the "Subjective" section of the Progress Notes routinely reflects patients have nonspecific "pain" in one or more regions of the spine, as well as other areas of the body. (Ex. 29, Representative Examples of Progress Notes and Bills.) Defendants also purport to document each patient's "overall" pain score, but fail to establish a baseline for each purported area of pain, or account for any variability in the purported areas of pain. (*Id.*) In addition, the

Progress Notes fail to account for the variable response to treatment, or lack thereof, across these different anatomic sites.  (*Id.*)

97.  Canizares, a Cereceda Chiropractor, admitted in sworn testimony the Progress Notes fail to provide meaningful information about patients' conditions.  Specifically, in April 2014 Canizares testified the Cereceda Clinics "generalize" each patient's pain score.  (Ex. 30 at pp. 50-54.)  After reviewing a patient's Progress Notes during his deposition, Canizares admitted that he could not "determine from looking at th[e] record the level of severity of pain" the patient experienced in each specific body part.  (*Id.*)

98.  In addition, the "Subjective" section of the Progress Notes used during the years 2015 and 2016 often reflect the following boilerplate finding: "[the patient] cannot perfom [*sic*] [his or her] activities of daily living effectively and without pain."  (Ex. 29.)  These Progress Notes never document, however, the specific activities that are purportedly impacted and/or cause pain.  (*Id.*)

99.  The Progress Notes during this same period also purportedly document "Objective" examination findings, which for nearly all patients reflect vague findings of "[p]ain and tenderness" in each anatomic site where patients purportedly report pain.  (*Id.*)  Moreover, where such "Objective" findings are documented, they routinely reflect nonspecific findings of "[m]yospasm" in one or more anatomic sites.  (*Id.*)  These purported "Objective" findings fail, however, to identify specific muscles, levels of the spine, or other structures that supposedly evince pain, tenderness, or spasming when palpated.  More recent Progress Notes submitted by the Cereceda Clinics do not list any objective findings, and instead generically refer back to the "[o]bjective findings . . . listed in the narrative report including the initial, follow up and final report when applicable."  (*Id.*)  Moreover, the more recent Progress Notes report only a patient's

overall pain intensity, notwithstanding that patients purportedly suffer from pain in multiple regions of the spine and/or other body parts.

100.    The Progress Notes also purport to document treatment that each patient received on each visit, but rarely, if ever, document the specific levels of the patient's spine (*e.g.*, C3-C4, L4-L5) or any particular muscles or joints supposedly treated.  Instead, the "Plan" section of the Progress Notes provides only nonspecific information that the cervical, thoracic, and/or lumbar regions of the spine, each of which is comprised of many different levels, muscles, and structures, were treated with various passive modalities.  (*Id.*)

101.    In addition to the five passive modalities provided on nearly all visits, the Cereceda Clinics bill for neuromuscular reeducation, group physical therapy, or therapeutic exercise under CPT Codes 97112, 97150, and 97110, respectively, which they purport to provide to patients on virtually all visits.  (Ex. 1, Treatment Columns; Ex. 29.)  This combination of services results in patients allegedly receiving six or more modalities on each visit, which would rarely, if ever, be medically necessary for any patient.

102.    Moreover, while the Progress Notes purport to reflect patients engage in active therapies such as neuromuscular reeducation, group physical therapy, or therapeutic exercise, they provide only vague descriptions of these active therapies.  (Ex. 29.)  As noted above, when prescribing active therapy, the Initial Exam Reports never specify the targeted structures or specific areas of the body, or make any specific recommendations as to the types of neuromuscular reeducation, group physical therapy, or therapeutic exercise each patient is to receive.  The Progress Notes fail to meaningfully document for each patient the specific goals for the active therapies or patients' progress (or lack thereof) towards those goals.  The Progress Notes also fail

to meaningfully document patients' responses to the exercises, nor is there progression in exercises demonstrated over time.  (*Id.*)

103.    Additionally, the "Assessment" section of the Progress Notes fails to meaningfully document how patients responded to any of the modalities purportedly provided to patients at each visit, or meaningfully document the patient's progress or responses to any of the therapies over time.  (*Id.*)  Incredibly, nearly all of the Progress Notes simply reflect that each patient "was able to tolerate today's treatment well."  (*Id.*)  Because the Progress Notes fail to provide meaningful information on each treatment visit, there is no baseline against which Defendants could measure the extent of any patient's progress (or lack thereof).

104.    The Progress Notes conclude by documenting that each patient purportedly suffers from a litany of diagnoses, most often exceeding ten or more diagnoses per patient, including predetermined findings of sprains and strains and nerve root lesions.  (*Id.*)

**D.    The Fraudulent And Unlawful Diagnostic Imaging Services**

105.    The overwhelming majority of the Cereceda Clinics' patients were referred by the Cereceda Providers for medically unnecessary MRIs and/or CT scans.  (Ex. 1, MRI/CT Column; Exs. 4A-B, MRI Appendix and CT Appendix.)  MRIs and CT scans are advanced imaging procedures that should be ordered if they are necessary for a diagnostic purpose to guide treatment, or another specific purpose designed to benefit the patient as explained in the medical record.  For example, MRIs and CT scans may be appropriate when a patient's diagnostic picture includes worrisome signs or symptoms, response to treatment is atypical, or legitimate concerns about structural issues exist.  For patients with soft tissue injuries, MRIs and CT scans are rarely indicated, and almost never indicated in multiple regions of the spine and body simultaneously. When MRIs and CT scans are clinically indicated and ordered, medical providers should evaluate

and document whether any abnormalities have clinical significance for the patient's current condition and care plan.

106.   The medically unnecessary and unlawful MRIs and CT scans performed on Defendants' patients were most often ordered early in the patient's course of treatment – sometimes during the patient's first visit to the Cereceda Clinics – despite the lack of any documented conditions or circumstances that would warrant a MRI and before there was an opportunity to determine if the patient recovered through a course of time and conservative care. (*See generally* Ex. 4A, MRI Appendix; Ex. 31 at p. 57.)  In fact, for the overwhelming majority of patients, the MRI and CT scan findings had no impact on their treatment plans.  At best, the MRI and CT scan findings sometimes resulted in referrals for consultations to other specialists (*e.g.*, neurologist, orthopedic surgeon) but the Cereceda Providers did little to follow-up on the results of the referrals or change the patients' course of treatment.

107.   In addition, when the Cereceda Providers ordered the medically unnecessary and unlawful MRIs, the majority of patients received MRIs on two or more regions of the spine or parts of the body.  (Ex. 1, MRI/CT Column; Ex. 4A, MRI Appendix.)  Many of Defendants' patients are unlawfully self-referred to Springs Crossing MRI for medically unnecessary MRIs. This allowed Defendants to submit additional charges to State Farm Mutual and State Farm Fire, which often exceed $1,400 per region of the spine or body.  (Ex. 4A, Amount Billed Column.) Indeed, since at least June 2015 through the present, the Cereceda Providers referred 483 patients to Springs Crossing MRI for 884 medically unnecessary and unlawful MRIs, for which State Farm Mutual and State Farm Fire were billed more than $1.3 million by Springs Crossing MRI.

108.   Moreover, the MRI reports reflecting the purported interpretations of the cervical, thoracic, and lumbar MRIs performed at Springs Crossing MRI for patients of the Cereceda Clinics

virtually always reflect positive findings, most often consisting of disc "herniations" or "bulges." (Ex. 32A, Representative Examples of MRI Reports and Bills.)  The MRI reports appear not only designed to further justify the need for the Predetermined Protocol, but also to document the existence of conditions that could support the patients' BI Claims and UM Claims, which require evidence of a "significant and permanent loss of an important bodily function," or "a permanent injury[.]"  Fla. Stat. § 627.737(2).  The MRI reports appear to facilitate apparent quid pro quo cross-referral relationships with PI Attorneys to the extent the reports increased the medical charges for patients and supported their BI or UM Claims.

