*Exhibit 10*

04/03/2012 10:31 FAX                                                                  ☒ 0001/0005

SCANNED

# ADVERTISING AGREEMENT
## (CHIROPRACTOR)

This Advertising Agreement (this "Agreement") is made and entered into as of the __1st__ day of __April__ 20__12__ (the "Effective Date"), by and between __1-800-411-PAIN REFERRAL SERVICE, LLC__, a Florida limited liability company ("Referral Service"), and _____ ("Participating Clinic") (Referral Service and Participating Clinic are sometimes referred to herein individually as a "Party" or collectively as the "Parties").

## RECITALS:

WHEREAS, Referral Service is a chiropractic and attorney referral service that operates on a nationwide basis and has at least fifty (50) participating chiropractor members; and

WHEREAS, Participating Clinic is a chiropractic clinic that employs or contracts with chiropractors ("Participating Chiropractors") licensed to practice chiropractic medicine in the state in which Participating Clinic is located; and

WHEREAS, Referral Service is the Exclusive Licensee of certain intellectual property rights (the "Licensed IP"), including but not limited to trademark rights as registered or under common law, patent rights, copyrights whether or not registered, and internet domains, related to the phrase "411 PAIN," and the toll free phone number, 1-800-411-PAIN and any other related phrases and toll free numbers (the "Toll Free Numbers") as set forth in Exhibit A; and

WHEREAS, using the Licensed IP, Referral Service develops marketing materials, web sites and purchases advertising in various forms of media to advertise the Toll Free Numbers ("Marketing Services"); and

WHEREAS, Participating Clinic has employees and independent contractors (the "Phone Agents") that will attend to phone calls placed by potential clients to the Toll Free Numbers (the "Potential Clients"); and

WHEREAS, Participating Clinic and Participating Chiropractors desire to contract with Referral Service to receive Marketing Services; and

WHEREAS, Referral Service desires to enter into a contractual relationship with Participating Clinic to provide Marketing Services to Participating Clinic for the purpose of providing Potential Clients to the Participating Clinic.

4840-2869-2487.1
42829/0001 tr

04/03/2012 10:32 FAX

NOW THEREFORE, in consideration of the mutual covenants contained herein, and for such other good and valuable consideration the receipt of which is hereby acknowledged, the Parties agree as follows:

1. **Recitals.** The Parties hereto acknowledge and agree that the foregoing recitals are true and correct and are hereby incorporated herein.

2. **Obligations of Referral Service.**

    (a) Referral Service shall develop marketing materials, web sites and purchase advertising in various forms of media to advertise the Toll Free Numbers;

    (b) Referral Service shall redirect all phone calls placed by potential clients to the Toll Free Numbers to the phone number(s) designated by Participating Clinic;

    (c) The foregoing notwithstanding, Referral Service shall have no quotas, minimums or other obligations with respect to the number of Potential Clients that must be directed to Participating Clinic through the provision of the Marketing Services. Referral Service's only obligation shall be to perform the specific obligations set forth in this Agreement;

    (d) Referral Service shall preserve and protect the Licensed IP from infringement claims of third parties during the Term of this Agreement and shall perform all undertakings with governmental authorities to register it rights with respect to the Licensed IP;

    (e) Referral Service shall have the right, in its sole discretion, at any time to prohibit any Participating Chiropractor from receiving referrals of Potential Clients and to prohibit a Participating Clinic from referring a Potential Client to said Participating Chiropractor.

3. **Obligations of Participating Clinic.** In addition to all other obligations set forth in this Agreement, Participating Clinic agrees to and to cause Participating Chiropractors (as applicable) to:

    (a) attend to phone calls placed by Potential Clients to the Toll Free Numbers and redirected by Referral Service to the phone number(s) designated by Participating Clinic;

    (b) comply with all applicable federal and state laws and regulations related to the marketing and sale of its services to the Potential Clients;

    (c) keep all Confidential Information (as defined herein) confidential in accordance with the provisions of Section 8 hereof;

(d) treat all Potential Clients referred to Participating Clinic fairly, with respect, and without discrimination in regards to race, color, religion, sex, national origin, age, sexual orientation or disability;

(e) ensure that Participating Chiropractors are, throughout the term hereof, (i) duly licensed to practice chiropractic medicine in the state in which they practice, and (ii) trained and qualified to perform (and are proficient in the performance of) the chiropractic services provided to Potential Clients. Participating Clinic agrees to immediately inform Referral Service upon learning that any of its Participating Chiropractors' license to practice chiropractic medicine has been suspended or revoked;

(f) cause Participating Chiropractors to perform chiropractic services in compliance with all applicable legal and regulatory and standards; and

(g) inform Referral Service monthly of the addition or deletion of any Participating Chiropractor.

