*Exhibit 13*

```
                                                                    1

 1                      EXAMINATION UNDER OATH OF

 2                         ███████████████

 3                    RE: CLAIM NUMBER 59-0977-3D7
                        DATE OF LOSS: 3/1/2017
 4                     OUR FILE NO.: 21703054

 5   _____
     EXAMINATION
 6   UNDER OATH:              ███████████████

 7   DATE:                    Thursday, May 11, 2017

 8   TIME:                    5:30 p.m. - 6:30 p.m.

 9   PLACE:                   ORANGE LEGAL - MIAMI
                              6303 Blue Lagoon Drive
10                            Suite 380
                              Miami, Florida 33126
11   STENOGRAPHICALLY
     REPORTED BY:             VANESSA OBAS, RPR
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
                                                                          5

                                                               Page 5

 1    ████████████████████████████. Is that your home

 2    address?

 3       A.  Yes, ma'am.

 4       Q.  And your date of birth is listed as

 5    ██████████████████?

 6       A.  Yes, ma'am.

 7       Q.  Okay. Perfect. Thank you for that.

 8           For identification purposes, we'll just make a

 9    copy of your license and hand that back to you at the

10    end of the statement.

11           The reason that State Farm wanted to talk to

12    you under oath is because in connection with this claim,

13    there was a bill and a medical report submitted for

14    payment from a company called Ceda Ortho &

15    Interventional Medicine located at 11890 Southwest

16    Eighth Street?

17       A.  Yes, ma'am.

18       Q.  Is that a medical facility that you're familiar

19    with?

20       A.  Yes, ma'am.

21       Q.  Okay. Following the accident, were you

22    referred to Ceda Ortho?

23       A.  Yes, ma'am.

24       Q.  Okay. Who were you referred by?

25       A.  By a lawyer, but I don't remember her name.
```

[3/1/2017]   ████████████████   5-11-2017

```
 1      Q.   Okay. And how did you come in contact with
 2   that lawyer?
 3      A.   I called 1-800-411-PAIN.
 4      Q.   Was that after the accident?
 5      A.   Yes.
 6      Q.   It was on the same day of the accident or a
 7   little bit after?
 8      A.   No. A couple days after.
 9      Q.   Okay. So the accident date I have is March 1st
10   which was a Wednesday. Do you remember when following
11   the accident you may have called 411-PAIN?
12      A.   More than likely probably that same Friday,
13   that week of that Friday or maybe that following -- that
14   Saturday. 'Cause it was only a few days after.
15      Q.   Was Saturday the day that you went to this
16   facility?
17      A.   I went a week after. When I called them, I
18   made the appointment. I went the following week. Like,
19   I didn't go that same week to the doctors.
20      Q.   Okay. So if the accident was on March 1st --
21   let me open up the calendar on my smartphone.
22      A.   Yeah, more than likely, I went --
23      Q.   Okay. Hold on. I have March 1st as a
24   Wednesday. That was the day of your accident?
25      A.   Right.
```

1   Q.   And then when do you think you first went to
2   Ceda?
3   A.   I probably -- more than likely I went on the
4   11th, if I'm not mistaken.
5   Q.   Do you recall it being a Saturday?
6   A.   Yeah, it was definitely a Saturday. I can't
7   remember if it was the 4th or the 11th, but I'm pretty
8   sure it was the 11th.
9   Q.   And what makes you think it was the 11th versus
10  the 4th?
11  A.   'Cause I don't remember going straight to the
12  hospital. Like, as soon as -- not the hospital, excuse
13  me, the clinic right after the -- right after the
14  accident.
15  Q.   Okay. So if I understand what you've told me
16  so far, after your car accident, you called 411-PAIN?
17  A.   Yes.
18  Q.   And you spoke to someone on the other end of
19  the phone?
20  A.   Yes, ma'am.
21  Q.   Do you remember who that person was?
22  A.   No.
23  Q.   What did they talk to you about when you first
24  called?
25  A.   They just said they were going to provide me

```
 1   with the lawyer's information and then they gave me the
 2   lawyer's information. I can't remember exactly her
 3   name, but it was a woman. And then I contacted her and
 4   then she gave me information to go to Ceda. And then I
 5   called Ceda and I -- or no, Ceda called me and then I
 6   set up the appointment for a couple days after that. So
 7   it had to have been a week after my accident.
 8      Q.  Okay. So let me stop you for one second.
 9          So the lawyer who 411-PAIN referred you to, did
10   you have any formal relationship, like a signed
11   agreement with that lawyer to represent you?
12      A.  No. No.
13      Q.  And as we're talking -- obviously, I'm a lawyer
14   for State Farm. Do you have a lawyer that represents
15   you for the March accident?
16      A.  No.
17      Q.  Okay. All right.
18          I'm sorry, so then she sent you the
19   information. She sent you to Ceda and you think you
20   called the lawyer the week of the accident and then your
21   first appointment was the following week?
22      A.  Yes.
23      Q.  Okay. And when you first went to Ceda, what
24   happened?
25      A.  I went to Ceda and then I talked to the
```

