*Exhibit 18*

Page 1

1  INSURER:  STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY
2  INSURED:  [redacted]
3  DATE OF LOSS: 9/5/2017
4  CLAIM NO: 59-1435-F16
5  _____
6
7       EXAMINATION UNDER OATH
8            OF
9       [redacted]
10      Taken on behalf of the Insurer.
11      EXAMINATION TAKEN ON:
        TUESDAY, OCTOBER 31, 2017
12      9:30 A.M. - 1:25 P.M.
13      EXAMINATION TAKEN AT:
        KENDALL EXECUTIVE SUITES
14      12485 SOUTHWEST 137TH AVENUE
        SUITE 212
15      MIAMI, FLORIDA 33186
        REPORTED BY: JONI KAHN
16      JOB#: J0679741
17
18
19
20
21
22
23
24
25

Page 2

1  APPEARANCES:
2  ON BEHALF OF THE INSURER
3     ANGELA C. VALDIVIESO, ESQUIRE
       ROIG LAWYERS
4      1255 S. MILITARY TRAIL
       SUITE 100
5      DEERFIELD BEACH, FLORIDA 33442
       PHONE:  954 462-0330
6
7  ON BEHALF OF THE INSURED
8     ADRIENNE ARMAS, LEGAL ASSISTANT (By phone.)
       WARD LAW GROUP, PL
9      7975 NORTHWEST 154TH STREET
       SUITE 306
10     MIAMI LAKES, FLORIDA 33016
       PHONE:  305 209-0613
11
12 ALSO PRESENT: STEPHANIE PRESTA, CLAIMS SPECIALIST
              MARIA VELESCO, INTERPRETER
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1             - - -
2            INDEX
3             - - -
4
5  WITNESS:
6  [redacted]
7
8
9
10
11
12            - - -
13          EXHIBITS
14            - - -
15
16 INSURER'S        DESCRIPTION         PAGE
17   1              License              9
     Composite 2    9-13 Claim Form     30
18   3              Photos              49
19       *** ALL EXHIBITS ATTACHED ***
20
21
22
23
24
25

Page 4

1      EXAMINATION OF [redacted]
2      TAKEN TUESDAY, OCTOBER 31, 2017
3            - - -
4    Examination taken before Joni Kahn, Court Reporter
5  and Notary Public in and for the state of Florida at
6  large, in the above cause.
7            - - -
8       THE COURT REPORTER:  Raise your right hand,
9  please.
10      (OATH ADMINISTERED.)
11      THE WITNESS:  I do.
12 Thereupon,
13      [redacted]
14 Having been first duly sworn or affirmed, was examined
15 and testified as follows:
16          DIRECT EXAMINATION
17 BY MS. VALDIVIESO:
18   Q.   Good morning, my name is Angela Valdivieso
19 and I represent State Farm Insurance Company.
20      I have been asked to take your examination
21 under oath regarding an accident that took place in
22 September 2017.
23      Were you involved in an accident in
24 September?
25   A.   Yes.

Page 21

1  Q. Was he injured?
2  A. No.
3  Q. You did not have any passengers, right?
4  A. No.
5  Q. Did he have any?
6  A. No.
7  Q. Were both vehicles drivable from the scene of
8  the accident?
9  A. Yes.
10 Q. Where did you go from there?
11 A. I made a turn on 132nd Avenue to wait for the
12 police.
13    The young man also did the same thing. Both
14 of us were waiting for the police.
15 Q. Once the investigation was completed, what
16 did you do?
17 A. I called work and I told my boss that I had
18 an accident and then I went to work.
19 Q. Did you go immediately to work from the scene
20 of the accident?
21 A. Yes.
22 Q. Were you able to work for the rest of the
23 day?
24 A. On that day thank God I didn't have a lot of
25 work and besides I didn't feel a lot of pain, a lot of

Page 22

1  discomfort.
2  Q. Did you do anything, when you got home that
3  night?
4  A. No.
5  Q. When did you begin to have some pain?
6  A. It was during the days of the hurricane and
7  my husband kept on telling me "You have to go and see a
8  doctor" because the pain began to get worse.
9  Q. What day of the week was the accident?
10 A. September 5, 2017.
11 Q. I show September 5th was a Tuesday, do you
12 remember it being a Tuesday?
13 A. Yes.
14 Q. I show that Hurricane Irma was on September
15 10th, Sunday, is that what you remember as well?
16 A. Yes.
17 Q. Did you seek any medical care between
18 September 5th and September 10th?
19 A. No.
20 Q. Why not?
21 A. Because I was not in a lot of pain.
22 Q. Do you and your husband have a home or is it
23 a condominium?
24 A. A home.
25 Q. What type of hurricane preparation did you

