*Exhibit 21*

EXAMINATION UNDER OATH

Date of Loss: August 13, 2016
Claim No.: 59-951M-169
Named Insured: ▉▉▉▉▉▉▉▉▉▉

EXAMINATION UNDER OATH OF ▉▉▉▉▉▉▉▉▉▉

OCTOBER 21, 2016
11:15 A.M. TO 12:45 P.M.

JONTIFF & JONTIFF
3550 BISCAYNE BLOULEVARD
SUITE 706
MIAMI, FLORIDA 33137

REPORTED BY:
Aaron Arcella, Reporter,
a Notary Public for the State of
Florida at Large



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

10-21-2016

**Page 2**

```
 1           APPEARANCES OF COUNSEL
 2  ON BEHALF OF THE PLAINTIFF.
 3     JONTIFF & JONIFF, PA
       3550 Biscayne Boulevard, Suite 706
 4     Miami, Florida 33137-3857
       Office: Office: 305-674-1099
 5     Email: Scott@Jontiff.com
       BY: SCOTT JONTIFF, ESQUIRE
 6
    ON BEHALF OF THE DEFENDANT
 7
       Kubicki Draper
 8     25 W Flagler St Ph
       Miami, FL 33130-1712
 9     Office: 305-374-1212 x6714
       Email: Smk@Kubickldraper.com
10     By: SAMANTHA KETANT, Esquire/Adjustor
```

**Page 3**

```
 1           INDEX OF EXAMINATION
 2  WITNESS:
 3                        PAGE
 4  DIRECT EXAMINATION
       By Ms. Ketant              5
```

**Page 4**

```
 1           INDEX OF EXHIBITS
 2  DEFENDANT'S
    EXHIBITS    DESCRIPTION            PAGE
 3
       1    copy of the EUO request     8
 4
       2    copy of the driver's license 9
 5
       3    Document                    85
 6
       4    Document                    88
 7
       5    Document                    92
```

**Page 5**

         EXAMINATION UNDER OATH OF
             OCTOBER 21, 2016
    THEREUPON,

    having first been duly sworn was deposed and testified
    as follows:
             DIRECT EXAMINATION
    BY MS. KETANT:
 9    Q   Good morning. We are here for an Examination
10  Under Oath. Did you receive or have a chance to review
11  the Notice that was sent to you to advise you to come
12  here today?
13    A   Yes.
14    Q   And what did you bring in response to the
15  Notice?
16    A   I didn't bring anything.
17    Q   Why is that?
18    A   Cause I have my attorney. He has everything.
19    Q   So your attorney has all of the documents we
20  requested?
21    A   Yes.
22    Q   So are you stating you have all of these
23  items?
24    A   I did not.
25    Q   Okay. So you had at least three documents



UNIVERSAL COURT REPORTING    877.291.3376    www.UCRinc.com

10-21-2016

### Page 38

1  Q   But when you said it came out, it came out of
2  the --
3  A   Not from the bottom, from the top part.
4  Q   -- oh, the top part of the metal?
5  A   Uh-huh.
6  Q   But that didn't connect with any of your body?
7  A   The head.
8  Q   So the metal rods --
9  A   Yeah, like, you could see them.
10 Q   -- scraped your head?
11 A   They didn't scrape my head, cause, but you
12 could see them, like, pointing out from the cushion.
13 Q   From the cushion, but it didn't connect with
14 your body?
15 A   It hit my head but it didn't, it didn't scrape
16 my head.
17 Q   Oh, so the metal cushions hit your head?
18 A   Yeah.
19 Q   But no scraping markings?
20 A   No.
21 Q   Nothing. And you don't have any bruises or
22 scratches?
23 A   I couldn't see myself if I had any bruises at
24 that time.
25 Q   Did you explain that to the doctor you visited

### Page 39

1  at the clinic?
2  A   I did, uh-huh.
3  Q   And they didn't do an examination, or mark
4  that in your --
5  A   They checked my back, I mean, the back of my
6  head and they did X-rays, so.
7  Q   But he didn't tell you there was any scarring
8  or bruising?
9  A   No.
10 Q   Okay. Going back to the night of the
11 accident. So you took the two Advil's; you stayed at
12 your brother's house; but then you left your brother's
13 house?
14 A   Uh-huh.
15 Q   Then when you went home, you were still in
16 pain? And the pain level?
17 A   Around the same, nine.
18 Q   The same, nine?
19 A   Uh-huh.
20 Q   And you didn't feel, ten being excruciating,
21 having to go to the hospital, you didn't feel the need
22 to go to urgent care or the
23 E.R.
24 A   No. No, I was able to walk, so I was, I
25 didn't see the reason to go to urgent care.

### Page 40

1  Q   But you were still in pain?
2  A   So I waited for Monday, since I was already
3  scheduled, I waited for Monday.
4  Q   When you say ?already scheduled,? how? What do
5  you mean by ?already scheduled??
6  A   I call 1-800-411-PAIN.
7  Q   When did you call 1-800-411-PAIN?
8  A   The day of the accident.
9  Q   What time? In the sequence of events?
10 A   In the sequence, 5:00 p.m.
11 Q   So while you were waiting at the accident
12 scene?
13 A   While I was waiting for police.
14 Q   How did you know to call 1-800-411-PAIN?
15 A   From all the commercials they put all the
16 time. It was the first thing that came to my head
17 because I was in pain.
18 Q   And do you recall who you spoke with?
19 A   No.
20 Q   So when you called 411-PAIN, they just gave
21 you the name of a clinic to go to?
22 A   Yes. They sent me, they scheduled me and
23 everything.
24 Q   So when you called in, she already gave you an
25 appointment at a clinic?

