*Exhibit 30*

## Page 1

```
 1        IN THE CIRCUIT COURT OF THE
          ELEVENTH JUDICIAL CIRCUIT, IN AND FOR
 2            MIAMI-DADE COUNTY, FLORIDA
              Case No:  [redacted]
 3   FLORIDA WELLNESS & REHABILITATION
     CENTERS, INC. a/a/o [redacted],
 4
           Plaintiff,
 5
     vs.
 6
     STATE FARM MUTUAL
 7   AUTOMOBILE INSURANCE,
     Company,
 8
           Defendant.
 9   _____/
10            DEPOSITION OF
11            DR. ROY CANIZARES
12
13       TAKEN ON BEHALF OF THE DEFENDANT
14
15            Thursday, April 3, 2014
16
17            10:00 a.m. - 11:30 a.m.
18
19              2750 Coral Way
20                Suite 202
21            Miami, Florida, 33145
22
23       Stenographically Reported By:
24        Paul C. Haferling, RPR, FPR
25              - - - - -
```

## Page 2

```
 1             APPEARANCES
 2   On Behalf of the Plaintiff:
 3       TRAVIS GREENE, ESQ.
         950 South Pine Island Road
 4       Suite A-150
         Plantation, Florida, 33324
 5       APPEARED TELEPHONICALLY
 6
 7   On Behalf of the Defendant:
 8       GOLDSTEIN LAW GROUP
         100 Northeast 3rd Avenue,
 9       Suite 700
         Fort Lauderdale, Florida, 33301
10       954-767-8393
         BY:  ANDREA MACK, ESQ.
```

## Page 3

```
                                          Page
 1         INDEX OF PROCEEDINGS
 2   Deposition of Dr. Roy Canizares          Page
 3   Direct Examination by Ms. Mack            4
 4
 5   Certificate of Oath of Witness           61
     Certificate of Reporter                  62
 6
 7
           Defendant's Exhibits
 8
     1    File                21
 9   2    Forms               42
     3    Initial Reports     49
10   4    May 7 Report        54
     5    A Document          59
11
     (EXHIBITS WERE RETAINED BY ANDREA MACK, ESQ.)
```

## Page 4

```
 1   Deposition taken before Paul Haferling, Registered
 2   Professional Reporter, Florida Professional Reporter,
 3   and Notary Public in and for the State of Florida at
 4   Large, in the above cause.
 5                  * * * * *
 6   Thereupon,
 7       THE COURT REPORTER:  Do you swear or affirm the
 8   testimony you are about to give will be the truth, the
 9   whole truth, and nothing but the truth?
10       THE WITNESS:  Yes.
11   Thereupon,
12           DR. ROY CANIZARES,
13   having been first duly sworn, was examined and testified
14   as follows:
15           DIRECT EXAMINATION
16   BY MS. MACK:
17       Q.  Good morning, this is Andrea Mack, I represent
18   State Farm in Florida Wellness and Rehab Centers as an
19   Assignee of [redacted] versus State Farm, which is
20   case number [redacted].  We are here today to take
21   your continuation of a deposition that was originally
22   conducted by Steven Litvack of my firm on December 10,
23   2013.  In that deposition we incorporated the background
24   information from another deposition of Florida Wellness
25   as an Assignee of [redacted], so we are
```

Page 49

1 Rehabilitation. So rehabilitation is what we do here.
2 The patient deals with those types of modalities. So if
3 you deal with -- let's say I'm going to put dentistry
4 there, and it does not fit my type of practice, putting
5 we're going to do molar one or extract molar two, I'm not
6 going to put any of that literature in any forms because
7 we -- that's not our area of practice.
8    Q.  Are there any therapies that are performed at
9 or were performed at Florida Wellness that are not listed
10 under this paragraph?
11    A.  I have to check for that. Most of them fall
12 under there. In this particular case, I think everything
13 is in that -- in this patient's file -- in that
14 paragraph.
15    Q.  I'm going to hand you a series of four other
16 initial reports. I will attach them as Defendant's
17 Exhibit Composition 3.
18       (Defendant's Exhibit 3, initial reports, was
19 marked for identification.)
20 BY MS. MACK:
21    Q.  And they are dated. I redacted the patients'
22 names for HIPAA purposes. The reports are dated November
23 3, 2008, July 9, 2008, September 10, 2009 and January 2,
24 2009. I am handing them to Dr. Canizares, and on the
25 last page or second to last page under Treatment Plan,