109.    In addition, the Cereceda Providers referred patients from across the Cereceda Clinics to Ceda Ortho South Miami for medically unnecessary and unlawful CT scans purportedly performed in a mobile trailer.  (Ex. 1, MRI/CT Column; Ex. 4B, CT Appendix; Ex. 19 at pp. 50-52; Ex. 32B, Representative Examples of CT Scan Reports and Bills.)  Since at least June 2015 through the present, the Cereceda Providers referred 81 patients to Ceda Ortho South Miami for 122 medically unnecessary CT scans, for which State Farm Mutual and State Farm Fire were billed more than $100,000 by Ceda Ortho South Miami.  As described in Section VIII, these patients were unlawfully self-referred by the Cereceda Providers and/or staff to Ceda Ortho South Miami.

110.    In sum, the MRIs and CT scans performed at Springs Crossing MRI and the Cereceda Clinics are not lawfully rendered and not ordered and performed because they are medically necessary to address each patient's unique circumstances and were therefore fraudulent. *See* Fla. Stat. §§ 627.732(11) and 627.736(5)(b)(1)(b) and (c); *see also* Exhibit 1, MRI/CT Column, and Exhibits 4A-B, MRI Appendix and CT Appendix.

### E.    The Cereceda Clinics' Fraudulent Re-Examinations

111.    Because patients are unique and respond differently to injuries and treatment, treatment plans should be periodically reassessed and modified, if appropriate, but there is no

indication the Cereceda Providers ever perform a meaningful re-examination of their patients' progress to assess whether treatment plans should be modified.

112.    Indeed, while the Cereceda Clinics may purport to re-evaluate some patients every few weeks, the re-examination reports ("Re-Examination Reports") are similar to the Initial Exam Reports in that they include recommendations for continued treatment pursuant to the Predetermined Protocol regardless of a patient's unique circumstances, the results of any diagnostic imaging, and whether there has been any documented medical improvement.

113.    In addition, the Re-Examination Reports are often similar to the Initial Exam Reports described above in that they reflect complaints and diagnoses that vary little, if at all, from earlier complaints and diagnoses, and recommendations for continued treatment.  At best, the re-examinations result only in a recommendation for either a continuation of the same, a decrease in the frequency of treatment, or a referral to another provider (although there is no meaningful documentation of any follow-up by the Cereceda Clinics to determine or use the results of these referrals).  Representative examples of the Re-Examination Reports and bills are attached hereto as Exhibit 33.

114.    The re-examinations performed at the Cereceda Clinics are not done to legitimately evaluate the patients' conditions and progress or to make medical decisions necessary to address the unique needs of the individual patients.  Instead, the re-examinations are a pretext to support predetermined recommendations for continued treatment and to facilitate separate office visit charges and are thus fraudulent.  *See* Fla. Stat. §§ 627.732(11) and 627.736(5)(b)(1)(c); *see also* Exhibit 33.

### F.    The Fraudulent Final Examinations

115.    Pursuant to the Predetermined Protocol, patients continue to receive services at Ceda Ortho Group and/or the Cereceda Clinics, whether they need them or not, until the patients'

No-Fault Benefits are exhausted or substantially reduced, or the patients unilaterally decide to stop treatment.  At the end of the Predetermined Protocol, the Cereceda Providers purport to conduct final examinations for those patients who are discharged, find these patients achieved MMI, and release the patients from further treatment.  These final examinations are reflected in reports that typically purport to detail the patient's final subjective complaints, examination findings, the results of any diagnostic tests, diagnoses, and/or discussion ("Final Exam Reports").  (Ex. 34, Representative Examples of Chiropractic Final Exam Reports and Bills; Ex. 35 Representative Examples of Physician Final Exam Reports and Bills.)

116.    Despite months of extensive treatment patients purportedly received at the Cereceda Clinics, which consisted of six or more modalities on nearly every visit, the Cereceda Providers prepare Final Exam Reports reflecting patients: (1) still suffer from a litany of diagnoses, typically exceeding the number of diagnoses documented in their Initial Exam Reports; and (2) have sustained a permanent impairment as a result of the accident.

117.    Specifically, the Final Exam Reports prepared by the Cereceda Chiropractors and Cereceda Physicians virtually always document patients have reached MMI and sustained some level of permanent impairment, even though most patients are diagnosed primarily with typical soft tissue injuries.  (Ex. 1, Diagnosis, MMI, and Impairment Columns; Exs. 34-35.)

118.    Patients are invariably discharged with some level of permanent impairment and instructions to consider costly, invasive procedures.  Defendants' documentation, reflecting nearly all of the patients reflected on Ex. 1 who received a final examination suffered some form of permanent impairment, is not credible.

## VII.   THE UNLAWFUL LICENSURE SCHEME

### A.   The HCCA And Licensing Procedures Act

119.    In 2003, the Florida Legislature enacted the HCCA after finding "the regulation of health care clinics must be strengthened to prevent significant cost and harm to consumers."  Fla. Stat. § 400.990(2).  The purpose of the HCCA is "to provide for the licensure, establishment, and enforcement of basic standards for health care clinics and to provide administrative oversight by [AHCA]."  *Id.*

120.    Consistent with its twin goals of establishing basic standards for health care clinics and providing administrative oversight, the licensing regime established by the HCCA subjects licensed clinics to increased regulation and scrutiny.  Indeed, it not only requires entities that provide health care services to obtain a license but also requires licensed clinics to meet numerous qualifications and accept enhanced oversight, including clinic inspections and certifications, proof of financial responsibility, increased criminal penalties for operating an unlicensed clinic, substantially higher fees to obtain clinic licensure, and mandatory background screening for all individuals and entities that qualify as clinic applicants.  Fla. Stat. § 400.990 *et seq*.

121.    In light of the importance of the above standards in protecting the public safety, health, and welfare, the HCCA further instructs "[a] charge or reimbursement claim made by or on behalf of a clinic that is required to be licensed under this part but that is not so licensed, or that is otherwise operating in violation of this part, regardless of whether a service is rendered or whether the charge or reimbursement claim is paid, is an unlawful charge and is non-compensable and unenforceable."  Fla. Stat. § 400.9935(3).  Thus, neither the patient nor third-party payors, like State Farm Mutual and State Farm Fire, are required to pay for medical treatment rendered by an unlicensed clinic that is not otherwise exempt from licensure under the HCCA.

### B.    Limited Exemptions From Licensure Under The HCCA

122.    The HCCA allows a "clinic" to avoid the increased regulation and oversight required by the Act under certain, limited circumstances.  For example, the HCCA exempts clinics that are "wholly owned by one or more licensed health care practitioners," but only "if one of the owners who is a licensed health care practitioner is supervising the business activities and is legally responsible for the entity's compliance with all federal and state laws."  Fla. Stat. § 400.9905(g) (*i.e.*, the Wholly-Owned Exemption).[13]

123.    Thus, entities that seek a certificate of exemption from AHCA pursuant to the Wholly-Owned Exemption are required to have one of the owners who is a licensed health care practitioner affirm that he "supervise[s] the business activities" and is "legally responsible for the entity's compliance with all federal and state laws."  Fla. Stat. § 400.9905(g).  The same holds true for those entities that, pursuant to Fla. Admin. Code R. 59A-33.006(1)-(2), choose to "self-determine" they are exempt from the licensure requirements of the HCCA based upon the Wholly-Owned Exemption.  Clinics that self-determine their exemption from the HCCA's licensure requirements must be wholly owned by a licensed health care practitioner who supervises the business activities and ensures the clinic's compliance with all federal and state laws.

---

[13] As of January 1, 2013, the PIP Law and the HCCA were amended to limit further the extent to which clinics that submit PIP claims can take advantage of the licensure exemptions to the HCCA. Specifically, even if a clinic would otherwise be exempt from licensure under the HCCA, the clinic must also be exempt from licensure under section 627.736(5)(h) of the PIP Law to receive reimbursement.  The PIP Law was also amended to emphasize that absentee owners cannot take advantage of the Wholly-Owned Exemption, expressly defining an "entity wholly owned" by a health care provider as "a proprietorship, group practice, partnership, or corporation that provides health care services rendered by licensed health care practitioners and in which licensed health care practitioners are the business owners of all aspects of the business entity, including, but not limited to, being reflected as the business owners on the title or lease of the physical facility, filing taxes as the business owners, being account holders on the entity's bank account, being listed as the principals on all incorporation documents required by this state, and having ultimate authority over all personnel and compensation decisions relating to the entity."  Fla. Stat. § 627.732(17).