4. **Fee Arrangement.**

(a) Participating Clinic agrees to pay a monthly fee of Three Thousand Dollars ($3,000.00) in advance on the Effective Date and on the first day of each month thereafter (prorated for partial months) in exchange for the provision of Marketing Services to Participating Clinic by Referral Service.

5. **Term; Termination.**

(a) The term ("Term") of this Agreement shall commence on the date of this Agreement, and shall terminate one (1) year from such date. This Agreement shall renew automatically from year to year unless either Party provides written notice to the other Party at least thirty (30) calendar days prior to the expiration of the Term of its intent not to renew.

(b) This Agreement may be terminated by either Party upon a breach of any material term or condition contained herein by another Party which remains uncured for more than ten (10) business days after written notice thereof to the breaching Party.

(c) Referral Service may immediately terminate this Agreement if Participating Clinic violates Section 3.

(d) Either Party may terminate this Agreement at any time with thirty (30) calendar days written notice to the other Party of its intent to terminate.

(e) Neither termination of this Agreement nor waiver of any right to terminate under this Agreement shall impair or limit any additional rights or remedies that either Party may have at law or in equity.

04/03/2012 10:33 FAX

6. **Indemnification.** Each Party shall indemnify, defend and hold harmless, the other Parties and their respective shareholders, directors, officers, employees and representatives for all claims, losses, demands, suits, liability, damages, costs and fees (including attorney's fees and costs through all levels of appeal) which result or arise from (i) a Party's breach of any covenants or obligations under this Agreement or (ii) negligent acts of the Party and its, directors, officers, employees and representatives and agents.

7. **Limitation of Liability:** IN THE EVENT OF ANY BREACH BY ANY PARTY OF ITS OBLIGATIONS UNDER THIS AGREEMENT, SUCH PARTY SHALL BE LIABLE FOR DIRECT DAMAGES SUFFERED BY THE OTHER PARTY THAT ARE CAUSED BY SUCH BREACH IN ACCORDANCE WITH APPLICABLE LAW. IN NO EVENT SHALL ANY PARTY BE LIABLE TO THE OTHER PARTY FOR SPECIAL OR CONSEQUENTIAL DAMAGES OF ANY KIND OR NATURE WHETHER ALLEGED TO BE ATTRIBUTED TO SUCH BREACH OF AGREEMENT, TO TORT OR NEGLIGENCE OR OTHERWISE. IN NO EVENT SHALL ANY PARTY BE LIABLE TO THE OTHER FOR LOST PROFITS RESULTING FROM AN ALLEGED BREACH OF THIS AGREEMENT, EVEN IF, UNDER APPLICABLE LAW, SUCH LOST PROFITS WOULD NOT BE CONSIDERED CONSEQUENTIAL OR SPECIAL DAMAGES.

8. **Confidentiality.**

(a) Each of the Parties hereto (a "Receiving Party") shall preserve as strictly confidential and proprietary all information and materials, whether or not marked as confidential, data, intellectual property, strategic plans, financial information, personnel files, customer (or potential customer) lists, data or other information that the other Parties ("Disclosing Party") may provide to Receiving Party in connection with this Agreement (collectively "Confidential Information"). Receiving Party shall hold the Confidential Information in confidence, with the same degree of care that it applies to its own confidential information of like importance, except that Receiving Party may disseminate such Confidential Information to its agents and subcontractors, if any, provided that such subcontractors are on a need to know basis and have signed non-disclosure agreements, prior to such dissemination, that are at least as restrictive as the confidentiality provisions contained herein.