Page 11

```
 1    Q.  Okay. All right. So on that first day and
 2   just to backtrack for a moment.
 3       The date that I have from them is March 4th
 4   which would have been the first Saturday following your
 5   accident.
 6    A.  Oh, okay then.
 7    Q.  The only reason that I think you might be
 8   correct in your timeline of events is there was a note
 9   from State Farm that you called, it looks like on
10   March 14th there was a note that said you had spoken to
11   someone at State Farm and you said you hadn't sought any
12   medical treatment yet.
13    A.  Yeah.
14    Q.  Do you remember that part?
15    A.  I don't want to keep giving you dates 'cause I
16   honestly don't remember.
17    Q.  Sure.
18    A.  But I know I did call State Farm after and did
19   tell them like, "I'm not proceeding anything. I'm okay,
20   I'm fine, I'm good to go." I just don't remember dates.
21    Q.  So regardless of the date, pretend the date
22   doesn't matter for a second.
23       How many times did you actually go to the Ceda
24   Clinic?
25    A.  No. One time.
```

12

Page 12

1  Q. One time and then you never went back?
2  A. Yeah, went in for the evaluation and never saw
3  them again.
4  Q. Okay. And just to backtrack for a second, do
5  you remember the doctor's name that you met with?
6  A. No.
7  Q. Do you have a picture of him in your mind?
8  Would you be able to physically describe him?
9  A. If I -- if you put him in a line up, I could
10 tell you who he was.
11 Q. Right.
12 A. But if I had to sit down and tell you like -- I
13 know he's a Hispanic man, he's tall, slender, but I
14 wouldn't be able to tell you, like, features, like if he
15 had green eyes or anything.
16 Q. Do you have a smartphone where you could get
17 online by any chance?
18 A. Yeah.
19 Q. Have you been to Ceda's website?
20 A. I'll go on now.
21 Q. Yeah, if you Google "Ceda" and you click on
22 "Doctors", there's some photos that come up of the
23 different practitioners that practice there.
24 A. Ceda Health?
25 Q. Uh-huh.

[3/1/2017]                              5-11-2017

1    A.   He asked me and I answered, "Yeah."

2    Q.   So then there's a part on Page 2 that says,

3  "Review of Systems," and it says, "General" and then it

4  says, "Patient denies" and then there's a list of

5  things. And then you can go down the list.

6  "Cardiovascular, patient denies; gastrointestinal,

7  patient denies."

8       For example, for that one, "The patient denies

9  ulcers, gastritis or recent change in bowel habits." Is

10 that information that they would have obtained through

11 paperwork or were you verbally asked any of those

12 questions?

13   A.   That happened through paperwork. We didn't

14 talk about any of that.

15   Q.   Okay. Then it says, "Objective Examination,"

16 and it talks about you're a 24-year-old right-handed

17 female, has your birthday?

18   A.   Uh-huh.

19   Q.   And then it talks about from listening to

20 heart, lungs and abdomen, they were within normal

21 limits. The word -- the actual word is auscultation,

22 which means, you know, when they used the stethoscope to

23 listen to your heart, your lungs and your abdomen. Did

24 the doctor do that with you?

25   A.   Not from what I remember, no.

```
 1      Q.   Okay.  "Motor eye movements were within normal
 2   limits."  Did he do anything to examine your eyes?
 3      A.   No.
 4      Q.   "Pupillary reflex was symmetrical and intact."
 5   Did he do anything to shine a light in your eyes to see
 6   how your pupil reacted?
 7      A.   No.
 8      Q.   Okay.  "Cranial nerve testing revealed no
 9   compromised function within normal limits."  Cranial
10   nerve testing includes a thorough exam of your head and
11   your face, so that would include things like eye exam
12   chart.  You know what an eye chart looks like?
13      A.   Uh-huh.
14      Q.   Or having them asking you as the patient to
15   follow a finger without moving your head, you know, your
16   eyeballs go left, your eyeballs go right.  Did he do
17   anything like that with you?
18      A.   No.
19      Q.   Testing your hearing in any kind of way?
20      A.   No.
21      Q.   Rubbing a cotton ball or any kind of material
22   on your face --
23      A.   No.
24      Q.   -- to see if you could feel the sensation?
25      A.   No.
```