Page 23

1  need to do for your home?
2  A. My husband installed the shutters and that
3  was it.
4  Q. Did you stay in your house for the hurricane?
5  A. Yes.
6  Q. At what point did you consider getting
7  checked out medically?
8  A. When I went back to work there was a lot of
9  work load because many people went to get their nails
10 fixed as a result of the hurricane.
11 Q. When did you return to work?
12 A. When was the hurricane, on the 10th?
13    I went to work on Thursday.
14 Q. So would that be four days after the
15 hurricane?
16 A. Yes.
17 Q. Did you return to work or go to a doctor
18 first?
19 A. I went to work and on that day the pain was
20 unbearable so I called the attorney and he told me to go
21 to the clinic.
22 Q. Did you call 411-PAIN?
23 A. No.
24 Q. Did you research or investigate in any way
25 what doctor to go to?

Page 24

1  A. I was in the car and I heard the radio and
2  that is when I heard the AD about this office.
3  Q. Which office?
4  A. That of -- let me see the name here.
5  Q. Did you hear the AD of the clinic or of the
6  attorney?
7  A. Of the attorney.
8  Q. The first day that you went to the clinic and
9  you filled out paperwork it would have asked you if you
10 had an attorney.
11    Did you disclose on that first day at the
12 clinic that you did have an attorney?
13 A. No.
14 Q. Why?
15 A. No, because I called the attorney's office
16 and a person arrived there and talked to me.
17 Q. Where did the person from the attorney's
18 office meet with you?
19 A. At the therapy office.
20 Q. Who came to meet you at the therapy office?
21 A. From the attorney's office.
22 Q. Who came to meet you from the attorney's
23 office at the therapy location?
24 A. Do you want the name?
25    Let me see if I can find the name --

Page 25

1  Jonathan.
2    Q.   Is Jonathan an attorney?
3    A.   I don't know if he was an attorney or same as
4  him.  (Indicating person on phone.)
5         (Brief recess was had.)
6  BY MS. VALDIVIESO:
7    Q.   Before the break you were telling me that
8  somebody from the attorney's office met you at the
9  clinic, but your answer got cut off from the interpreter
10 accidentally dropping the phone.
11        So let's go back through that.
12        We have the representative, Mr. Armas, from
13 your attorney's office back on the phone.
14        Who met you from the attorney's office at the
15 clinic?
16   A.   A gentleman whose name was Jonathan.
17   Q.   Was it your understanding that Jonathan was a
18 legal assistant similar to the person appearing
19 telephonically today for you?
20   A.   At that point he told me that he was
21 representing the attorney's firm.
22   Q.   Do you mean when Jonathan met you at the
23 clinic he told you at that time he was there on behalf
24 of your lawyer?
25   A.   The office of the attorney.

Page 26

1    Q.   How did you choose Ceda Clinic or who chose
2  them for you?
3    A.   He is the one that told me "Go to this clinic
4  and we will meet there."
5    Q.   Were you familiar with Ceda Clinic or did you
6  just go there because Jonathan told you to?
7    A.   Yes.
8    Q.   Did you know Jonathan?
9    A.   No.
10   Q.   Did you fill out paperwork at the clinic that
11 first day?
12   A.   He filled them out for me.
13   Q.   Do you mean that Jonathan filled out your
14 paperwork for you?
15   A.   Yes.
16   Q.   Did he fill out the law office paperwork for
17 you or the clinic paperwork for you?
18   A.   The paperwork that came from his law office.
19   Q.   Where did you meet with him?
20   A.   At Ceda.
21   Q.   Where did you meet with him inside Ceda?
22   A.   In an office.
23   Q.   Who let you and Jonathan go back to an office
24 to meet?
25   A.   A younger girl from Ceda.