### Page 41

1  A   Well, no. They told me that someone was going
2  to call me from a clinic, and I guess she contacted Seda
3  Health which is a clinic where I'm going to get my
4  therapy, and they called me and they asked me, do you
5  want to come in on Monday and I go, yes.
6  Q   What time, I'm sorry. What time did Seda call
7  you? Because from the 5:00 phone call?
8  A   Right after the accident.
9  Q   Meaning?
10 A   I'm not sure if it was Seda or if it was 411-
11 PAIN. Someone called me back just to make sure that if
12 it was okay for me to go Monday.
13 Q   You didn't ask who the person was, where they
14 were calling from?
15 A   We're calling you from 411-PAIN regarding the
16 accident you just had, to go to Seda.
17 Q   So it was from 411-PAIN, because you said you
18 didn't know if it was Seda or 411-PAIN that made the
19 appointment?
20 A   Well, that's what I don't know, like, they
21 told me you contact 411-PAIN, you just had an accident,
22 and you are scheduled to go to Seda Health on Monday.
23 What time is good for you? And I go, the sooner the
24 better.
25 Q   So what --



10-21-2016

42

1   A   I didn't ask if they were calling from Seda or
2   from 411-PAIN and they referred me to my attorney.
3   Q   The same person that called you back?
4   A   No, the first time.
5   Q   I'm sorry, I just want to make sure I
6   understand?
7   A   The first time I called 411-PAIN, they
8   referred me to my attorney.
9   Q   Okay.
10  A   And I told them what was my pain, and they
11  told me they were going to contact a clinical, and they
12  were going to call me with a, with an appointment, for
13  the following day, which it was Monday, because Sunday
14  they were closed.
15  Q   But they called you back?
16  A   They called me back.
17  Q   On that Saturday?
18  A   Yes.
19  Q   Okay, that's fine. When did you call State
20  Farm?
21  A   I did not.
22  Q   Why is that?
23  A   I let my attorney handle it.
24  Q   Oh, so your attorney is the one who reported
25  the loss for you?

43

1   A   Uh-huh.
2   Q   So your attorney was the one that explained
3   the facts of the loss and how the accident occurred to
4   State Farm?
5   A   Yes.
6   Q   Did you ever speak with anyone at State Farm?
7   A   No.
8   Q   Did you receive any letters, or did your
9   attorney give you any letters from State Farm?
10  A   Yes, he's keeping me updated.
11  Q   No, letters or correspondences sent from State
12  Farm to you. Did you ever read them?
13  A   No.
14  Q   Okay. And again, you have never seen a copy
15  of the crash report?
16  A   No.
17  Q   Is your brother seeking treatment?
18  A   Yes.
19  Q   Okay. Now with regards to your appointment
20  with Seda, is Seda's location close to where you reside
21  or work?
22  A   It's, it's not far. It's a couple of miles.
23  Q   Where is the Seda location located?
24  A   22nd Avenue, Flagler Street.
25  Q   And when you say a couple of miles, a couple

44

1   of miles from where you work or where you live, or both?
2   A   From both. Actually, it's closer from my job.
3   Q   Okay.
4   A   So on my way home I would stop.
5   Q   Do you know the hours where Seda operates? The
6   hours of operation?
7   A   Yes. Monday, Wednesday and Fridays from 10:00
8   to 8:00; Tuesdays and Thursdays from 2:00 to 8:00. And I
9   believe Saturday, 10:00 to 1:00 p.m.
10  Q   Have you ever been to Seda Orthopedic & Health
11  prior to this accident?
12  A   No.
13  Q   Did anyone from 411-PAIN contact you after you
14  started going to Seda Health?
15  A   No.
16  Q   When you arrived at Seda Health, what time was
17  your appointment on that Monday?
18  A   I don't recall.
19  Q   But you went at a scheduled appointment time?
20  A   Yes.
21  Q   Do you recall if it was before you went to
22  work or after you were leaving work?
23  A   No, it was after work.
24  Q   Oh, it was after work?
25  A   It was, like, during hours of work.

45

1   Q   So during hours of work. You would have left
2   work early. Did you tell your boss or supervisor that
3   you were in an accident?
4   A   No.
5   Q   Why is that?
6   A   Because my office is not where my boss?s
7   office is at, so, I didn't feel the need, that I needed
8   to tell him that I got in an accident.
9   Q   Did you have to let anyone know that you would
10  be leaving work early?
11  A   No.
12  Q   Okay. So when you went to Seda for the first
13  time, what, I guess I'll break this down so it's easier.
14  When you first appeared at Seda, what happened? Like,
15  walk me through the sequence of when you first arrived
16  at Seda Health Facility?
17  A   Filled out, filled out a bunch of paperwork.
18  Q   What was the paperwork that you filled out?
19  A   My medical history, asking questions if I
20  suffer from any medical problems that I have, and my
21  personal information.
22  Q   Did anybody explain to you the forms you were
23  filling out?
24  A   Yes.
25  Q   And who was that?



UNIVERSAL COURT REPORTING

877.291.3376
www.UCRinc.com