Page 50

1 the treatment plan, the second paragraph under Treatment
2 Plan always begins with the exact same language,
3 "Treatment consists of specific subjective procedures of
4 vertebral subluxation complexes." Then it lists the
5 areas using "high velocity, low amplitude procedures,
6 cryotherapy, heat therapy, mechanical traction, trigger
7 point therapy, neuromuscular reeducation, ultrasound
8 therapy, EMS, et cetera, an instructions for home care
9 with the purpose of improving impaired function to
10 maximum clinical-improved status." Would you agree that
11 it is the same in each of these reports?
12    A.  Yes. We do rehab so we -- I will go back to
13 the dentistry. We would not put anything that a dentist
14 would do on our forms. We do rehab.
15    Q.  So on each patient, do you list each therapy
16 that can be potentially performed at Florida Wellness?
17    A.  Yes, yes. We put what we do, rehab.
18    Q.  Just a few more. Let's go to 4/22/2010.
19    A.  4/22 -- 6/22?
20    Q.  4/22, Do you have another copy there?
21    A.  Yes, I have it here.
22    Q.  Is there any way to determine from the report
23 of 4/22/2010 the level of severity of the patient's neck
24 pain?
25    A.  No. At this moment, and we don't -- we do

Page 51

1 generalize now. On our pain scales, we used to try a
2 little more specific on each one of them. We find it
3 just better just to do a generalization today. What we
4 do now in this case -- back then we do a little more. In
5 this case, the neck was an 8.
6    Q.  On 4/22?
7    A.  Yeah. As an 8, underneath the N -- it was an 8
8 for the neck and 8 for the right and left shoulder.
9    Q.  Can I see where you are looking at?
10    A.  Under the N.
11    Q.  Okay. Under Complaints.
12    A.  Yeah.
13    Q.  So that's an 8. And what else was an 8, you
14 said?
15    A.  The shoulder.
16    Q.  Shoulder.
17       Can you determine what the severity of the
18 upper back pain was?
19    A.  The upper back or -- upper back and middle back
20 were four or five, one of those two.
21    Q.  Do you know which was which?
22    A.  At that date, no.
23    Q.  Can you determine the severity of the right
24 shoulder pain?
25    A.  Eight on both.

Page 52

1    Q.  Under that same sort of top paragraph, there
2 is, "Patient describes pain today," and there is scale of
3 1 through 10.
4    A.  Right.
5    Q.  The 10 is circled, correct?
6    A.  Right.
7    Q.  Which body parts does that refer?
8    A.  That's the lower back.
9    Q.  How do you know that?
10    A.  Well, if you kind of go by the history of the
11 patient from the beginning until now, then you will see
12 which areas were getting better. The lower back was 8.
13 So I don't know what was a 10. It's not the lower back
14 because it says 8 there. So when I can tell by here that
15 the shoulders were 8, the neck was 8. The upper middle
16 back was either 4 or 5. I am not sure what Dr. Yoman
17 is -- it says, "Patient states she had the same pain, and
18 the pain in the right shoulder. Weakness, stiffness.
19 Cannot lift her right arm over head."
20       So maybe that was -- maybe that was the 10. I
21 am not 100 percent. But this gives us some gauge of more
22 or less how they feel that day. The following one 5/11,
23 that was more -- a little bit more specific than he was
24 in his. Actually he was more specific. Dr. Goodrich,
25 not me, Dr. Goodrich was more specific on his follow up a