124.    Importantly, an entity cannot take advantage of the Wholly-Owned Exemption by relying on a licensed health care provider who does not supervise the business activities of the entity, or ensure that it complies with all federal and state laws.  *See, e.g.*, *State Farm Fire & Cas. Co. v. Silver Star Health & Rehab*, 739 F.3d 579, 585 (11th Cir. 2013); *State Farm Mut. Auto. Ins. Co. v. Performance Orthopaedics & Neurosurgery, LLC*, 2018 WL 2186496, at *9 (S.D. Fla. Feb. 16, 2018); *State Farm Mut. Auto. Ins. Co. v. Med. Serv. Ctr. of Florida, Inc.*, 103 F. Supp. 3d 1343, 1351 (S.D. Fla. 2015).

125.    As noted above, Cereceda, on behalf of Ceda Ortho Downtown, Ceda Ortho FIU, Ceda Ortho Hialeah, Ceda Ortho South Miami, and Springs Crossing MRI, submitted applications for certificates of exemption from licensure based upon the Wholly-Owned Exemption.  (Ex. 36.) To obtain the exemption, Cereceda represented on each application that he wholly owned Ceda Ortho Downtown, Ceda Ortho FIU, Ceda Ortho Hialeah, Ceda Ortho South Miami, and Springs Crossing MRI, and that he "supervises the business activities and is legally responsible for the applicant's compliance with all federal and state laws." (*Id.*)  Similarly, Cereceda self-determined Ceda Ortho Cutler Bay and Ceda Ortho Group were exempt from the HCCA's clinic licensure requirements.

126.    Ceda Ortho Group, the Cereceda Clinics, and Springs Crossing MRI were not lawfully exempt from the HCCA licensing requirements because Cereceda does not supervise their business activities and has failed to ensure their compliance with all federal and state laws, including the PIP Law and Patient Self-Referral Act.  In fact, Cereceda knowingly orchestrated a fraudulent scheme to submit bills and supporting documentation to State Farm Mutual and State Farm Fire for medically unnecessary and unlawful services under Fla. Stat. §§ 400.9905(4)(g), 400.9935(3), 456.053(5)(c) and (d), 627.732(11), 627.736(5)(b)(1)(b)-(c), and 627.736(5)(h)(3).

127.     Since at least June 2015 through the present, Cereceda has failed to supervise the business activities and ensure compliance with all federal and state laws for Ceda Ortho Group, the Cereceda Clinics, and Springs Crossing MRI.  Specifically, in a February 22, 2017 deposition, Cereceda admitted under oath that:

(a)     he simply "just own[s] the facilities" and has "people run the facilities for [him]";

(b)     he does "not [have] much" oversight of a Cereceda Clinic's operations because he "ha[s] staff for that";

(c)     he does not know whether there is anyone who manages the Cereceda Clinics;

(d)     he does not have access to the software used for medical records and billing, and was not trained in how to use that software;

(e)     he has never been involved with "setting the prices for medical treatment" at Ceda Ortho Hialeah, and is not involved with the amounts that are collected;

(f)     he does not "enter into agreements on behalf of the [Cereceda Clinics]";

(g)     he does not maintain any "professional training" for his staff;

(h)     his "staff and attorneys" are tasked with determining whether providers at the Cereceda Clinics are licensed; and

(i)     he is not involved with the "hiring process" at the Cereceda Clinics.

(Ex. 37 at pp. 53-59, 65-66, 70-72, 105.)  Cereceda was also questioned about one of the Cereceda Clinics – specifically, Cereceda Ortho Hialeah – and testified that:

(a)     he does not review Ceda Ortho Hialeah's "profit and loss statement(s)";

(b)     he does not know who applied for Ceda Ortho Hialeah's tax identification number;

(c)     he does not review any tax forms for Ceda Ortho Hialeah; and

(d)     he is "just the owner" and Ceda Ortho Hialeah "runs on its own."

(*Id.* at pp. 106-07, 118.)  Similarly, in a November 16, 2017, deposition, Cereceda testified his duties and responsibilities at Cereceda Ortho FIU consist of being the "owner," and refused to

answer any other questions about his purported duties at the clinic on the grounds that it involved "company secrets."  (Ex. 38 at pp. 24-25.)

128.    Cereceda also testified an unidentified person "in [] billing" determines the charges submitted to insurers.  (*Id.* at p. 34.)  He also demonstrated a complete lack of understanding regarding how his own clinics actually conduct their business, incorrectly testifying the "Florida Wellness Clinics" were different clinics from the Cereceda Clinics.  (*Id.* at pp. 77-78.)  In fact, the Florida Wellness Clinics are not separate clinics from the Cereceda Clinics – they are one and the same.  Cereceda himself filed to change the name of the Florida Wellness Clinics to the Cereceda Clinics in September 2011.  In short, Cereceda has failed to supervise the business activities of the Cereceda Clinics and Springs Crossing MRI.  Moreover, as noted above, Cereceda failed to ensure the Cereceda Clinics and Springs Crossing MRI comply with all federal and state laws; to the contrary, Cereceda knowingly designed, oversaw, and/or was responsible for the implementation of the Predetermined Protocol to violate the PIP Law and Patient Self-Referral Act by rendering medically unnecessary and unlawful services to State Farm insureds.

129.    Franz Schiebel ("Schiebel"), a former billing clerk for Physicians CBO, also testified that Cereceda's role at the Cereceda Clinics is simply that "he owns them."  (Ex. 39 at p. 30.)  Specifically, Schiebel testified as follows:

> Q.    So in that time period, what was Mark Cereceda's role at Ceda Health of South Miami?
>
> A.    Just the owner.
>
> Q.    Did he work at Ceda Health of South Miami?
>
> A.    No.
>
> Q.    You're sure about that?
>
> A.    Pretty sure.
>
> Q.    Did he handle the billing for Ceda Health of South Miami?
>
> A.    No.

Q.   Did he supervise at Ceda Health of South Miami?

A.   No, that I know of.

Q.   Did he hire people for Ceda Health of South Miami?

A.   I don't think so.

Q.   Did he make any determination as to the reasonableness of the pricing of the CPT codes for that time period at Ceda Health of South Miami?

A.   No.

Q.   Aside from owning the clinic, did he have any participation, whatsoever, in Ceda Health of South Miami?

A.   I don't think so.

Q.   And same answers for Ceda Health of FIU Kendall?

A.   That's correct.

(*Id.* at pp. 31-32.)   In addition, Schiebel testified Cereceda "owns the company" and is "not involved in, you know, the [Cereceda Clinics] or anything like that."  (*Id.* at pp. 85-86.)

130.   Accordingly, Ceda Ortho Group, the Cereceda Clinics, and Springs Crossing MRI never qualified for exemptions from licensure as health care clinics as set forth in the Wholly-Owned Exemption, Fla. Stat. § 400.9905(4)(g).   As a consequence, Ceda Ortho Group, the Cereceda Clinics, and Springs Crossing MRI operated, at all times, in violation of the HCCA and were not entitled to collect No-Fault Benefits.   Thus, Ceda Ortho Group, the Cereceda Clinics, and Springs Crossing MRI submitted, or caused to be submitted, bills to State Farm Mutual and State Farm Fire that falsely represented such bills were for services lawfully rendered, and eligible to collect No-Fault Benefits when in fact they were not.   As a result, all of Ceda Ortho Group, the Cereceda Clinics, and Springs Crossing MRI's charges submitted to State Farm Mutual and State Farm Fire are unlawful, noncompensable, and unenforceable.   *See* Fla. Stat. §§ 400.9905(4)(g), 400.9935(3), 456.053(5)(c) and (d), 627.732(11), 627.736(5)(b)(1)(b)-(c), and 627.736(5)(h)(3).