(b) Receiving Party agrees that in the event of a breach or threatened breach of this Section 8, that Disclosing Party may be irreparably harmed such that monetary damages will not adequately compensate for its injuries. In the event of any such breach, the Disclosing Party shall be entitled, in addition to any rights or remedies it may have at law or in equity, to temporary and permanent injunctive relief issued by any court of competent jurisdiction enjoining and restraining Receiving Party from continuing such breach and the payment by Receiving Party of all costs associated with any litigation, including attorneys' fees and costs through all levels of appeal. The foregoing obligations shall survive termination or expiration of this Agreement.

(c) Confidential Information shall not include the following information to the extent that Receiving Party can show that the information: (i) is previously known by it at the time of disclosure without obligation of confidence, or without breach of this Agreement; (ii) is publicly disclosed through no wrongful act of Receiving Party or its representatives; (iii) is received from a third party having the right to lawfully possess and disclose same and without breach of this Agreement, (iv) is independently developed by Receiving Party without access or reference to the Confidential Information; (v) is approved for release by prior written authorization of a Disclosing Party; or (vi) is required to be disclosed by a court of competent jurisdiction pursuant to applicable law or regulation, but only to the extent expressly required and only after alerting Disclosing Party of such disclosure requirement.

9. **Non-Disparagement.** Participating Clinic and Participating Physicians agree that during the Term and thereafter, they will not disparage Referral Service or any of Referral Service's investors, owners, agents, employees, physicians, contractors, or other participating members, or take any action or inaction that they know or should know may bring discredit upon Referral Service.

10. **Independent Contractor.** Nothing herein contained will create or shall be deemed to create a partnership, joint venture or agency relationship between the Parties to this Agreement and no Party will have the authority to bind another Party in any respect.

11. **No Exclusivity.** This Agreement does not create any exclusive obligations among the Parties.

12. **Assignment.** This Agreement may not be assigned by Participating Clinic without prior written consent from Referral Service. Referral Service may assign this Agreement at any time, without the prior consent of the other Party.

13. **Notices.** All notices, requests, consents and other communications required or permitted under this Agreement shall be in writing and shall be hand-delivered, mailed by registered or certified mail (postage prepaid), return receipt requested, or sent by an overnight delivery service from which a receipt may be obtained, addressed to:

> If to REFERRAL SERVICE, to:
> 1-800-411-PAIN REFERRAL SERVICE, LLC
> 2659 West Oakland Place Boulevard,
> Lauderdale Lakes, FL 33311
> Attn: Robert Lewin, D.C.

> If to PARTICIPATING CLINIC, to:
> _____
> _____ ve
> Zephyrhills, FL 33544
> Attn: _____

4840-2869-2487.1
42829/0001 tr

5

04/03/2012 10:34 FAX

14. **Headings.** The headings in this Agreement are solely for convenience or reference and will be given no effect in the construction or interpretation of this Agreement.

15. **Attorneys' Fees.** If a default or breach of this Agreement occurs by either Party in observance or performance of any term, provision or covenant of this Agreement, the prevailing Party will be entitled to be paid by the other Party for all expenses or obligations, including, but not limited to, attorneys' fees and costs, including interest, incurred in the instituting, prosecuting, appealing at all levels or defending of any action or proceeding related to such default or breach of contract.

16. **Survival.** All covenants, agreements, representations and warranties made in this Agreement or otherwise made in writing by any Party pursuant to this Agreement will survive the expiration or termination of this Agreement.

17. **Successors.** Except as otherwise specifically provided in this Agreement, this Agreement will be binding upon and inure to the benefits of the Parties and their legal representatives, heirs, administrators, executors, successors and assigns.

18. **Legislative Amendments.** During the Term, and notwithstanding any other provisions of this Agreement, if any federal, applicable state or local government or agency passes, issues, promulgates, or modifies any law, court decision, rule regulation, standard or interpretation ("Legislative Amendment") impacting upon this Agreement, the Parties will abide by said Legislative Amendment. Further, the Parties agree that the Agreement will be construed as if amended to comply with the Legislative Amendment, unless the Parties agree that such Legislative Amendment requires specific modification of this Agreement, in which case the parties will cooperate in negotiating the required modification(s). If, within sixty (60) calendar days after passage of the Legislative Amendment, the Parties are not able to agree on the terms of a required modification, or that a modification is required, the Parties agree that this Agreement will be immediately terminated.