1  Q. Checking your mouth, putting a popsicle stick
2  on your tongue, looking in your throat?
3  A. No. This is what he's saying he did?
4  Q. Yeah, that's what the report indicates. Asking
5  you -- sometimes doctors might, if they're doing a
6  neurological exam, for example, have you raise your
7  eyebrows or your cheeks to make sure that your
8  neurological function in your face is appropriate within
9  normal limits. Did he do anything like that?
10 A. No.
11 Q. Okay. Then it says, "Palpation Findings." It
12 says, "Pain, tenderness and myospasms were noted over
13 the paravertebral musculature during digital palpation
14 over" and then these number here, the letter and the
15 number C1, C2, C3, these are all areas of your spine
16 from your neck all the way to your lower back. And
17 palpation means touching.
18      So what this indicates is that the doctor took
19 his hands and he touched your back from your neck all
20 the way to your lower spine. Did that happen?
21 A. No. He didn't touch me -- he stayed on his
22 side and that was it.
23 Q. His side of his desk?
24 A. Yeah. Yeah.
25 Q. Okay. "Orthopedic Tests," he reports a

1  cervical spine exam. There's something called a
2  cervical compression test, a shoulder decompression test
3  and an O'Donoghue's maneuver. And then I'll explain
4  medically what that means. But then it says, "Was
5  performed on this patient," and then it gives results of
6  those tests.
7      So, for example, cervical compression test
8  would require the doctor to put his hands, his palms on
9  the top of your head and push down and ask you when he
10 did that if you felt pain?
11    A.  He didn't do that.
12    Q.  Didn't happen?
13    A.  No.
14    Q.  Shoulder decompressor test would require the
15 doctor to physically touch you again and he would be
16 pushing force on your head towards one side of your body
17 and then pushing on your shoulder with the -- on the
18 opposite side. So head tilted right, pressure on your
19 left shoulder, asking if you felt pain?
20    A.  No.
21    Q.  Anything like that happen?
22      O'Donoghue's maneuver is where the examiner,
23 the doctor, would be putting his hand on your forehead
24 and he would ask you again for resistance to lean
25 forward or hand on the back of your head with resistance

1  to push back or side to side, but that didn't happen
2  because he didn't touch you?
3      A.  No.
4      Q.  Okay. I know it may sound silly, but there's
5  lots of tests that are indicated to have been performed
6  so I just want to make sure that this is false.
7      A.  The only thing that I -- he did touch me, he
8  took my blood pressure. And if I'm not mistaken, I
9  think he said because it was so high. And other than
10 that, he didn't touch me. That was it.
11     Q.  Okay. And then it talks about on Page 3, it
12 talks about, "The following additional cervical
13 orthopedic tests performed were negative: Jackson's
14 compression," would require him to touch you. "Cervical
15 distraction" is where a physician would lift up on your
16 neck to release any tension from your body. Did that
17 happen?
18     A.  No.
19     Q.  "Valsalva's maneuver" would be asking you to
20 pretend to cough or close your mouth and close your nose
21 and exhale as hard as you can to determine if when you
22 did that you felt any pressure in your spine?
23     A.  No.
24     Q.  Okay. "Soto-Hall" test would be either sitting
25 or laying on your back, chin to chest, to see if you

```
 1   felt pain when you extended or flexed your shin towards
 2   your chest?
 3       A.  No.
 4       Q.  Then there's a "Thoracic Spine Exam," that
 5   includes additional tests where you'd be moving your
 6   torso, bending in any direction --
 7       A.  No.
 8       Q.  -- that he asked you to. "Posture Analysis,"
 9   it says, "Revealed the following: Head tilt to the
10   left, shoulder high on left and pelvis is high on the
11   right." That would require the doctor to somehow
12   determine --
13       A.  No.
14       Q.  -- posture, okay? "Balance and Proprioception"
15   is the next category. "Leg Length Discrepancy."
16           Were you ever laying on your back on an exam
17   table?
18       A.  No.
19       Q.  Okay. Finger-to-nose test would be -- I know
20   it sounds silly -- where you'd be closing your eyes and
21   you would take your index finger on your right or your
22   left-hand side and you would be pointing -- eyes closed,
23   seeing if you could hit your finger to your nose, almost
24   like a DUI test?
25       A.  No.
```

```
 1     Q.  Were you asked to do that?
 2     A.  No.
 3     Q.  "Alternating Hand Movement Test," that would be
 4  where you're sitting in your palms, you would be face
 5  down on your knees and he would ask you to flip them
 6  over --
 7     A.  No.
 8     Q.  -- multiple times to check your -- okay. To
 9  check your movements.
10         Heel-toe walk, did he ask you to walk,
11  heel-toe, heel-toe?
12     A.  No.
13     Q.  Okay. "A complete isometric examination of
14  major muscle groups of the upper and lower extremities
15  revealed the following: All of your muscle groups were
16  normal, 5/5 in accordance with" these guidelines.
17         Muscle testing would be where the doctor would
18  be touching you, either asking you to squeeze your hands
19  to test for strength or hands on your legs and ask you
20  to push up or push down, testing -- you know what I
21  mean -- the strength in your arms or your legs?
22     A.  No.
23     Q.  Okay. "Dermatome Testing" with a "sensory
24  pinwheel examination of upper and lower extremities
25  revealed no sensory deficits or hypersensitivity and
```