Page 27

1    Q.   Did she appear to recognize Jonathan?
2    A.   I didn't become aware.
3    Q.   Who approached the lady at Ceda in order to
4  get access to the room?
5    A.   Jonathan.
6    Q.   Had you filled out any paperwork for the
7  clinic, before Jonathan arrived?
8    A.   No.
9    Q.   Who arrived to Ceda first, you or Jonathan?
10   A.   Jonathan.
11   Q.   Tell me what happened when you first saw
12 Jonathan.
13   A.   He introduced himself to me and he told me
14 that I was going to be taken care of there and then he
15 took me to that office.
16   Q.   Did anybody photograph your vehicle at Ceda
17 Clinic?
18   A.   Not at Ceda.
19   Q.   I am asking if anybody took photographs of
20 your truck that was involved in this accident that first
21 day that you went to Ceda.
22   A.   No.
23   Q.   Who took photographs of the damage to your
24 car for your case?
25   A.   I took them.  When I arrived home I took the

Page 28

1  photo and I sent them to Jonathan.
2    Q.   What day was that?
3    A.   I don't remember the date of the first day
4  that we went to the clinic.
5    Q.   Earlier you testified that you returned to
6  work on Thursday, do you think that you went to the
7  clinic before or after that time?
8    A.   I went to work first.
9    Q.   Do you think that you went to work on
10 Wednesday or on Thursday or when was it?
11   A.   Thursday.
12   Q.   How do you recall that?
13   A.   Because at home my phone failed and I wanted
14 to call work to find out if there was going to be work.
15        So I never got in touch with them until they
16 told me to return.
17   Q.   Would your nail salon have a record
18 confirming you didn't return to work until Thursday,
19 9-14?
20   A.   They don't keep records, but they do know the
21 day that they opened after the hurricane.
22   Q.   Was the nail salon closed on Wednesday?
23   A.   We open on Tuesdays, Wednesdays, Thursdays,
24 Fridays and Saturdays, but that week we didn't open --
25 but that week we opened on Tuesday and Wednesday.

Page 49

1  marked Insurer's Exhibit 3.)
2  BY MS. VALDIVIESO:
3     Q.   Do you recognize anybody else on this page
4  that has been marked as Exhibit 3?
5     A.   I think she.
6     Q.   What individual are you indicating on Exhibit
7  3, when you say "she?"
8     A.   Number six.
9     Q.   Tell me everything that happened that first
10 day when you went to Ceda in terms of your contact with
11 the gentleman that is marked number five on Exhibit
12 Number 3.
13    A.   He sent me to have xrays taken and then he
14 sent me to therapy.
15    Q.   Is that a complete description as to the
16 entirety of your contact with him that first date of
17 service?
18    A.   During that first day?
19    Q.   Correct.
20    A.   Yes.
21    Q.   So when you first met with him -- and I am
22 speaking of the gentleman in photograph five on Exhibit
23 3 -- he greeted you and then he immediately sent you for
24 xrays, correct?
25    A.   Not that fast.

Page 50

1     Q.   I want to know everything that happened.
2          Tell me everything that you remember about
3  your interaction with him, please.
4     A.   Okay, he asked me how much pain that I was
5  feeling, where I was feeling the pain and meanwhile he
6  was taking notes.
7          Thereafter he sent me to have the xrays.
8          He told me that that was to find out what was
9  going on with my spine.
10         Later he told me that he was going to send me
11 to have therapy.
12         Before sending me to receive therapy he first
13 read the xrays in order to find out what was wrong and
14 thereafter he sent me to have the therapy.
15    Q.   Besides having a discussion with you and
16 sending you for xrays, then reviewing your xrays with
17 you, did you have any other contact with him that first
18 day?
19    A.   He sent me to have -- I don't know, it was
20 with this little device all over my spine.
21         I don't know what you call that.
22    Q.   Are you talking about as part of the process
23 of the therapy?
24    A.   That is the first day when he sent me to
25 receive therapy.

Page 51

1          He is the one that applied that little device
2  on my spine.  That was another interaction that I had
3  with him.
4     Q.   Are you talking about the clicking device
5  that is sometimes called an adjuster?
6          It is basically a clicking device that he
7  says that will adjust your spine.
8     A.   That's right.
9     Q.   Besides him using the clicking device to
10 adjust your spinal column as part of the physical
11 therapy process, did you have any physical contact with
12 him besides that on the first date?
13    A.   Oh, no -- no, no, no, not that first day, not
14 anymore.
15         That is when he told me that I was going to
16 have 42 therapy sessions.
17         At the beginning, I had five days of therapy
18 per week and then he reduced them to three days per week.
19    Q.   Did he tell you on the first day that you
20 would need 42 days of therapy?
21    A.   42 therapies.
22    Q.   In other words, did he tell you on that first
23 date that you would be going to the clinic 42 times?
24    A.   Yes.
25    Q.   Did that sound like a lot to you?