Page 53

1  couple weeks later.
2      Q.  Let's go to 5/7.
3      A.  5/14.  5/12, 5/11.  Is that an evaluation?
4      Q.  It's a daily note.  Do you need a copy of it?
5  Do you have one?
6      A.  5/11?
7      Q.  Seven.  It would be right after that then.
8      A.  No.
9      Q.  You don't have a record for 5/7?
10     A.  No.
11     Q.  You don't have 5/7?
12     A.  I don't seem to have it.
13     Q.  I'm going to hand you a copy that was produced
14 to us in response to our Request to Produce, and that
15 will expedite things, since we are getting to the end of
16 it.
17         Can you determine from looking at the 5/7
18 report the level of severity of pain to the patient's
19 left shoulder?
20     A.  No.  It does not say here.
21     Q.  Can you determine from looking at the 5/7
22 report the level of severity of pain to the patient's
23 right shoulder?
24     A.  No.  We have to enter this as an exhibit now,
25 right?

Page 54

1      MS. MACK:  Yes.  Let's put it as 4.
2      (Defendant's Exhibit 4, 5-7 report, was marked
3  for identification.)
4      MS, MACK:  The next one, this one will be 5.  I
5  will put a little 5 on it.
6  BY MS. MACK:
7      Q.  5/11/2010?
8      A.  I think I have that one.
9      Q.  You have that one?  Okay.  We going to use it
10 as an exhibit then.
11     A.  I have 5/11.
12     Q.  Is there any way to determine from looking at
13 this record the level of severity of pain to the
14 patient's right shoulder?
15     A.  No, Right shoulder -- he did write "right
16 shoulder getting better."
17     Q.  Do you have any idea, though, whether it was
18 now a 1 out of 10, 2 out of 10, 3 out of 10, 4 out of 10?
19     A.  No.
20     Q.  Was this patient ever referred to any
21 specialist?
22     A.  I did refer the patient to an MRI to get a
23 diagnostic study on 6/22.
24     Q.  Do you know whether she ever underwent the MRI?
25     A.  I believe not, but I have no document here

Page 55

1  saying she did.
2      Q.  Did the patient ever complain of radiating pain
3  from her lumbar spine?
4      A.  It takes awhile to go through the follow up.
5  Numbness and tingling.  No, I don't have -- I don't
6  believe -- the orthopedic tests were positive.  That
7  could be from radiating down the leg or not.  Lumbar,
8  straight leg raisers.
9      Q.  Does it specifically state there was radiating
10 pain?
11     A.  Well, the part of the orthopedic test is
12 straight leg raising is pain radiating down the leg.
13     Q.  Which date of service is that?
14     A.  All of them.  I am looking at 4/22.  We had the
15 first one here.  Let me see the first one here.
16     Q.  Exhibit 2?
17     A.  Exhibit 2.  She did have straight leg positive
18 on lower left and right, which could be indicative of
19 radicular pain, by disk palm.
20     Q.  On 4/21, looking at the daily therapy note, did
21 the patient have any pains/tenderness or myospasm to the
22 deltoid region?
23     A.  On 4/22?
24     Q.  4/21.
25     A.  On the left deltoid.  On the left one at that

Page 56

1  moment that he palpated.
2      Q.  Can I see where you are referring?
3      A.  That is 4/20.
4      Q.  I am asking about 4/21.
5      A.  Okay.  No, there Is nothing there on that.
6      Q.  On 5/7 --
7      A.  We are about to finish up.  I will give you a
8  couple more minutes.  I will explain this real quick
9  before we keep on going with these dates.  Okay?  Where
10 you see the muscle spasms, let's say, go to -- let's go
11 back to 4/21, since that is where we started.  When you
12 see the myospasm and tenderness, that is the actual
13 doctor doing his analysis and palpation before doing the
14 chiropractic manipulation.  So that is the doctor finding
15 with what he is doing for the manipulation.  It's not
16 there for the shoulder or extremities at that moment.  He
17 did not palpate that at that moment.  We don't palpate
18 every patient at every treatment for everything.
19         So the reason why it's not listed on everyone,
20 because that is done on reevaluations.  So on all the
21 reevaluations, there should be pain and tenderness on all
22 the areas that the patient has it.
23     Q.  So if I understand you correctly, sometimes he
24 will palpate on the deltoid region and sometimes he
25 won't?