## VIII.   THE FRAUDULENT AND UNLAWFUL SELF-REFERRAL SCHEME

### A.   Florida's Patient Self-Referral Act Attempts To Eliminate The Potential For Financial Incentives To Improperly Influence The Independent Medical Judgments Of Licensed Professionals That Should Be Based Solely On The Best Interests Of Patients

131.   The Patient Self-Referral Act prohibits health care providers from referring patients for designated health care services to any entity in which the health care provider is an investor or has an investment interest, subject to thirteen exceptions set forth in Fla. Stat. § 456.053(3)(o) that do not apply here.  *See* Fla. Stat. § 456.053(5).  The Patient Self-Referral Act also prohibits health care providers from submitting any claim for payment to any entity, including third-party payors, for services rendered pursuant to an unlawful self-referral.  Fla. Stat. § 456.053(5)(c).  Moreover, a provider that collects any amount billed for services that were the product of an unlawful self-referral must "refund such amount on a timely basis."  Fla. Stat. § 456.053(5)(d).

132.   Importantly, under the Patient Self-Referral Act, health care providers include chiropractors, such as Cereceda, and designated health care services include MRIs, such as those provided by Springs Crossing MRI, and CT scans, such as those provided by Ceda Ortho South Miami.  *See* Fla. Stat. § 456.053(3)(c) and (i).

133.   The legislative intent expressed in the Patient Self-Referral Act recognizes "that the referral of a patient by a health care provider to a provider of health care services in which the referring health care provider has an investment interest represents a potential conflict of interest. The Legislature finds these referral practices may limit or eliminate competitive alternatives in the health care services market, may result in overutilization of health care services, may increase costs to the health care system, and may adversely affect the quality of health care.  The Legislature also recognizes, however, that it may be appropriate for providers to own entities providing health care services, and to refer patients to such entities, as long as certain safeguards  are present in the

arrangement.  It is the intent of the Legislature to provide guidance to health care providers regarding prohibited patient referrals between health care providers and entities providing health care services and to protect the people of Florida from unnecessary and costly health care expenditures." Fla. Stat. § 456.053(2).

134.    The policy rationale behind these prohibitions on self-referrals is that medical treatment should be guided solely by the patient's best interests, including his or her legitimate medical needs, and a physician's medical judgment should not be influenced by the potential for financial gain.  By generally prohibiting chiropractors and physicians from referring patients to entities, including entities that provide diagnostic imaging services, in which they have a direct or indirect financial interest, the Patient Self-Referral Act seeks to eliminate financial factors that may interfere with a provider's independent medical judgment, and ensure judgments regarding whether services are needed and by whom those services should be provided are based solely on the best interests of the patients, not the economic interests of the chiropractors and physicians.

**B.     Cereceda Unlawfully Directs The Cereceda Providers To Refer Patients For MRIs To Springs Crossing MRI And For CT Scans To Ceda Ortho South Miami**

135.    Cereceda, who is a health care provider as defined in Fla. Stat. § 627.736(3)(i), has violated the Patient Self-Referral Act by directing the Cereceda Providers and/or staff who work for or on behalf of Ceda Ortho Group and the Cereceda Clinics to refer patients to receive designated health services, namely MRIs, at Springs Crossing MRI, an entity in which Cereceda is an investor and has an investment interest.  *See* Ex. 4A, reflecting the patients at issue who received unlawful MRIs at Springs Crossing MRI.  Indeed, since Cereceda formed Springs Crossing MRI in 2015, the vast majority of the patients who received an MRI pursuant to a referral from the Cereceda Providers, received their MRIs at Springs Crossing MRI.  As such, these MRIs were not lawfully rendered and were not compensable.  *See* Fla. Stat. §§ 627.732(11),

627.736(1)(a)(1), (5)(a), and (5)(b)(1)(b) and (c).  Furthermore, it was a violation of the Patient Self-Referral Act for Springs Crossing MRI to present claims for payment for these MRIs to State Farm Mutual and State Farm Fire, to collect such payments, and not to refund them to State Farm Mutual and State Farm Fire.  *See* Fla. Stat. § 456.053(5)(c) and (d).

136.    Several patients who received MRIs at Springs Crossing MRI testified the Cereceda Providers specifically steered them to Springs Crossing MRI, did not disclose the common ownership between the facilities and/or did not give them the option of choosing a different MRI facility.[14]  For example, patient A.D. testified when she received a referral from a Cereceda Provider for an MRI, she was referred "specifically" to Springs Crossing MRI.  Patient E.M. also testified he was sent to Springs Crossing MRI and was not informed of the common ownership between Springs Crossing MRI and the Cereceda Clinic where he was treating.  Similarly, patient C.M. testified when a Cereceda Provider referred him for an MRI, he went to Springs Crossing MRI because "[t]hat's the one [the Cereceda Providers] told me to go [to]" and did not know he had the option of going to another facility.  Patients C.B. and J.L. also testified they were not given the option of selecting the MRI facility and instead, where directed to Springs Crossing MRI.

137.    In addition to facilitating the unlawful MRI referrals, Cereceda, who is a health care provider as defined in Fla. Stat. § 627.736(3)(i), has violated the Patient Self-Referral Act by directing the Cereceda Providers and/or staff who work for or on behalf of Ceda Ortho Group and the Cereceda Clinics to refer patients to receive designated health services, namely CT scans, at Ceda Ortho South Miami, an entity in which Cereceda is an investor and has an investment interest. *See* Ex. 4B, reflecting the patients at issue who received unlawful CT scans at Ceda Ortho South

---

[14] In addition, State Farm Mutual and State Farm Fire have no knowledge of any written disclosure forms Defendants furnished to patients pursuant to Fla. Stat. § 456.052.

Miami.  Indeed, since Ceda Ortho South Miami began providing CT scans, the vast majority of the patients who received a CT scan pursuant to a referral from the Cerececda Providers, received their CT Scans at Ceda Ortho South Miami.  All of these referrals were unlawful self-referrals in violation of the Patient Self-Referral Act.  As such, these CT scans were not lawfully rendered and were not compensable.  *See* Fla. Stat. §§ 627.732(11), 627.736(1)(a)(1), (5)(a), and (5)(b)(1)(b) and (c).  Furthermore, it was a violation of the Patient Self-Referral Act for Ceda Ortho South Miami to present claims for payment for these CT scans to State Farm Mutual and State Farm Fire, to collect such payments, and not to refund them to State Farm Mutual and State Farm Fire.  *See* Fla. Stat. § 456.053(5)(c) and (d).

## IX.    DEFENDANTS' VIOLATIONS OF FDUTPA

138.    FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Fla. Stat. § 501.204(1).  The provisions of FDUTPA are to be liberally construed to protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts and practices in the conduct of any trade or commerce.  Fla. Stat. § 501.202(2).

139.    Violations of any law, statute, rule, or regulation which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices constitute violations of FDUTPA.  Fla. Stat. § 501.203(3)(c).  "A deceptive act or practice is 'one that is likely to mislead consumers and an unfair practice is one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'"  *State Farm Mut. Auto. Ins. Co. v. First Care Sol., Inc.*, 232 F. Supp. 3d 1257, 1268 (S.D. Fla. 2017) (citation omitted).  "Fraudulent conduct in the context of billing for PIP benefits qualifies as a

deceptive act for purposes of FDUTPA." *Id.*  In addition, "[a] violation of the [HCCA] may serve as a statutory predicate for a *per se* FDUTPA violation."  *State Farm Mut. Auto. Ins. Co. v. Performance Orthopaedics & Neurosurgery, LLC*, 315 F. Supp. 3d 1291, 1307 (S.D. Fla. 2018). Similarly, "[t]he Insurance Fraud Statute may serve as a predicate offense under the FDUTPA."[15] *Id.*

140.    Defendants violated FDUTPA by engaging in the unfair and deceptive acts and practices described above, namely, making intentional false and fraudulent representations that the services performed at Ceda Ortho Group, the Cereceda Clinics, and Springs Crossing MRI were lawfully rendered when, in fact, these services were not lawfully rendered.  These unfair and deceptive acts and practices violate the established public policies of the state of Florida as codified in the PIP Law, HCCA, Insurance Fraud Statute, and Patient Self-Referral Act, and are immoral, unethical, oppressive, unscrupulous, misleading, and substantially injurious to State Farm Mutual and State Farm Fire and consumers in general.  Accordingly, the services purportedly provided by Ceda Ortho Group, the Cereceda Clinics, and Springs Crossing MRI are not lawfully rendered and therefore are not compensable under Florida law.  *See* Fla. Stat. §§ 400.9905(4)(g), 400.9935(3), 456.053(5)(c)    and    (d),    627.732(11),    627.736(5)(b)(1)(b)-(c),    627.736(5)(h)(3),    and 817.234(1)(a)(2).