19. **Entire Agreement.** This Agreement contains the complete, full and exclusive understanding of the Parties and supersedes any and all other oral or written agreements between the Parties with respect to this subject matter.

20. **Waivers.** The waiver by any Party of a breach of any provision of this Agreement will not operate as or be construed to be a waiver of any other breach of such provision or of any breach of any other provision of this Agreement. The failure of any Party to insist upon strict adherence to any term of this Agreement will not constitute a waiver by such Party to require at some subsequent time strict adherence to such term. Any waiver must be in writing and signed by the person or Party against whom charged.

21. **Governing Law and Venue; Submission to Jurisdiction.** This Agreement will be governed by and construed in accordance with, and the rights of the parties will be determined by, the laws of the State of Florida without giving effect to its

4840-2869-2487.1
12829/0001 tr

6

04/03/2012 10:35 FAX

choice of law provisions. Both Parties irrevocably and unconditionally: (i) agree that any suit, action or other legal or equitable proceeding arising out of, or relating to, this Agreement will be brought in the courts of Broward County, Florida or the applicable United States District Court in Fort Lauderdale, Florida; (ii) consent to the jurisdiction of each such court in any such suit, action or proceeding; (iii) waive any objection that he or it may have to the laying of venue of any such suit, action or proceeding in any of such courts; and (iv) agree that service of any court paper may be effected on such Party by any manner as may be provided under applicable laws or court rules in Florida.

22. **Amendments.** This Agreement constitutes the entire agreement between the Parties. No oral statement or prior written material not specifically mentioned herein shall be of any force or effect and no change in or addition to this Agreement shall be recognized unless evidenced by a writing executed by the Parties, such amendment(s) to become effective on the date stipulated therein.

23. **Counterparts.** This Agreement may be executed in multiple counterparts, each of which shall constitute an original and all of which shall constitute but one Agreement.

24. **Gender and Number.** Unless a different meaning is required by the context, the use of the masculine, feminine or neuter genders, and the use of the singular and plural, shall not be given an effect of any exclusion or limitation herein. The use of the word "person" or "party" shall mean and include any individual, trust, corporation, partnership or other entity.

25. **No Construction Against Drafter.** This Agreement is not to be construed against the drafting Party.

26. **Severability.** The invalidity, illegality or unenforceability of any provision of this Agreement will not affect any other provision of this Agreement, which will remain in full force and effect, nor will the invalidity, illegality or unenforceability of a portion of any provision of this Agreement affect the balance of such provision. If any one or more of the provisions contained in this Agreement or any portion thereof will for any reason be held to be invalid, illegal or unenforceable in any respect, this Agreement will be reformed, construed and enforced as if such invalid, illegal or unenforceable provision had never been contained herein.

27. **WAIVER OF JURY TRIAL.** THE PARTIES INTENTIONALLY, KNOWINGLY AND VOLUNTARILY WAIVE ANY AND ALL RIGHTS TO A TRIAL BY JURY IN CONNECTION WITH OR PURSUANT TO ANY DISPUTE AMONG THE PARTIES RELATED TO OR ARISING FROM THIS AGREEMENT.

[INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed as of the date first above written.

            **1-800-411-PAIN REFERRAL SERVICE, LLC**
            By:_____
                    Robert Lewin, D.C.
                    Managing Member

_____

By:_____

_____
Print Name and Title

# EXHIBIT A

US Registration No. 2621497 ( 411PAIN )

US Registration No. 2750243 ( GET THE 411 )

US Registration No. 3110019 ( DR. B )

US Registration No. 3149431 ( DOCTOR B )

US Registration No. 3548378 ( AFTER 911, CALL 411 )
US App. Serial No. 85005253 ( 1-800-411-PAIN )

US App. Serial No. 85014865 (CALL SATURDAY, SUNDAY OR EVEN CHRISTMAS DAY !)

US App. Serial No. 85014888 (CALL FROM HOME, HOSPITAL OR ACCIDENT SCENE.)

US App. Serial No. 85014933 (AT 5:01 ATTORNEYS PHONES GO DEAD.)

US App. Serial No. 85014955 ( 411DOLOR.COM)

All copyrights that include any of the above marks.

Any know how associated with marketing any of the above marks.

Any trade secrets associated with the licensing, marketing or business processes where any of the above marks are involved in any way.