1  were within normal limits."
2        Sensory pinwheel, someone actually told me it
3  looks like a cookie cutter, but it is an apparatus or
4  some sort of equipment where they would run an object,
5  dull or sharp, on your skin, arms and legs to see if you
6  felt the sensation?
7     A.  No.
8     Q.  "Deep tendon reflex testing of the upper and
9  lower extremities" were also reported. Reflexes, reflex
10 hammer, so hitting your knee, hitting your Achilles
11 heel, elbows, tri-ceps, anywhere on your body to test
12 your reflexes?
13    A.  No.
14    Q.  And then it says, "Your prognosis is fair based
15 on the objective findings supported by the Norris and
16 Watt Protocols" which appears to be based on the testing
17 that we already established didn't happen; is that
18 right?
19    A.  Yes, ma'am.
20    Q.  All right. Then there's a "Radiology Report."
21 We did discuss that you did have x-rays taken?
22    A.  Yes, ma'am.
23    Q.  The cervical x-ray findings says," There's a
24 break in George's line at C45 (sic) which is indicative
25 of ligamentous laxity or tear of the posterior

1   longitudinal ligament."
2        Were you told anything about a tear?
3   A.  No.
4   Q.  Or anything called George's line break?
5   A.  Can you -- what is that?
6   Q.  Your guess is as good as mine.
7   A.  No. Because I know he told me something about
8   the scoliosis and he also said that something about my
9   posture was a little off.
10  Q.  Okay.
11  A.  But nothing -- no.
12  Q.  Nothing to be concerned about?
13  A.  No. No.
14  Q.  And then it says, "The above impression was
15  discussed with the patient at length using appropriate
16  diagrams to demonstrate the perceived pathology." Did
17  he use any diagrams with you?
18  A.  No. Not that I remember. Like something like
19  a picture that he would show me?
20  Q.  Uh-huh.
21  A.  No.
22  Q.  Okay. "The patient indicated understanding of
23  these procedures and after consent of the patient, the
24  treatment plan was initiated." And then the treatment
25  plan recommends that you "begin initial program of care

```
 1   of three to five visits per week for two weeks as
 2   tolerated, followed by continued active care with the
 3   goal of returning to your pre-injury status or maximum
 4   functional capability status."
 5       But you didn't get any treatment so that's
 6   irrelevant; right?
 7       A.  No. Uh-huh.
 8       Q.  Okay. He says, "I instructed Ms. ▮▮▮▮▮ to
 9   follow up with her general medicine physician for
10   further evaluation and treatment"?
11       A.  Yes.
12       Q.  Did he tell you that?
13       A.  No. He didn't tell me any of that. I --
14       Q.  You did that --
15       A.  I took that initiative, yes.
16       Q.  Okay. And then it says, "I recommend to
17   Ms. ▮▮▮▮▮ that she should avoid heavy lifting and
18   continue range of motion exercises to the affected
19   area"?
20       A.  No.
21       Q.  And then --
22       A.  I told him I was gonna stop going to the gym
23   for a little bit. He didn't tell me anything.
24       Q.  Okay. Then it says, "Supplies, gel pack, cold
25   packs were prescribed to reduce swelling and
```

1  discomfort." Did you have any swelling?
2     A.  No.
3     Q.  But you got the goody bag that you thought was
4  free?
5     A.  That was what was in the goody bag, that stuff,
6  the gel packs, whatever, creams and stuff.
7     Q.  Okay. Last page it says, "Home Exercise,
8  Ms. [redacted] will be instructed to subtle stretching and
9  range of motion exercises as tolerated to speed
10 healing." Did he give you any kind of information about
11 stretching or range of motion exercises for at home?
12    A.  No.
13    Q.  Okay. And then there's a diagnosis, okay.
14        So at best, you had a conversation with this
15 guy and then he sent you for x-rays?
16    A.  Yeah. He lied so much. That's so -- no. And
17 I'm really sitting here thinking hard, no, none of that.
18 Majority of that stuff did not happen.
19    Q.  The only thing that happened was the
20 conversation and the vitals?
21    A.  Yeah, and the x-ray.
22    Q.  And the x-ray.
23    A.  And the goody bag, that's it.
24    Q.  Okay. How much time did you spend talking to
25 the doctor on that visit; do you remember?