Page 52

1     A.   I don't know.
2          They are the ones that know.
3     Q.   Before you go to therapy, did he touch you in
4  any way?
5     A.   No.
6     Q.   Before you go to the therapy, did he perform
7  any type of a physical examination on you?
8     A.   Yes, he touched me with a little hammer on my
9  knees and asked me what I felt.
10    Q.   Did he tell you on the first day that he was
11 going to refer you for an MRI?
12    A.   I don't remember if it was that first day.
13    Q.   Did he refer you for an MRI?
14    A.   Yes.
15    Q.   Didn't you get an MRI the very next day or
16 could that date be incorrect?
17    A.   I remember going quickly.
18    Q.   You mean that you recall going to the MRI
19 facility very soon after the very first time that you
20 went to Ceda Clinic?
21    A.   Yes.
22    Q.   Did anybody at Ceda Clinic tell you that they
23 had a financial interest in the MRI facility that they
24 were sending you to?
25    A.   No.

Page 61

1  A.  Not like that as she has specified.
2  Q.  Do you feel that that description would be an
3  exaggeration of your condition?
4  A.  Yes.
5  Q.  Did your therapy change in any way, after you
6  met with her or did it continue on the same?
7  A.  No, the same.
8  Q.  Did she prescribe any medications or talk to
9  you about any side effects of medications, when you met
10 with her?
11 A.  Yes, she prescribed me pain killers.
12 Q.  What kind of pain killers did she prescribe
13 and did she tell you about the side effects?
14 A.  I don't remember the name, but the pain went
15 away with them.
16 Q.  Did anybody describe the 20 percent
17 co-payment responsibility that you had for your medical
18 bills?
19 A.  No.
20 Q.  If you knew about the patient responsibility
21 to pay 20 percent of the bills, would you want to know
22 how much your medical bills were at Ceda and at the MRI
23 facility?
24 A.  I was not able to pay 20 percent, I wasn't.
25 Q.  Did anybody discuss it with you?

Page 62

1  A.  No, they only told me that that was covered
2  by liability or something like that of my insurance.
3  Q.  Besides someone describing that your own
4  insurance would pay your medical bills, did anybody
5  explain to you that you had the responsibility for 20
6  percent of the medical bills?
7  A.  No.
8  Q.  Do you have any idea how much your medical
9  bills are?
10 A.  No.
11 Q.  Did anybody at the clinic give you a goody
12 bag that had some medical supplies in it or creams or
13 anything like that?
14 A.  Yes.
15 Q.  Were there little ketchup-size packets of
16 sample size creams in there for you?
17 A.  Yes.
18 Q.  Did the front desk explain to you that if you
19 liked it to let her know and she could sell you the
20 cream?
21 A.  Yes, and I had to purchase them.
22 Q.  Was it your understanding that the goody bag
23 was complimentary?
24 A.  Yes.
25 Q.  Did you expect that you or your insurance

Page 63

1  company would be charged for that goody bag?
2  A.  I understand that there is no free lunch,
3  nobody gives you gifts.
4  Q.  Did you think that somebody would be charged
5  for sample pain creams?
6  A.  Not charge me.
7  Q.  In other words, was it your understanding
8  that there would be no charge for the pain creams that
9  she explained that she would later sell to you, if you
10 liked them?
11 A.  Yes -- no, I never thought that they were
12 going to charge me for those samples.
13 Q.  Did you receive any type of promotion or
14 incentive to treat at either Ceda or the MRI facility.
15 A.  No.
16 Q.  Did you ever go to Ceda on a Saturday?
17 A.  No.
18 Q.  How long would you normally be there for your
19 therapy?
20 A.  Around 45 or 40 minutes.
21 Q.  Did you ever go on a vibrating machine there?
22 A.  Yes.
23 Q.  Did you stand on it or sit on it?
24 A.  I sat on a chair and I only set the leg where
25 I felt pain on it.

Page 64

1  Q.  Did anybody explain to you the purpose of
2  that machine or the benefit of that machine?
3  A.  Yes.
4  Q.  What did they tell you?
5  A.  That it was good for my leg nerves.
6  Q.  Did you feel that that therapy on the
7  vibrating machine was helping you, hurting you or having
8  no impact?
9  A.  It helped a lot.
10 Q.  You already testified that on the first visit
11 the gentleman show in photograph number five told you
12 that first day that you needed to come to the clinic 42
13 times, right?
14 A.  Yes.
15 Q.  Did you ask him if you would have to go 42
16 times?
17 A.  No.
18 Q.  Did you wonder how he knew that first day
19 that you would need to come 42 times?
20 A.  No, because since the first day I felt so
21 good with the therapy that I thought that it was normal.
22 Q.  Within a couple of visits of going to Ceda
23 Clinic and getting therapy you were already reporting
24 that you were feeling much better, right?
25 A.  Well, they always asked me the pain level