---

[15] Pursuant to Fla. Stat. § 817.234(1)(a)(2) (the "Insurance Fraud Statute"), a person commits insurance fraud if that person, "with the intent to injure, defraud or deceive any insurer prepares or makes any written statement that is intended to be presented to any insurer in connection with, or support of, any claim for payment pursuant to an insurance policy, knowing that such statement contains any false, incomplete, or misleading information concerning the claim."  Fla. Stat. § 817.234(1)(a)(2).

## X.    STATE FARM MUTUAL AND STATE FARM FIRE'S RELIANCE

141.    Defendants are obligated legally and ethically to act honestly and with integrity. Florida medical practice statutes govern the conduct of physicians and chiropractors who provide services in the state of Florida.  *See, e.g.*, Fla. Stat. §§ 456.072, 458.331, and 460.413 (collectively, the "Disciplinary Statutes").  Pursuant to the Disciplinary Statutes, the following acts can result in disciplinary action against a physician and chiropractor:

(a)    Making misleading, deceptive, or fraudulent representations in or related to the practice of the licensee's profession;

(b)    Making deceptive, untrue, or fraudulent representations in or related to the practice of a profession; and

(c)    Exercising influence on the patient or client for the purpose of financial gain of the licensee or a third party.

Fla. Stat. §§ 456.072(1)(a), (m), and (n), 458.331(1)(k) and (n), and 460.413(1)(k) and (n).

142.    Moreover, the Insurance Fraud Statute imposes criminal penalties on providers who "with the intent to injure, defraud or deceive any insurer prepares or makes any written statement that is intended to be presented to any insurer in connection with, or support of, any claim for payment pursuant to an insurance policy, knowing that such statement contains any false, incomplete, or misleading information concerning the claim."  Fla. Stat. § 817.234(1)(a)(2).

143.    Despite their duty to act honestly, with integrity, and in accord with Florida law, Defendants submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire bills and supporting documentation that are false, misleading, and fraudulent because they represent patients were legitimately examined, had sustained emergency medical conditions, and received medically necessary and lawfully rendered services when, in fact, they did not.  Defendants

submitted the bills and supporting documentation to State Farm Mutual and State Farm Fire to induce them to pay benefits to which Defendants knew they were not entitled.

144.   As a result of Defendants' false statements in the bills and supporting medical records they submitted to State Farm Mutual and State Farm Fire, State Farm Mutual and State Farm Fire paid for medically unnecessary and unlawful services.

145.   State Farm Mutual and State Farm Fire are under statutory and contractual duties to pay or deny claims for No-Fault Benefits within 30 days, and may be ordered to pay interest and attorneys' fees if they fail to pay the full amount owed within that time period. *See* Fla. Stat. § 627.736(4)(b) and (d).  Defendants' fraudulent scheme was successful because of precisely how State Farm Mutual and State Farm Fire are required to adjust claims for No-Fault Benefits.

146.   Defendants developed and implemented their fraudulent scheme to take advantage of State Farm Mutual and State Farm Fire and the Florida No-Fault claims environment. Defendants knew the efficient operation of a system of insurance requires prompt processing of individual claims.  Thus, Defendants designed a scheme that could go undetected in an individual claim.  Specifically, Defendants fraudulently concealed their conduct by repeatedly submitting misleading bills and supporting documentation that made it appear they were delivering medically necessary and lawful care when considered in the context of a single patient's claim, when they were not.

147.   In short, each bill and its supporting documentation, when viewed in isolation, does not reveal its fraudulent and unlawful nature.  It was only when the bills and supporting documentation across the patients at issue in this Complaint are viewed together as a whole do the patterns emerge revealing the fraudulent and unlawful nature of all the bills and supporting documentation.  Indeed, State Farm Mutual and State Farm Fire did not discover and could not

have reasonably discovered their payments to Defendants were based upon fraud until they reviewed together as a whole the patterns reflected in the bills and supporting documentation for all of the patients at issue in this Complaint.  (*See, e.g.*, 1-4A-B, 25-26, 28-29, 32A-B, and 33-35.) Only then did it become apparent Defendants were not providing necessary and lawful medical care designed to address their patients' unique needs.  The submission of fraudulent bills and supporting documentation were affirmative acts by Defendants that prevented State Farm Mutual and State Farm Fire from discovering the truth.

148.    State Farm Mutual and State Farm Fire's injuries were inherently unknowable because State Farm Mutual and State Farm Fire believed they were paying Defendants what they were owed.  State Farm Mutual and State Farm Fire relied on the accuracy of Defendants' bills and supporting documentation and their representations the services rendered were medically necessary and lawfully rendered, when they were not.

149.    The bills and supporting documents that Defendants submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire in support of the fraudulent and unlawful charges at issue, combined with the material misrepresentations described above, were designed to and did cause State Farm Mutual and State Farm Fire to rely on them to their detriment.  As a result, State Farm Mutual and State Farm Fire have incurred damages of more than $4 million.

## XI.    CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**COMMON LAW FRAUD**
**(Against Cereceda, Crespo-Smith, Javech, Moya,**
**Canizares, Facuseh, Fenelus, Haban, Habayeb, Ross, Schulman, Yoham,**
**Ceda Ortho Group, The Cereceda Clinics, Physicians CBO, And Springs Crossing MRI)**

150.    State Farm Mutual and State Farm Fire incorporate as though fully set forth herein the allegations in paragraphs 1 through 149 above.

151.    In the claims set forth in Exhibit 1, Defendants Cereceda, Crespo-Smith, Javech, Moya, Canizares, Facuseh, Fenelus, Haban, Habayeb, Ross, Schulman, Yoham, Ceda Ortho Group, the Cereceda Clinics, Physicians CBO, and Springs Crossing MRI acted in concert to intentionally and knowingly make, or cause to be made, false and fraudulent representations of material fact to State Farm Mutual and State Farm Fire.

152.    The false and fraudulent representations of material fact include that: (a) the services were performed, medically necessary, and lawful as required by the PIP Laws, when they were not; (b) patients were legitimately examined to determine the true nature and extent of their injuries, when they were not; (c) patients were legitimately diagnosed, when they were not; (d) patients were legitimately found to have sustained an EMC as a result of their auto accident, when they were not; (e) patients received treatments consisting of five or more passive modalities at nearly every visit, in addition to vague neuromuscular reeducation, group physical therapy, or therapeutic exercise on virtually all visits because such treatments were medically necessary, when they were not; (f) patients received goods (*e.g.*, cold packs, creams) that were medically necessary, when they were not; (g) patients received medically necessary and lawfully rendered x-rays, MRIs, and CT scans at the Cereceda Clinics and Springs Crossing MRI, when in fact the x-rays, MRIs, and CT scans were not medically necessary and not lawfully rendered; (h) patients were legitimately found to suffer from permanent impairments at their final examinations, when they were not; and (i) the services performed at Ceda Ortho Group, the Cereceda Clinics, and Springs Crossing MRI were lawfully rendered when, in fact, these services were not lawfully rendered and therefore were not owed pursuant to the PIP Law because such services were rendered pursuant to intentional violations of the PIP Law, HCCA, Insurance Fraud Statute, and Patient Self-Referral Act.