All domain names registered in the name of or assigned to 1-800-411-I.P. Holdings, LLC.

4840-2869-2487.1
42829/0001 lr

9

Select Year: 2011 Go

# The 2011 Florida Statutes

| Title XLVI | Chapter 817 | View Entire Chapter |
|---|---|---|
| CRIMES | FRAUDULENT PRACTICES | |

817.505  Patient brokering prohibited; exceptions; penalties.—

(1) It is unlawful for any person, including any health care provider or health care facility, to:

(a) Offer or pay any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, to induce the referral of patients or patronage to or from a health care provider or health care facility;

(b) Solicit or receive any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, in return for referring patients or patronage to or from a health care provider or health care facility;

(c) Solicit or receive any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, in return for the acceptance or acknowledgement of treatment from a health care provider or health care facility; or

(d) Aid, abet, advise, or otherwise participate in the conduct prohibited under paragraph (a), paragraph (b), or paragraph (c).

(2) For the purposes of this section, the term:

(a) "Health care provider or health care facility" means any person or entity licensed, certified, or registered; required to be licensed, certified, or registered; or lawfully exempt from being required to be licensed, certified, or registered with the Agency for Health Care Administration or the Department of Health; any person or entity that has contracted with the Agency for Health Care Administration to provide goods or services to Medicaid recipients as provided under s. 409.907; a county health department established under part I of chapter 154; any community service provider contracting with the Department of Children and Family Services to furnish alcohol, drug abuse, or mental health services under part IV of chapter 394; any substance abuse service provider licensed under chapter 397; or any federally supported primary care program such as a migrant or community health center authorized under ss. 329 and 330 of the United States Public Health Services Act.

(b) "Health care provider network entity" means a corporation, partnership, or limited liability company owned or operated by two or more health care providers and organized for the purpose of entering into agreements with health insurers, health care purchasing groups, or the Medicare or Medicaid program.

(c) "Health insurer" means any insurance company authorized to transact health insurance in the state, any insurance company authorized to transact health insurance or casualty insurance in the state that is offering a minimum premium plan or stop-loss coverage for any person or entity providing health care benefits, any self-insurance plan as defined in s. 624.031, any health maintenance organization authorized to transact business in the state pursuant to part I of chapter 641, any prepaid health clinic authorized to transact business in the state pursuant to part II of chapter 641, any prepaid limited

health service organization authorized to transact business in this state pursuant to chapter 636, any multiple-employer welfare arrangement authorized to transact business in the state pursuant to ss. 624.436-624.45, or any fraternal benefit society providing health benefits to its members as authorized pursuant to chapter 632.

(3) This section shall not apply to:

(a) Any discount, payment, waiver of payment, or payment practice not prohibited by 42 U.S.C. s. 1320a-7b(b) or regulations promulgated thereunder.

(b) Any payment, compensation, or financial arrangement within a group practice as defined in s. 456.053, provided such payment, compensation, or arrangement is not to or from persons who are not members of the group practice.

(c) Payments to a health care provider or health care facility for professional consultation services.

(d) Commissions, fees, or other remuneration lawfully paid to insurance agents as provided under the insurance code.

(e) Payments by a health insurer who reimburses, provides, offers to provide, or administers health, mental health, or substance abuse goods or services under a health benefit plan.

(f) Payments to or by a health care provider or health care facility, or a health care provider network entity, that has contracted with a health insurer, a health care purchasing group, or the Medicare or Medicaid program to provide health, mental health, or substance abuse goods or services under a health benefit plan when such payments are for goods or services under the plan. However, nothing in this section affects whether a health care provider network entity is an insurer required to be licensed under the Florida Insurance Code.

(g) Insurance advertising gifts lawfully permitted under s. 626.9541(1)(m).

(h) Commissions or fees paid to a nurse registry licensed under s. 400.506 for referring persons providing health care services to clients of the nurse registry.