153.     Defendants Cereceda, Crespo-Smith, Javech, Moya, Canizares, Facuseh, Fenelus, Haban, Habayeb, Ross, Schulman, Yoham, Ceda Ortho Group, the Cereceda Clinics, Physicians CBO, and Springs Crossing MRI knew the above-described misrepresentations made to State Farm Mutual and State Farm Fire relating to the purported examination, diagnoses, EMC determinations, diagnostic imaging, and services of patients were false and fraudulent when they were made.

154.     Representative examples of the fraudulent reports, documents, and bills can be found in Exhibits 1-4A-B, 25-26, 28-29, 32A-B, and 33-35.

155.     Defendants Cereceda, Crespo-Smith, Javech, Moya, Canizares, Facuseh, Fenelus, Haban, Habayeb, Ross, Schulman, Yoham, Ceda Ortho Group, the Cereceda Clinics, Physicians CBO, and Springs Crossing MRI made the above-described misrepresentations and engaged in such conduct to induce State Farm Mutual and State Farm Fire into relying on the misrepresentations.

156.     As a result of its reliance on these misrepresentations, State Farm Mutual and State Farm Fire have incurred damages of at least $4 million.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against Defendants Cereceda, Crespo-Smith, Javech, Moya, Canizares, Facuseh, Fenelus, Haban, Habayeb, Ross, Schulman, Yoham, Ceda Ortho Group, the Cereceda Clinics, Physicians CBO, and Springs Crossing MRI jointly and severally for compensatory damages, costs, and other such relief as the Court deems equitable, just, and proper.

**SECOND CLAIM FOR RELIEF**
**UNJUST ENRICHMENT**
**(Against Cereceda, Crespo-Smith, Javech, Moya,**
**Canizares, Facuseh, Fenelus, Haban, Habayeb, Ross, Schulman, Yoham,**
**Ceda Ortho Group, The Cereceda Clinics, Physicians CBO, And Springs Crossing MRI)**

157.    State Farm Mutual and State Farm Fire incorporate as though fully set forth herein the allegations in paragraphs 1 through 149 above.

158.    In each claim described in Exhibit 1, State Farm Mutual and State Farm Fire conferred a benefit upon Defendants Cereceda, Crespo-Smith, Javech, Moya, Canizares, Facuseh, Fenelus, Haban, Habayeb, Ross, Schulman, Yoham, Ceda Ortho Group, the Cereceda Clinics, Physicians CBO, and Springs Crossing MRI by paying their claims and these Defendants voluntarily accepted and have retained benefits from the payments conferred by State Farm Mutual and State Farm Fire.

159.    Because Defendants Cereceda, Crespo-Smith, Javech, Moya, Canizares, Facuseh, Fenelus, Haban, Habayeb, Ross, Schulman, Yoham, Ceda Ortho Group, the Cereceda Clinics, Physicians CBO, and Springs Crossing MRI knowingly submitted, or caused to be submitted, charges for examinations, diagnostic imaging, goods, treatments, and other services that were not medically necessary and lawfully rendered, the circumstances are such that it would be inequitable to allow them to retain the benefit of the monies paid.

160.    As a direct and proximate result of the above-described conduct, State Farm Mutual and State Farm Fire have been damaged and Defendants Cereceda, Crespo-Smith, Javech, Moya, Canizares, Facuseh, Fenelus, Haban, Habayeb, Ross, Schulman, Yoham, Ceda Ortho Group, the Cereceda Clinics, Physicians CBO, and Springs Crossing MRI have been unjustly enriched by more than $4 million.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against Defendants Cereceda, Crespo-Smith, Javech, Moya, Canizares, Facuseh, Fenelus, Haban, Habayeb, Ross, Schulman, Yoham, Ceda Ortho Group, the Cereceda Clinics, Physicians CBO, and Springs Crossing MRI jointly and severally for compensatory damages, costs, and other such relief as the Court deems equitable, just, and proper.

**THIRD CLAIM FOR RELIEF**
**CIVIL CONSPIRACY**
**(Against Cereceda, Crespo-Smith, Javech, Moya,**
**Canizares, Facuseh, Fenelus, Haban, Habayeb, Ross, Schulman, Yoham,**
**Ceda Ortho Group, The Cereceda Clinics, Physicians CBO, And Springs Crossing MRI)**

161.    State Farm Mutual and State Farm Fire incorporate as though fully set forth herein the allegations in paragraphs 1 through 149 above.

162.    Defendants Cereceda, Crespo-Smith, Javech, Moya, Canizares, Facuseh, Fenelus, Haban, Habayeb, Ross, Schulman, Yoham, Ceda Ortho Group, the Cereceda Clinics, Physicians CBO, and Springs Crossing MRI each knowingly agreed and conspired to conduct and participate, directly or indirectly, in the fraudulent scheme described above in paragraphs 1 through 149 when they submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire bills and supporting documentation that were fraudulent and unlawful.

163.    Defendants Cereceda, Crespo-Smith, Javech, Moya, Canizares, Facuseh, Fenelus, Haban, Habayeb, Ross, Schulman, Yoham, Ceda Ortho Group, the Cereceda Clinics, Physicians CBO, and Springs Crossing MRI each agreed to act and did act in furtherance of the common and overall objective of the conspiracy to fraudulently obtain No-Fault Benefits by knowingly facilitating the submission of bills and supporting documentation to State Farm Mutual and State Farm Fire that made intentional false and fraudulent representations that: (a) the services were performed, medically necessary, and lawful as required by the PIP Laws, when they were not; (b)

patients were legitimately examined to determine the true nature and extent of their injuries, when they were not; (c) patients were legitimately diagnosed, when they were not; (d) patients were legitimately found to have sustained an EMC as a result of their auto accident, when they were not; (e) patients received treatments consisting of five or more passive modalities at nearly every visit, in addition to vague neuromuscular reeducation, group physical therapy, or therapeutic exercise on virtually all visits because such treatments were medically necessary, when they were not; (f) patients received goods (*e.g.*, cold packs, creams) that were medically necessary, when they were not; (g) patients received medically necessary and lawfully rendered x-rays, MRIs, and CT scans at the Cereceda Clinics and Springs Crossing MRI, when in fact the x-rays, MRIs, and CT scans were not medically necessary and not lawfully rendered; (h) patients were legitimately found to suffer from permanent impairments at their final examinations, when they were not; and (i) the services performed at Ceda Ortho Group, the Cereceda Clinics, and Springs Crossing MRI were lawfully rendered when, in fact, these services were not lawfully rendered and therefore were not owed pursuant to the PIP Law because such services were rendered pursuant to intentional violations of the PIP Law, HCCA, Insurance Fraud Statute, and Patient Self-Referral Act.

164.    Defendants Cereceda, Crespo-Smith, Javech, Moya, Canizares, Facuseh, Fenelus, Haban, Habayeb, Ross, Schulman, Yoham, Ceda Ortho Group, the Cereceda Clinics, Physicians CBO, and Springs Crossing MRI are jointly and severally liable to State Farm Mutual and State Farm Fire for the damages caused by the conspiracy.

165.    As a direct and proximate result of Defendants Cereceda, Crespo-Smith, Javech, Moya, Canizares, Facuseh, Fenelus, Haban, Habayeb, Ross, Schulman, Yoham, Ceda Ortho Group, the Cereceda Clinics, Physicians CBO, and Springs Crossing MRI's conspiracy, State Farm Mutual and State Farm Fire have incurred damages of more than $4 million.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against Defendants Cereceda, Crespo-Smith, Javech, Moya, Canizares, Facuseh, Fenelus, Haban, Habayeb, Ross, Schulman, Yoham, Ceda Ortho Group, the Cereceda Clinics, Physicians CBO, and Springs Crossing MRI jointly and severally for compensatory damages, costs, and other such relief as this Court deems equitable, just, and proper.