(i) Payments by a health care provider or health care facility to a health, mental health, or substance abuse information service that provides information upon request and without charge to consumers about providers of health care goods or services to enable consumers to select appropriate providers or facilities, provided that such information service:

1. Does not attempt through its standard questions for solicitation of consumer criteria or through any other means to steer or lead a consumer to select or consider selection of a particular health care provider or health care facility;

2. Does not provide or represent itself as providing diagnostic or counseling services or assessments of illness or injury and does not make any promises of cure or guarantees of treatment;

3. Does not provide or arrange for transportation of a consumer to or from the location of a health care provider or health care facility; and

4. Charges and collects fees from a health care provider or health care facility participating in its services that are set in advance, are consistent with the fair market value for those information services, and are not based on the potential value of a patient or patients to a health care provider or health care facility or of the goods or services provided by the health care provider or health care facility.

(4) Any person, including an officer, partner, agent, attorney, or other representative of a firm, joint venture, partnership, business trust, syndicate, corporation, or other business entity, who violates any provision of this section commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

(5)  Notwithstanding the existence or pursuit of any other remedy, the Attorney General or the state attorney of the judicial circuit in which any part of the offense occurred may maintain an action for injunctive or other process to enforce the provisions of this section.

(6)  The party bringing an action under this section may recover reasonable expenses in obtaining injunctive relief, including, but not limited to, investigative costs, court costs, reasonable attorney's fees, witness costs, and deposition expenses.

(7)  The provisions of this section are in addition to any other civil, administrative, or criminal actions provided by law and may be imposed against both corporate and individual defendants.

History.—s. 1, ch. 96-152; s. 226, ch. 97-101; s. 168, ch. 98-166; s. 297, ch. 99-8; s. 7, ch. 99-204; s. 228, ch. 2000-160; s. 19, ch. 2006-305.

Copyright © 1995-2012 The Florida Legislature • Privacy Statement • Contact Us

**64B2-15.001 Deceptive and Misleading Advertising Prohibited; Policy; Definition.**
(1) It is the policy of the Board that advertising by licensed practitioners of the profession of chiropractic in this State should be regulated so as to effectuate the duty of the State of Florida to protect the health, safety and welfare of its residents, while not abridging any rights guaranteed to such practitioners or to the public by the Constitution of the United States and the State of Florida, as construed by the United States Supreme Court and the Florida Supreme Court. To that end, the Board permits the dissemination to the public of legitimate information, in accordance with the Board's rules, regarding the art and science of Chiropractic and where and from whom chiropractic services may be obtained, so long as such information is in no way fraudulent, false, deceptive, or misleading.
(2) No chiropractor shall disseminate or cause the dissemination of any advertisement or advertising which is in any way fraudulent, false, deceptive or misleading. Any advertisement or advertising shall be deemed by the Board to be fraudulent, false, deceptive, or misleading if it:
(a) Contains a misrepresentation of facts; or
(b) Is misleading or deceptive because in its content or in the context in which it is presented it makes only partial disclosure of relevant facts. More specifically, the Board finds that it is misleading and deceptive for a chiropractor to advertise free services (i.e., x-rays, examination, etc.) or services for a specific charge when in fact the chiropractor is transmitting a higher charge for the advertised service to a third party payor for payment. The Board finds it misleading and deceptive to fail to include the fact that x-rays and/or video fluoroscopy will only be given if medically necessary in an advertisement for free x-rays and/or video fluoroscopy. For the purpose of this rule, a verbal announcement or a minimum of 15 second exposure of the disclaimer clause required by Section 456.062, F.S., is required for free services advertised on radio or television. The Board also finds that it is misleading and deceptive for a chiropractor or a group of chiropractors to advertise a chiropractic referral service or bureau unless the advertisement specifically names each of the individual chiropractors who are participating in the referral service or bureau. Referral services that operate on a national or statewide basis, and that have at least 50 participating members, do not have to specifically name each individual chiropractor participating in the service on their advertisements. Any advertisement generated by or on behalf of a chiropractor must disclose that it is generated by or on behalf of a chiropractor by including a reference to the chiropractor by name and degree.
(c) Creates false, or unjustified expectations of beneficial treatment or successful cures; or
(d) Contains representations relating to the quality of the Chiropractic services offered; or
(e) Conveys the impression that the chiropractor or chiropractors, disseminating the advertising or referred to therein, possess qualifications, skills, or other attributes which are superior to other chiropractors, other than a simple listing of earned professional post-doctoral or other professional achievements. However, a chiropractor is not prohibited from advertising that he has attained Diplomate status in a chiropractic specialty area recognized by the Board of Chiropractic.
1. Chiropractic Specialities recognized by the Board are those recognized by the various Councils of the American Chiropractic Association, the International Chiropractic Association, or International Academy of Clinical Neurology. Each specialty requires a minimum of 300 hours of post-graduate credit hours and passage of a written and oral examination approved by the American Chiropractic Association, International Chiropractic Association, or International Academy of Clinical Neurology. Titles used for the respective specialty status are governed by the definitions articulated by the respective councils.
2. A Diplomate of the National Board of Chiropractic Examiners is not recognized by the Board as a chiropractic specialty status for the purpose of this rule.
3. A chiropractor who advertises that he or she has attained recognition as a specialist in any specific chiropractic or adjunctive procedure by virtue of a certification received from an entity not recognized under this rule may use a reference to such specialty recognition only if the board, agency, or other body which issued the additional certification is identified, and only if the letterhead or advertising also contains in the same print size or volume the statement that "The specialty recognition identified herein has been received from a private organization not affiliated with or recognized by the Florida Board of Chiropractic Medicine".
4. A chiropractor may use on letterhead or in advertising a reference to an honorary title or degree only if the letterhead or advertising also contains in the same print size or volume the statement "Honorary" or (Hon.) next to the title.
(f) Fails to conspicuously identify the chiropractor or chiropractors referred to in the advertising as a chiropractor or chiropractors; or
(g) Contains any representations or claims, as to which the chiropractor, referred to in the advertising, fails to perform; or
(h) Contains any representation which identifies the chiropractic practice being advertised by a name which does not include the