**FOURTH CLAIM FOR RELIEF**
**AIDING AND ABETTING FRAUD**
**(Against Cereceda, Crespo-Smith, Javech, Moya,**
**Canizares, Facuseh, Fenelus, Haban, Habayeb, Ross, Schulman, Yoham,**
**Ceda Ortho Group, The Cereceda Clinics, Physicians CBO, And Springs Crossing MRI)**

166.    State Farm Mutual and State Farm Fire incorporate as though fully set forth herein the allegations in paragraphs 1 through 149 above.

167.    Defendants Cereceda, Crespo-Smith, Javech, Moya, Canizares, Facuseh, Fenelus, Haban, Habayeb, Ross, Schulman, Yoham, Ceda Ortho Group, the Cereceda Clinics, Physicians CBO, and Springs Crossing MRI each knowingly aided and abetted the fraudulent scheme described above in paragraphs 1 through 149 that was perpetrated against State Farm Mutual and State Farm Fire.

168.    The acts of Defendants Cereceda, Crespo-Smith, Javech, Moya, Canizares, Facuseh, Fenelus, Haban, Habayeb, Ross, Schulman, Yoham, Ceda Ortho Group, the Cereceda Clinics, Physicians CBO, and Springs Crossing MRI in substantially advancing the fraudulent scheme include knowingly facilitating the submission of bills and supporting documentation to State Farm Mutual and State Farm Fire that made intentional false and fraudulent representations that: (a) the services were performed, medically necessary, and lawful as required by the PIP Laws, when they were not; (b) patients were legitimately examined to determine the true nature and extent of their injuries, when they were not; (c) patients were legitimately diagnosed, when they

were not; (d) patients were legitimately found to have sustained an EMC as a result of their auto accident, when they were not; (e) patients received treatments consisting of five or more passive modalities at nearly every visit, in addition to vague neuromuscular reeducation, group physical therapy, or therapeutic exercise on virtually all visits because such treatments were medically necessary, when they were not; (f) patients received goods (*e.g.*, cold packs, creams) that were medically necessary, when they were not; (g) patients received medically necessary and lawfully rendered x-rays, MRIs, and CT scans at the Cereceda Clinics and Springs Crossing MRI, when in fact the x-rays, MRIs, and CT scans were not medically necessary and not lawfully rendered; (h) patients were legitimately found to suffer from permanent impairments at their final examinations, when they were not; and (i) the services performed at Ceda Ortho Group, the Cereceda Clinics, and Springs Crossing MRI were lawfully rendered when, in fact, these services were not lawfully rendered and therefore were not owed pursuant to the PIP Law because such services were rendered pursuant to intentional violations of the PIP Law, HCCA, Insurance Fraud Statute, and Patient Self-Referral Act.

169.    The conduct of Defendants Cereceda, Crespo-Smith, Javech, Moya, Canizares, Facuseh, Fenelus, Haban, Habayeb, Ross, Schulman, Yoham, Ceda Ortho Group, the Cereceda Clinics, Physicians CBO, and Springs Crossing MRI in substantially advancing the fraudulent scheme was material and necessary to the success of Defendants' fraudulent scheme.

170.    Defendants Cereceda, Crespo-Smith, Javech, Moya, Canizares, Facuseh, Fenelus, Haban, Habayeb, Ross, Schulman, Yoham, Ceda Ortho Group, the Cereceda Clinics, Physicians CBO, and Springs Crossing MRI aided and abetted the fraudulent scheme in a calculated effort to induce State Farm Mutual and State Farm Fire into paying Defendants' fraudulent and unlawful charges.

171.     As a direct and proximate result of Defendants Cereceda, Crespo-Smith, Javech, Moya, Canizares, Facuseh, Fenelus, Haban, Habayeb, Ross, Schulman, Yoham, Ceda Ortho Group, the Cereceda Clinics, Physicians CBO, and Springs Crossing MRI's conduct in substantially advancing the fraudulent scheme, State Farm Mutual and State Farm Fire have incurred damages of more than $4 million.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against Defendants Cereceda, Crespo-Smith, Javech, Moya, Canizares, Facuseh, Fenelus, Haban, Habayeb, Ross, Schulman, Yoham, Ceda Ortho Group, the Cereceda Clinics, Physicians CBO, and Springs Crossing MRI jointly and severally for compensatory damages, costs, and other such relief as this Court deems equitable, just, and proper.

### FIFTH CLAIM FOR RELIEF
### VIOLATIONS OF FDUTPA
### (Against Cereceda, Crespo-Smith, Javech, Moya, Canizares, Facuseh, Fenelus, Haban, Habayeb, Ross, Schulman, Yoham, Ceda Ortho Group, The Cereceda Clinics, Physicians CBO, And Springs Crossing MRI)

172.     State Farm Mutual and State Farm Fire incorporate as though fully set forth herein the allegations in paragraphs 1 through 149 above.

173.     In each claim set forth in Exhibit 1 submitted to State Farm Mutual and State Farm Fire, Defendants Cereceda, Crespo-Smith, Javech, Moya, Canizares, Facuseh, Fenelus, Haban, Habayeb, Ross, Schulman, Yoham, Ceda Ortho Group, the Cereceda Clinics, Physicians CBO, and Springs Crossing MRI engaged in unfair and deceptive acts and practices in the conduct of trade and commerce.  Such acts and practices offend public policy and are unconscionable, immoral, unethical, oppressive, and unscrupulous.  These acts and practices include intentionally and knowingly making, or causing to be made, false and fraudulent statements of material fact to State Farm Mutual and State Farm Fire in fraudulent submissions for services that were not

lawfully rendered by Ceda Ortho Group, the Cereceda Clinics, and Springs Crossing MRI because they were rendered pursuant to intentional violations of the PIP Law, HCCA, Insurance Fraud Statute, and Patient Self-Referral Act.   *See* Fla. Stat. §§ 400.9905(4)(g), 400.9935(3), 456.053(5)(c) and (d), 627.732(11), 627.736(5)(b)(1)(b)-(c), 627.736(5)(h)(3), and 817.234(1)(a)(2).   State Farm Mutual and State Farm Fire relied upon Defendants' false, fraudulent, and deceptive submissions to their detriment when it paid Defendants' claims for No-Fault Benefits.

174.    Accordingly, by virtue of the foregoing, State Farm Mutual and State Farm Fire are entitled to compensatory damages of more than $4 million, plus attorneys' fees and costs and any other relief this Court deems equitable, just, and proper.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against Defendants Cereceda, Crespo-Smith, Javech, Moya, Canizares, Facuseh, Fenelus, Haban, Habayeb, Ross, Schulman, Yoham, Ceda Ortho Group, the Cereceda Clinics, Physicians CBO, and Springs Crossing MRI jointly and severally for compensatory damages plus interest and costs and any other relief this Court deems equitable, just, and proper.

### SIXTH CLAIM FOR RELIEF
### DECLARATORY JUDGMENT
### (Against Ceda Ortho Group)

175.    State Farm Mutual and State Farm Fire incorporate as though fully set forth herein the allegations in paragraphs 1 through 149 above.

176.    This is an action for declaratory relief pursuant to 28 U.S.C. § 2201.

177.    There is an actual case and controversy between State Farm Mutual and State Farm Fire, on one hand, and Ceda Ortho Group, on the other hand, as to all claims and charges for patients who purportedly received services performed at Ceda Ortho Group that have not been

paid or were allegedly underpaid.  State Farm Mutual and State Farm Fire contend Ceda Ortho Group is not entitled to be paid for any of these unpaid or allegedly underpaid claims and charges submitted to State Farm Mutual and State Farm Fire to date and through the trial of this case.

178.    Because Ceda Ortho Group knowingly made false and fraudulent statements and otherwise engaged in the above-described fraudulent conduct with the intent to conceal and misrepresent material facts and circumstances regarding each claim and charge Ceda Ortho Group submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire, it is not entitled to any reimbursement for unpaid or allegedly underpaid claims and charges submitted to State Farm Mutual and State Farm Fire to date and through the trial of this case.  *See* Fla. Stat. §§ 400.9905(4)(g), 400.9935(3), 627.732(11), 627.736(5)(b)(1)(b)-(c), 627.736(5)(h)(3), and 817.234(1)(a)(2).