terms "chiropractor", "chiropractic", or some easily recognizable derivative thereof; or

(i) Contains any representation regarding a preferred area of practice or an area of practice in which the practitioner in fact specializes, which represents or implies that such specialized or preferred area of practice requires, or that the practitioner has received any license or recognition by the State of Florida or its authorized agents, which is superior to the license and recognition granted to any chiropractor who successfully meets the licensing requirements of Chapter 460, F.S. However, a chiropractor is not prohibited from advertising that he has attained Diplomate status in a specialty area recognized by the Board; or

(j) Appears in any classified directory, listing, or compendium under a heading, which when considered together with the advertisement, has the capacity or tendency to be deceptive or misleading with respect to the profession or professional status of the chiropractor; or

(k) Contains any other representation, statement or claim which is misleading or deceptive; or

(l) Contains a reference to any other degree or uses the initials "M.D." or "D.O." or any other initials unless the chiropractic physician has actually received such a degree and is a licensed holder of such degree in the State of Florida. If the chiropractic physician licensee is not licensed to practice in any other health care profession in Florida, the chiropractic physician must disclose this fact, and the letterhead, business card, or other advertisement shall also include next to the reference or initials a statement such as "Not licensed as a medical doctor in the State of Florida" or "Licensed to practice chiropractic medicine only" in the same print size or volume.

(m) Contains a reference that the chiropractic physician is licensed to practice acupuncture, unless the chiropractic physician is licensed under the provisions of Chapter 457, F.S. Any chiropractic physician certified to practice acupuncture pursuant to Section 460.403, F.S., and Rules 64B2-11.012, 64B2-11.013, and 64B2-17.003, F.A.C., and using the term "acupuncture" in the letterhead, business card, or other advertisement, must state that the practitioner is "certified" to practice acupuncture and identify that the practitioner is a chiropractor in the same print size or volume.

(3) As used in the rules of this Board, the terms "advertisement" and "advertising" shall mean any statements, oral or written, disseminated to or before the public or any portion thereof, with the intent of furthering the purpose, either directly or indirectly, of selling professional services, or offering to perform professional services, or inducing members of the public to enter into any obligation relating to such professional services. The terms advertisement or advertising shall include the name under which professional services are performed.

*Specific Authority 460.405 FS. Law Implemented 456.062, 460.413(1)(d) FS. History–New 1-10-80, Amended 11-25-81, 5-12-83, Formerly 21D-15.01, Amended 4-19-89, Formerly 21D-15.001, 61F2-15.001, Amended 7-18-95, Formerly 59N-15.001, Amended 9-21-98, 5-20-99, 4-23-00, 11-19-00, 10-24-04, 11-27-05, 11-9-06.*