WHEREFORE, State Farm Mutual and State Farm Fire respectfully request a judgment declaring that Ceda Ortho Group is not entitled to reimbursement for any of the unpaid or allegedly underpaid charges for services purportedly performed at Ceda Ortho Group and submitted to State Farm Mutual and State Farm Fire to date and through the trial of this case, and for supplementary relief, attorneys' fees, interest, and costs as this Court deems equitable, just, and proper.

### SEVENTH CLAIM FOR RELIEF
### DECLARATORY JUDGMENT
### (Against The Cereceda Clinics)

179.    State Farm Mutual and State Farm Fire incorporate as though fully set forth herein the allegations in paragraphs 1 through 149 above.

180.    This is an action for declaratory relief pursuant to 28 U.S.C. § 2201.

181.    There is an actual case and controversy between State Farm Mutual and State Farm Fire, on one hand, and the Cereceda Clinics, on the other hand, as to all claims and charges for

patients who purportedly received services performed at the Cereceda Clinics that have not been paid or were allegedly underpaid.  State Farm Mutual and State Farm Fire contend the Cereceda Clinics are not entitled to be paid for any of these unpaid or allegedly underpaid claims and charges submitted to State Farm Mutual and State Farm Fire to date and through the trial of this case.

182.    Because the Cereceda Clinics knowingly made false and fraudulent statements and otherwise engaged in the above-described fraudulent conduct with the intent to conceal and misrepresent material facts and circumstances regarding each claim and charge the Cereceda Clinics submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire, they are not entitled to any reimbursement for any unpaid or allegedly underpaid claims and charges submitted to State Farm Mutual and State Farm Fire to date and through the trial of this case.  *See* Fla. Stat. §§ 400.9905(4)(g), 400.9935(3), 456.053(5)(c) and (d), 627.732(11), 627.736(5)(b)(1)(b)-(c), 627.736(5)(h)(3), and 817.234(1)(a)(2).

WHEREFORE, State Farm Mutual and State Farm Fire respectfully request a judgment declaring that the Cereceda Clinics are not entitled to reimbursement for any of the unpaid or allegedly underpaid charges for services purportedly performed at the Cereceda Clinics and submitted to State Farm Mutual and State Farm Fire to date and through the trial of this case, and for supplementary relief, attorneys' fees, interest, and costs as this Court deems equitable, just, and proper.

**EIGHTH CLAIM FOR RELIEF**
**DECLARATORY JUDGMENT**
**(<u>Against Springs Crossing MRI</u>)**

183.    State Farm Mutual and State Farm Fire incorporate as though fully set forth herein the allegations in paragraphs 1 through 149 above.

184.    This is an action for declaratory relief pursuant to 28 U.S.C. § 2201.

185.    There is an actual case and controversy between State Farm Mutual and State Farm Fire, on one hand, and Springs Crossing MRI, on the other hand, as to all claims and charges for patients who purportedly received MRIs performed at Springs Crossing MRI that have not been paid or were allegedly underpaid.  State Farm Mutual and State Farm Fire contend Springs Crossing MRI is not entitled to be paid for any of these unpaid or allegedly underpaid claims and charges submitted to State Farm Mutual and State Farm Fire to date and through the trial of this case.

186.    Because Springs Crossing MRI has knowingly made false and fraudulent statements relating to a claim and charge and otherwise engaged in the above-described fraudulent and unlawful conduct with the intent to conceal and misrepresent material facts and circumstances regarding each claim and charge Springs Crossing MRI submitted to State Farm Mutual and State Farm Fire it is not entitled to any reimbursement for any unpaid or allegedly underpaid claims and charges submitted to State Farm Mutual and State Farm Fire to date and through the trial of this case.  *See* Fla. Stat. §§ 400.9905(4)(g), 400.9935(3), 456.053(5)(c) and (d), 627.732(11), 627.736(5)(b)(1)(b)-(c), 627.736(5)(h)(3), and 817.234(1)(a)(2).

WHEREFORE, State Farm Mutual and State Farm Fire respectfully request a judgment declaring that Springs Crossing MRI is not entitled to reimbursement for any of the unpaid or allegedly underpaid charges for MRIs purportedly performed at Springs Crossing MRI and submitted to State Farm Mutual and State Farm Fire to date and through the trial of this case, and for supplementary relief, attorneys' fees, interest, and costs as this Court deems equitable, just, and proper.

## NINTH CLAIM FOR RELIEF
## PATIENT SELF-REFERRAL ACT
### (<u>Against Cereceda, Springs Crossing MRI, And Ceda Ortho South Miami</u>)

187.     State Farm Mutual and State Farm Fire incorporate as though fully set forth herein the allegations in paragraphs 1 through 149 above.

188.     Cereceda owns Ceda Ortho Group, the Cereceda Clinics, and Springs Crossing MRI.  To the extent State Farm Mutual and State Farm Fire's payments were for MRIs and CT scans rendered to State Farm Mutual and State Farm Fire insureds who were unlawfully referred to Springs Crossing MRI and Ceda Ortho South Miami by Ceda Ortho Group and/or the Cereceda Clinics at the direction of Cereceda, including each claim identified in Exhibits 1, 4A, and 4B attached hereto, all such MRIs and CT scans were rendered in violation of the Patient Self-Referral Act.

189.     Cereceda, Springs Crossing MRI, and Ceda Ortho South Miami violated the Patient Self-Referral Act by submitting, or causing to be submitted, bills for payment to State Farm Mutual and State Farm Fire that were rendered pursuant to unlawful self-referrals.  *See* Fla. Stat. § 456.053(5)(c).

190.     Because Springs Crossing MRI and Ceda Ortho South Miami received payments from State Farm Mutual and State Farm Fire for MRIs and CT scans that were rendered pursuant to unlawful self-referrals and Springs Crossing MRI and Ceda Ortho South Miami were not allowed to submit bills for payment, they were therefore obligated to refund those payments under the Patient Self-Referral Act.  *See* Fla. Stat. § 456.053(5)(d).

191.     By virtue of the foregoing, State Farm Mutual and State Farm Fire are entitled to compensatory damages of more than $650,000.

WHEREFORE, State Farm Mutual and State Farm Fire respectfully request judgment against Cereceda, Springs Crossing Imaging, and Ceda Ortho South Miami for compensatory damages, costs, and other such relief as this Court deems equitable, just, and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), State Farm Mutual and State Farm Fire demand a trial by jury.

Dated: January 23, 2020                                Respectfully submitted,

By: */s/ David I. Spector*
        DAVID I. SPECTOR, ESQ.
        Fla. Bar No. 086540
        david.spector@hklaw.com
        JOSEPH F. VALDIVIA, ESQ.
        Fla. Bar No. 0107878
        joseph.valdivia@hklaw.com
        HOLLAND & KNIGHT LLP
        222 Lakeview Avenue
        Suite 1000
        West Palm Beach, Florida  33401
        Telephone:  (561) 833-2000
        Facsimile:   (561) 650-8399

        – and –

        ROSS O. SILVERMAN
        ross.silverman@katten.com
        (*admitted pro hac vice*)
        ERIC T. GORTNER
        eric.gortner@katten.com
        (*admitted pro hac vice*)
        JOHN W. REALE
        john.reale@katten.com
        (*admitted pro hac vice*)
        JOHN T. LEPORE
        john.lepore@katten.com
        (*admitted pro hac vice*)
        MICHAEL J. POWERS
        michael.powers@katten.com
        (*admitted pro hac vice*)

KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, IL 60661-3693
Telephone: (312) 902-5200
Facsimile: (312) 902-1061

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on January 23, 2020 the foregoing document will be served on all counsel of record via CM/ECF.

By: *David I. Spector* _____
DAVID I. SPECTOR
Fla. Bar No. 086540
david.spector@hklaw.com
HOLLAND & KNIGHT LLP
222 Lakeview Avenue
Suite 1000
West Palm Beach, Florida  33401
Telephone:  (561) 833-2000
Facsimile:   (561) 650-8399

*Attorneys for Plaintiffs*